# UNITED STATES DISTRICT COURT
## Southern District of Florida

| | |
|---|---|
| Double AA International Investment Group, Inc. and Daymi Rodriguez, <br><br> Plaintiffs, <br><br> vs. <br><br><br> Swire Pacific Holdings, Inc., a Delaware Corporation, and Lawyers Title Insurance Corporation, <br><br> Defendants. | **Civil Action No.**   **08-23444-CIV ALTONAGA/BROWN** |

## AMENDED COMPLAINT

Plaintiffs Double AA International Investment Group, Inc, ("Double AA") and Daymi Rodriguez ("Ms. Rodriguez") (collectively, "Plaintiffs") sue Defendants Swire Pacific Holdings, Inc., a Delaware Corporation ("Swire"), and Lawyers Title Insurance Corporation ("Lawyers Title") (collectively, "Defendants") for Declaratory Relief under 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure; for violation of the Florida Deceptive and Unfair Trade Practices Act (only against Swire); and for breach of contract and the covenant of good faith and fair dealing (only against Swire).

The gist of Plaintiffs' action is the recovery of a $232,000.00 deposit (plus interest, costs, and attorney's fees) given to Swire for the purchase of a condominium, half of which Lawyers Title holds in escrow. Swire engaged in deceptive trade practices vis-à-vis the Plaintiffs; it violated Florida's public policy against the unreasonable restraint on the alienation of property; the contract it drafted and which Plaintiffs executed is void for lack of mutuality of remedies; and, lastly, the contract contains an invalid liquidated damages clause.

## I. Jurisdiction and Venue

1.      This Court has jurisdiction under 28 U.S.C § 1332. The Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

2.      Venue is proper in this district as this is where the Plaintiffs reside, where the Defendants regularly conduct business, where the parties executed the contract, and where the property which is the subject of the contract is located.

## II. Parties

3.      Plaintiff Double AA is a corporation registered with the Florida Department of State, its principal address is 8045 NW 7th Street, # 407, Miami, FL 33126. Double AA is a corporate citizen of the State of Florida.

4.      Plaintiff Ms. Rodriguez is a natural person who resides in Miami-Dade County, Florida and is competent to sue.  Ms. Rodriguez is a citizen of the State of Florida.

5.      Defendant Swire Pacific Holdings, Inc., a Delaware corporation, is a foreign corporation registered with the Florida Department of State – Division of Corporations. Its principal place of business is 12634 S. 265th W., Draper, UT 84020. For jurisdictional purposes, Defendant Swire Pacific Holdings, Inc. is a corporate citizen of the States of Utah and Delaware. Swire Pacific Holdings, Inc. is in the business of developing high-rise condominiums for sale to the general public for which it promotes, markets, and sells through both interstate and intrastate instrumentalities of commerce (e.g., mail, telephone).

6.      Defendant Lawyers Title Insurance Corporation is a corporate citizen of the State of Virginia and is registered as a foreign corporation with the Florida Department of State –

Division of Corporations. Its principal place of business is 5600 Cox Road, Glen Allen, VA 23060. Lawyers Title regularly conducts business in the State of Florida as an escrow agent.

### III. GENERAL ALLEGATIONS

**A.    The Payment of Deposits and Violation of Fla. Stat. § 718.202.**

7.     On or around September 20, 2004, the principle of Double AA, Jose Rodriguez, paid $50,000.00 to reserve Unit #3202 at a projected condominium development which Swire planned to build.

8.     Swire's escrow agent, Lawyers Title, provided Mr. Rodriguez with a receipt, acknowledging that Check # 0306 for $50,000.00 had been received as a reservation deposit for Unit #3202. (*See* **Exhibit A**).

9.     On February 2, 2005, Plaintiff Double AA and Defendant Swire entered into a Purchase Agreement ("Agreement") for the purchase of Unit # 3202 in a proposed condominium called Asia, located at 900 Brickell Key Boulevard, Miami, FL 33131. (*See* **Exhibit B**).

10.    Under the terms of the Agreement, the purchaser, Double AA, had to pay an additional $66,000.00 upon execution of the Agreement.

11.    Double AA paid the balance of $66,000.00 under the Purchase Agreement to meet the 10% initial deposit requirement.

12.    Shortly after the execution of the Purchase Agreement, Mr. Rodriguez, on behalf of Double AA, received a copy of an Escrow Deposit Receipt, dated February 3, 2005, acknowledging receipt of an additional $66,000.00 (Check # 5001). (*See* **Exhibit C**).

13.    The Agreement also provided that within 120 days after the date of the Agreement, the purchaser would provide an additional 10% deposit of $116,000.00. (*See* **Exhibit B**).

14.  On or around May 18, 2005, Mr. Rodriguez, on behalf of Double AA, received a copy of an Escrow Deposit Receipt, dated May 17, 2005, acknowledging receipt of the additional 10% deposit of $116,000.00 (Check # 1018). (*See* **Exhibit D**).

15.  By approximately May 18, 2005, Swire, by and through its escrow agent, Lawyers Title, had received from Double AA a total of $232,000.00 in deposits, representing 20% of the purchase price of Unit #3202.

16.  When Double AA, by and through its principle, Mr. Rodriguez, contracted to purchase Unit # 3202 and paid the required deposits, Unit # 3202 was not substantially completed.

17.  Swire is a "developer" under Florida's Condominium Act.

18.  Fla. Stat. § 718.202(1) requires the developer to pay "into an escrow account all payments up to 10 percent of the sale price[.]

19.  Fla. Stat. § 718.202(2) further requires a developer to establish a "special escrow account" for all deposit payments in excess of 10 percent of the sale price and for such monies to be "held in a special escrow account."

20.  As shown by the April 29, 2009 Affidavit of Damaris Rodriguez, Escrow Manager for Lawyers Title Insurance, Swire, by and through its escrow agent, Lawyers Title, failed to establish a "special account" as required under § 718.202(2) for Unit # 3202's deposits in excess of 10% of the sale price. (*See* **Exhibit E**).

21.  As ¶ 3 of Ms. Damaris Rodriguez's Affidavit states: "Once the purchase went to contract, the full deposit, which typically equaled 20% of the purchase price, was transferred to a "special account." (*See* **Exhibit E**).

22.   Swire violated § 718.202(2) by commingling all of the Unit # 3202's deposits (totaling $232,000.00) into a single escrow account and not establishing a special escrow account for the $116,000.00 deposit made on May 18, 2005.

23.   Swire's failure to establish a special escrow account is prima facie evidence of an intentional and willful violation of § 718.202 as stated in § 718.202(7).

24.   Pursuant to § 718.202(5), Plaintiffs provided notice voiding the Agreement on February 24, 2009 and reaffirmed on May 7, 2009. (*See* **Composite Exhibit F**).

**B.     The Condominium and Violations of ILSFDA and FDUTPA**.

25.   Asia is a 33-floor condominium which Swire, a single developer, built on a contiguous parcel and subdivided into more than 100 lots or units (it has 123 condominium units) which were then marketed under a common promotional plan to the public.

26.   The Agreement expressly provides that Swire has until June 30, 2009 to complete construction, or, over four (4) years from the date Double AA signed the contract.

27.   Asia falls under the disclosure requirements of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701, *et. seq.* ("ILSFDA" or the "Act").

28.   Unit # 3202 is a nonexempt lot as defined in the ILSFDA.

29.   Swire did not register Asia, or file a statement of record for Asia, with the U.S. Department of Housing and Urban Development's Office of Interstate Land Sales Registration as the ILSFDA requires.

30.   Prior to the execution of the Agreement, Double AA should have received from Swire, as required under the ILSFDA, a printed Property Report. (*See* 15 U.S.C. § 1703(a)(1)(B) and 24 C.F.R. § 1710.3).

31.   Double AA did not receive the ILSFDA required printed Property Report from Swire.

32.     In addition, the Agreement did not inform Double AA of its rights of revocation under the ILSFDA.  (*See* 15 U.S.C. §§ 1703(b),(c) and (d)).

33.     The Agreement did not contain a description of the lot (unit) which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official in Miami-Dade County, Florida responsible for maintaining land records. (*See* 15 U.S.C. § 1703(d)(1)).

34.     The Agreement did not contain a notice that in the event of Double AA's breach or default of the Agreement Swire would provide Double AA with a notice of such default or breach and the opportunity to cure or remedy the default or breach within twenty (20) days after receipt of the notice. (*See* 15 U.S.C. § 1703(d)(2)).

35.     The Agreement also did not contain a notice that if Double AA lost its right and interest in the unit due to breach or default which occurs after the payment of a deposit in excess of 15%, then Double AA is entitled to a refund of at least 5% under ILSFDA. (*See* 15 U.S.C. § 1703(d)(3)).

36.     Swire's failure to comply with the disclosure requirements of the ILSFDA, including but not limited to the failure to register Asia, to provide Double AA with a printed Property Report, to disclose in the Agreement Double AA's rights of revocation or otherwise comply with the ILSFDA disclosure requirements, is itself a violation of the ILSFDA's prohibitions against employing any device, scheme, artifice to defraud or to engage in any transaction, practice, course of business which operates or would operate as a fraud or deceit upon Double AA, the purchaser.  (*See* 15 U.S.C. § 1703(a)(2)(A) and (C)).

37.     Swire also engaged in a deceptive and fraudulent practice when — through its agent, a woman by the name of Marta Hermida — it informed Double AA's principal (Mr.

Rodriguez) in the Fall of 2007 that he could not sell or transfer the unit (after a potential buyer expressed to Mr. Rodriguez his intent to purchase Unit # 3202) because the agreed selling price of $1,160,000.00 was too low. Swire's agent told Mr. Rodriguez that Swire would only agree to allow him to sell or transfer the unit if the selling price was no less than $1,500,000.00. Swire did not disclose this restriction on Double AA's ability to alienate the property prior to Double AA's execution of the Agreement. (*See* 15 U.S.C. § 1703(a)(2)(B)).

38.    Swire's failures to adhere to the requirements of the ILSFDA constitute a violation of the Florida Deceptive and Unfair Trade Practices Act. ("FDUTPA") (*See* § 501.2105, FLORIDA STATUTES).

39.    Swire's failure to inform Double AA of its restrictions regarding the transfer or sale of the unit before Double AA executed the Agreement is a violation of both the ILSFDA and the FDUTPA. (*See* § 501.2105, FLORIDA STATUTES).

40.    On August 28, 2008 Double AA assigned its rights under the Agreement to Daymi Rodriguez.

41.    Double AA is, however, still obligated under the Agreement pursuant to the terms of the Assignment.

42.    On August 8, 2008, Lawyer's Title, through its agent Hedda Desire, confirmed that Lawyer's Title had received a total amount of $232,000.00 from Double AA and that the money was being held in an Escrow Account at HSBC Bank. (*See* **Exhibit G**).

43.    On October 1, 2008, counsel for Plaintiffs notified the escrow agent, Ms. Desire that the Plaintiffs would be cancelling the Agreement and demanded return of the $232,000.00 escrow amount.

44.    Ms. Desire refused to release the funds to Double AA or Ms. Rodriguez.

45.    On October 14, 2008, counsel for Plaintiffs notified Swire through its agent, Asia's Sales

Director, that the Plaintiffs were cancelling the Agreement and demanded the return of

the deposit. (*See* **Exhibit H**).

46.    On October 14, 2008, Plaintiffs' counsel received a reply letter from Swire's counsel

refusing to return the $232,000.00. (*See* **Exhibit I**).

47.    Plaintiffs have retained undersigned counsel and are obligated to pay a reasonable

attorney's fee.

48.    Plaintiffs have the right to recover attorney's fees under the Agreement and § 501.2105,

FLORIDA STATUTES.

49.    All conditions precedent to this suit have been performed, have occurred, or have been

waived.

### III. CAUSES OF ACTION

### Count I — Declaratory Action Against Defendant Swire

50.    Plaintiffs re-allege paragraphs 1 through 49.

51.    Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201-2202.

52.    There is an actual controversy between the Plaintiffs and the Defendant Swire over the

$116,000.00 that Defendant Lawyers Title holds in escrow.[1]

53.    The matter is ripe for adjudication.

54.    The controversy arises over Plaintiffs and Defendant Swire's competing claims to

$116,000.00 which Lawyers Title holds in escrow.

---

[1] According to the Affidavit of Ms. Damaris Rodriguez, Lawyers Title disbursed, on April 19, 2006, all funds in excess of 10% of the purchase price to Swire for construction purposes.

55.     Plaintiff Daymi Rodriguez is entitled the $116,000.00 because the Agreement violates

Florida law: it lacks mutuality of remedies and the liquidation of damages clause in the

Agreement is a penalty and not a true liquidated damages clause.

56.     Defendant Swire, on the other hand, appears to base its claim for the $116,000.00 on the

default provisions (Paragraph 13) of the Agreement.

57.     Plaintiffs' position is that Paragraph 13 is unenforceable for two reasons: (a) it lacks

mutuality of remedies; and, (b) the liquidated damages clause is, in reality, a penalty

which the Defendant is attempting to exert against the Plaintiffs.

58.     In relevant part, Paragraph 13 provides:

> Default.  If Buyer [Plaintiffs] fails to perform any of Buyer's
> obligations under this Agreement (including making scheduled
> deposits and other payments) Buyer will be in "default".  If Buyer
> is still in default ten (10) days after Buyer receives notice thereof,
> Seller [Swire] shall be entitled to the remedies provided herein. **If,
> however, Buyer's default is in failing to close on the scheduled
> date, then Seller can cancel this Agreement without giving
> Buyer any prior (or subsequent) notification or opportunity to
> close at a later date**.

> Upon Buyer's default (and the expiration of any notice period, if
> applicable), all Buyer's rights under this Agreement will end and
> Seller can resell the Unit [Unit # 3202] without any accounting to
> Buyer.  Buyer understands that because Seller has taken the Unit
> off the market for Buyer, has spent money on sales, advertising,
> promotion and construction and has incurred other costs incident to
> this sale, Buyer's default will damage Seller. As compensation for
> this damage, in the event Seller cancels this Agreement because of
> Buyer's default, Buyer authorizes Seller to keep (or if not then paid
> by Buyer, Buyer will pay to Seller) all deposits . . . Buyer has then
> made . . . and all interest which was, or would have been, earned
> on them, all as liquidated damages (and not as penalty) and as
> Seller's sole and exclusive remedy.  Buyer and Seller agree to this
> because there is no other precise method of determining Seller's
> damages. . . [.]

> If Seller fails to perform any of Seller's obligations under this
> Agreement, Seller will be in "default".  If Seller is still in default

ten (10) days after Buyer sends notice thereof (or such longer time as may be reasonably necessary to cure the default if same cannot be reasonably cured within (10) days), Buyer will have such rights as may be available in equity and/or under applicable law, provided however, that absent an intentional or willful default by Seller under this Agreement, Buyer shall not be permitted to seek specific performance of Seller's obligations under this Agreement.

(*See* **Exhibit A**) (Emphasis in original)

59.   Paragraph 13 — especially when read in conjunction with Paragraphs 26 and 37 — manifests a clear lack of mutuality of remedies. The remedies in the Agreement are not mutual, unequivocal, and reasonable.

60.   Swire's remedies (as described in Paragraph 13) against the Plaintiffs for any purported default are clear, precise, and far-reaching. For example, if the Plaintiffs default by failing to appear at a scheduled closing, Swire is not required to provide any notice and may cancel the Agreement without regard to Plaintiffs' legal or equitable rights. In contrast, the Agreement requires Plaintiffs to provide Swire a default notice regardless of the nature of the default. The language of Paragraph 13 hollows the proper function of a default notice when the Plaintiffs issue it but not when Swire does.

61.   This lack of mutuality in the notice provisions is a glaring example of the lack of mutuality of remedies that permeates the whole Agreement.

62.   The liquidated damages clause in Paragraph 13 is void for it is in fact — despite verbiage to the contrary — a penalty. The 20% penalty is beyond any reasonable amount (as evidenced by the fact that the ILSFDA caps the penalty at 15%); and, Swire's damages are not difficult to determine (despite the language to the contrary).

63.   Plaintiffs request that this Court construe the Agreement and declare Paragraphs 13, 26 and 37 void for lack of mutuality of remedies.

64.     Plaintiffs request that this Court construe the Agreement and declare the liquidated damages clause in Paragraph 13 void and unenforceable because the liquidated damages clause in Paragraph 13 is substantially — despite language to the contrary — a penalty exerted against the Plaintiffs.

65.     Lastly, even if this Court were to find Paragraph 13 enforceable, Plaintiffs request that this Court declare Swire is still not entitled to recover the deposit monies as liquidated damages because Swire has failed to meet the condition precedent under Paragraph 13 — it has not cancelled the Agreement — required for its recovery of liquidated damages.

66.     Plaintiffs request this Court to declare their rights vis-à-vis the legal interests of Defendants Swire and Lawyers Title regarding the $116,000.00 held in escrow.

67.     Plaintiffs further request this Court to declare their rights vis-à-vis Swire for the remainder of the deposits which Plaintiffs paid ($116,000.00) plus accumulated interest.

*WHEREFORE*, Plaintiffs request that this Court enter a declaratory judgment stating that, (1) Swire has no right, interest, or title to the $116,000.00 held in escrow; (2) Lawyers Title must release the escrowed funds, plus any accumulated interest, to Ms. Rodriguez; (3) Plaintiffs are entitled to recover the additional $116,000.00 tendered in deposit plus accumulated interest on the whole $232,000.00; and, (3) awarding Plaintiffs' attorney's fees and costs and any other relief this Court deems just and proper.

### Count II — Declaratory Action Against Swire and Lawyers Title

68.     Plaintiffs re-allege paragraphs 1 through 49.

69.     Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201-2202.

70.     There is an actual controversy between the Plaintiffs and the Defendant Swire over the $116,000.00 that Defendant Lawyers Title holds in escrow.

71.    The matter is ripe for adjudication.

72.    Swire and Lawyers Title refuse to release the $116,000.00 in escrow to the Plaintiffs despite the Plaintiffs properly terminating the Agreement pursuant to § 718.202(1)(a).

73.    Under the plain language of § 718.202(5), Plaintiffs are entitled to "all sums deposited" plus interest.

74.    Swire and Lawyers Title have refused Plaintiffs repeated requests to release the funds in violation of § 718.202(1)(a).

75.    Plaintiffs request this Court to declare their rights, under Fla. Stat. § 718.202, vis-à-vis the legal interests, of Defendants Swire and Lawyers Title, regarding the $116,000.00 held in escrow.

76.    Plaintiffs further request this Court to declare their rights regarding the additional $116,000.00 deposited plus accumulated interest on all deposited sums.

*WHEREFORE*, Plaintiffs request that this Court enter a declaratory judgment stating that, (1) Swire has no right, interest, or title to the $116,000.00 held in escrow; (2) that Lawyers Title must release the escrowed funds, plus any accumulated interest, to Ms. Rodriguez; (3) that Ms. Rodriguez has a right to recover the additional monies paid in deposit ($116,000.00) plus accumulated interest on the whole amount ($232,000.00) as provided in § 718.202(5); and, (4) awarding Plaintiffs' attorney's fees and costs and any other relief this Court deems just and proper.

### Count III — Violation of the FDUTPA Against Defendant Swire

77.    Plaintiffs re-allege paragraphs 1 through 49.

78.    The FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

79.    At all relevant times, Defendant Swire solicited, advertised, and offered to sell property located in this State through the means of both interstate and intrastate instrumentalities of commerce.

80.    At all relevant times, Plaintiffs were consumers as that term is defined in the FDUTPA.

81.    Defendant Swire violated the FDUTPA when it failed to comply with the registration and disclosure requirements of the ILSFDA.

82.    The ILSFDA proscribes deceptive and unfair trade practices in relation to interstate land sales.

83.    Defendant Swire's failure to comply with the registration and disclosure requirements of the ILSFDA is a deceptive trade practice as defined by the FDUTPA.

84.    Defendant Swire also violated ILSFDA's anti-fraud provisions by adopting a method of disposition of lots for the express purpose of evading ILSFDA's disclosure requirements.

85.    Defendant Swire attempted to circumvent ILSFDA's disclosure requirements by claiming the 99 lot exemption applies because it "piggybacked" or "stacked" exemptions to purportedly comply with the 99 lot exemption requirement.

86.    However, Swire's purported exemptions do not comply with the requirements of 15 U.S.C. § 1703(a)-(b).

87.   Swire purposefully disposed and manipulated its sales transactions to evade the disclosure requirements of ILSFDA.

88.   For example, Swire did not contractually obligate itself to build the condominium in 2 years as ILSFDA requires for the 99 lot exemption to apply. (*See* **Exhibit B, ¶ 7**).

89.   Swire purposeful attempt to evade the anti-fraud provisions of the ILSFDA violates the ILSFDA and is a *per se* violation of the FDUTPA.

90.   Swire's attempt to evade the disclosure requirements of the ILSFDA damaged Plaintiffs by depriving them of the full disclosure (and ability to exercise attendant rights) that otherwise would have been available to them under ILSFDA.

91.   In addition, Defendant Swire's failure to disclose to Plaintiff Double AA the requirement that any sale or transfer of the unit to a third-party purchaser required a selling price of at least $1,500,000.00 is a deceptive and fraudulent trade practice as defined by the FDUTPA.

92.   Defendant Swire's deceptive trade practices have damaged Plaintiffs in that Plaintiffs were not fully apprised of their rights or obligations under the Agreement prior to the execution of the Agreement or its assignment.

93.   Had Swire informed Double AA of its restriction on the resale or transfer of the unit (minimum selling price of $1,500,000.00) Double AA would not have executed the Agreement.

94.   Defendant Swire's unfair and deceptive trade practices also include failing to establish a special escrow account, as required under § 718.202(2).

95. The deceptive trade practice inheres in Defendant Swire purporting to convey a condominium without complying with Florida's requirements for conveying or selling a condominium.

96. Such requirements include complying with the establishment of escrow accounts as provided in § 718.202.

97. Plaintiffs' damages arising from Swire's multiple violations of the FDUTPA include, but are not limited to, actual damages in the amount of $232,000.00.

98. Plaintiffs seek legal and declaratory relief under § 501.211, FLORIDA STATUTES, that Defendant Swire's above described conduct constitutes a deceptive and unfair trade practices under FDUTPA.

99. Plaintiffs requests attorney's fees and costs pursuant to § 501.211 and § 501.2105, FLORIDA STATUTES.

*WHEREFORE*, Plaintiffs demand a declaratory judgment that Defendant Swire violated the FDUTPA and an injunction enjoining future violations of the FDUTPA pursuant to § 501.211(1), Florida Statutes, actual damages for violation of the FDUTPA pursuant to § 501.211(2), monetary damages, an award of attorney's fees and costs pursuant to § 501.211(2) and 501.2105 and such other relief that this Court deems just and proper.

### Count IV — Breach of Contract Against Defendant Swire

100. Plaintiffs re-allege paragraphs 1 through 49.

101. Swire breached Paragraph 22 of the Agreement by refusing to allow Double AA to transfer or assign the Agreement to a third-party ready, willing, and able purchaser because the selling price was below $1,500,000.00.

102.    Swire breached Paragraph 4 of the Agreement by failing to establish a "special escrow account" as Fla. Stat. § 718.202(2) requires.

103.    When Swire's agent informed Double AA that it could not transfer or assign the Agreement because the selling price did not meet the minimum requirement, she did not indicate to Double AA that this restriction was temporary.

104.    In preventing Double AA from transferring or assigning its equitable interest in the unit because the selling price was below $1,500,000.00, Swire violated Florida's Rule Against the Unreasonable Restraint on the Alienation of Property.

105.    In violating the Rule Against the Unreasonable Restraint on the Alienation of Property, Swire breached its contractual obligations to Double AA under the Agreement.

106.    Not only is Swire's minimum re-sale price restriction patently unreasonable, it violates Florida's public policy.

107.    Given Swire's initial breaches of contract and of the covenant of good faith and fair dealing (*See* Count V), the Plaintiffs have no obligation to complete the Agreement.

108.    Plaintiff have provided Swire notice of voiding the Agreement under § 718.202(5).

109.    Swire's breach of contract damaged the Plaintiffs.

110.    Plaintiffs damages include, but are not limited to, the loss of the opportunity to regain their $232,000.00 deposit through the sale of the unit to a third-party purchaser for the same price ($1,160,00.00) that they were obligated to pay Swire.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor for actual damages against Defendant Swire, attorney's fees and costs, and any other relief this Court deems just and proper.

### Count V — Breach of the Covenant of Good Faith
### and Fair Dealing Against Defendant Swire

111.    Plaintiffs re-allege paragraphs 1 through 49 and 101 through 105.

112.    Swire breached its covenant of good faith and fair dealing under the Agreement vis-à-vis

Paragraph 22.

113.    Swire unreasonably withheld consent to Double AA's request in 2007 to assign the

Purchase Agreement for Unit # 3202.

114.    Swire's breach of the covenant of good faith and fair dealing damaged Plaintiffs.

115.    Plaintiffs damages include, but are not limited to, the loss of the opportunity to regain

their $232,000.00 deposit through the sale of the unit to a third-party purchaser for the

same price ($1,160,00.00) that they were obligated to pay Swire.

*WHEREFORE*, Plaintiffs request that this Court enter judgment in their favor for actual damages

against Defendant Swire, attorney's fees and costs, and any other relief this Court deems just and

proper.

### IV. JURY TRIAL DEMAND

116.    Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

/s/ Alexander Lian
Alexander Lian (Florida Bar Number: 571271)
Attorney e-mail address:
alian@alexanderlian.com
ALEXANDER LIAN, P.A.
777 Brickell Avenue, Suite 1210
Miami, Florida 33131
Telephone: (305) 381-7910
Facsimile: (305) 381-7135
*Attorney for Plaintiffs Double AA and*
*Daymi Rodriguez*

## Certificate of Service

I hereby certify that on June 11, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____ /s/ Alexander Lian _____

<u>SERVICE LIST</u>

## U.S. District Court
## Southern District of Florida (Miami)
## CASE #: 1:08-cv-23444-CMA

### 08-22662-CIV- ALTONAGA/BROWN

Stephen James Binhak
Greenberg Traurig
1221 Brickell Avenue
Miami , FL 33131
305-579-0862
Fax: 579-0717
Email: binhaks@gtlaw.com
*Attorneys for Swire Pacific Holdings*

Sandra Jessica Millor
Greenberg Traurig
1221 Brickell Avenue
Miami , FL 33131
305-579-0774
Fax: 305-579-0717
Email: millors@gtlaw.com
*Attorneys for Swire Pacific Holdings*

Philip J. Kantor
Quintairos, Prieto, Wood & Boyer, P.A.
One East Broward Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
(954) 523-7008
Fax: (954) 523-7009
Email:  pkantor@qpwblaw.com
*Attorneys for Lawyers Title Insurance Corporation*

Asika Patel
Quintairos, Prieto, Wood & Boyer, P.A.
One East Broward Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
(954) 523-7008
Fax: (954) 523-7009
Email:  apatel@qpwblaw.com
*Attorneys for Lawyers Title Insurance Corporation*

# EXHIBIT A

## RECEIPT

September 20, 20004

TO:   Jose Rodriguez and Daymi Rodriguez
      14252 SW 30 st.
      Miami, FL 33175

Re:   **Project X, a Condominium**

Dear Proposed Purchaser(s):

     This will acknowledge receipt from you of a _Check # 0306_ in the amount of U.S. $_50,000_ representing a deposit under your Reservation Agreement dated _09-20-04_ for Unit No. _3202_ in the above-referenced Condominium. This deposit will be held in accordance with your Reservation Agreement, the Escrow Agreement referred to therein and Florida Statutes, Section 718.202(6).

Sincerely,

LAWYERS TITLE INSURANCE COMPANY

By: _Tyffanie Verman_

9/21/04

# EXHIBIT B

ORIGINAL

Form 09

ASIA, A CONDOMINIUM
AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

In this Agreement ("Agreement"), the term "Buyer" or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" or "Developer" means or refers to Swire Pacific Holdings Inc., a Delaware corporation, and its successors and/or assigns.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition of such word is given in this Agreement, then in the Declaration (as defined in Section 1 of this Agreement).

| | | | |
|---|---|---|---|
| Buyer(s): | Double AA International Investment Group | | |
| Address: | 8045 NW 7th Street, Suite 407 | | |
| City: | Miami | State: | FL |
| Country: | USA | Zip Code: | 33126 |
| Home Phone: | 305-227-9986 | Office Phone: | |
| Tax I.D. No.: | _____ | Fax. No. | 305-227-9987 |
| Email: | | Cellular No. | 305-812-8228 |
| Soc. Sec. No.: | _____ | Other: | _____ |

1. **Purchase and Sale.** Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **3202**, (the "Unit") in the proposed ASIA, A CONDOMINIUM (the "Condominium"), located at approximately 900 Brickell Key Boulevard, Miami, Florida 33131. The Unit and the Condominium are described in greater detail in this Agreement and in the proposed Declaration of Condominium (the "Declaration") included in the Prospectus and attached exhibits (the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement. The foregoing statement shall not be in lieu of the execution of a Receipt for Condominium Documents.

The total purchase price for the Unit is $ **1,160,000.00** (the "Purchase Price").

The Purchase Price also includes the exclusive use of one parking space to be located within the Common Elements of the Condominium Property. At closing, Buyer will receive an assignment of the exclusive right to use such parking space, which, once assigned, shall be a Limited Common Element appurtenant to the Unit. The designated parking space shall be selected by Seller or its designee, in its sole discretion.

2. **Payment of the Purchase Price.** Buyer agrees to make the following payments against the Purchase Price:

| Payment | Due Date | Amount | |
|---|---|---|---|
| Initial 10% deposit | Upon execution of this Agreement | $ | _____ |
| Application of Reservation Deposit (if applicable) | Upon execution of this Agreement | $ | 50,000.00 Received |
| Balance of Initial 10% Deposit | Upon execution of this Agreement | $ | 66,000.00 |
| Additional 10% deposit | 120 days following the date of this Agreement | $ | 116,000.00 |
| Balance | Due at closing | $ | 928,000.00 |
| TOTAL PURCHASE PRICE | | $ | 1,160,000.00 |

Deposits may be made by personal check (subject to clearance), cashier's check or wire transfer of federal funds. All payments must be made in United States funds and all checks must be payable on a bank located in the Continental United States. **The balance due at closing must be paid by wire transfer of good funds or by cashier's check, payable directly to Seller or its designee, or as otherwise directed by Seller, drawn on a Florida bank doing business in Miami-Dade, Broward or Palm Beach County.** Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer by credit card and/or drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing. If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received and cleared by Seller.

Buyer also agrees to pay all costs and other sums required to be paid by Buyer in this Agreement.  At the present time, the costs for which dollar amounts can be computed are:

(a)    $       14,500.00     -        1.25% Development Fee

(b)    $       1,834.41     -        Initial Contribution to the Condominium Association and Master Association

These charges are subject to change as provided in Section 11 of this Agreement and are explained in more detail in that paragraph, as are other costs which cannot be computed at this time.

       3.     How Buyer Pays.  Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing.  This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender.  Buyer will be solely responsible for making Buyer's own financial arrangements.  Seller agrees, however, to cooperate with any lender Buyer chooses and to coordinate closing with such lender, if, but only if, such lender meets the Seller's closing schedule and pays Seller the proceeds of its mortgage at closing.  In the event that lender does not pay Seller these proceeds at closing in immediately cleared funds, and if Seller allows same (which it is not obligated to do), Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared.  Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Buyer's obligation to close "all cash" on the purchase of the Unit.

       Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance).  This late funding charge may be estimated and charged by Seller at closing.  Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request.  The foregoing Section will survive (continue to be effective after) closing.

       4.     Deposits.  Except as permitted below or by the provisions of the Florida Condominium Act, all of Buyer's deposits will be held in escrow by LAWYERS TITLE INSURANCE CORPORATION ("Escrow Agent"), with offices at 200 South Biscayne Boulevard, Suite 2660, Miami, FL 33131, in accordance with the escrow agreement contained in the Condominium Documents.  The escrow agreement is incorporated into this Agreement as if repeated at length here, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

       Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law.  In addition to the foregoing, if Seller has obtained or obtains the approval of the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the Escrow Agent to disburse such deposits to it for all uses permitted by law.  If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer.  Likewise, if such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.

       If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent.  Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.

       At closing, all deposits not previously disbursed to Seller will be released to Seller.  **Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller, and as such, shall not be credited against the Purchase Price of the Unit.**  Buyer further understands and agrees that to the extent that deposit monies are used for construction purposes, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds).  No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest.

       5.     Seller's Financing.  Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium.  Buyer agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing.  At closing, Seller shall cause the then applicable mortgages to be released and may use Buyer's closing proceeds for such purpose.  Neither this Agreement, nor Buyer's payment of deposits, will give Buyer any lien or claim against the Unit, the Condominium or the real property upon which the Condominium is being developed.  Without limiting the generality of the foregoing, Buyer's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit or the Condominium (or the real property upon which the Condominium is being developed) even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

       6.     Insulation; Energy Efficiency.  Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation: (a) 3/4' sprayed insulation on the exterior walls, having an R-Value of R-3; and (b) rigid insulation of varying widths on the roof, having an average R-Value of

R-11. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors.

To the extent required by applicable law, each buyer may have the Condominium building's energy efficiency rating determined. In accordance with the provisions of applicable law, upon the completion and certification of an energy performance level display card for the Condominium building, such card shall be forwarded to the Buyer and deemed incorporated in this Agreement. Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's general right, under Sections 14, 27 and 30, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.     Completion Date, Presale Contingency. Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than June 30, 2009, subject, however, only to delays resulting from "Force Majeure" (the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control. Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least fifty percent (50%) of the Units in the Condominium. Seller must, however, notify Buyer of such a termination no later than one (1) year following the date of this Agreement, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to proceed with the construction of the Condominium and to remain bound by the terms of this Agreement, whether or not the stated presales threshold has been met. In the event of Seller's termination of this Agreement pursuant to this Section, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to meet the foregoing pre-sale requirement.

8.     Inspection Prior to Closing. Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit, itself) which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Miami-Dade County, Florida for properties, of similar, type, style and age), Seller will be obligated to correct those defects at its cost within a reasonable period of time after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. **No escrows or holdbacks of closing funds will be permitted.** Buyer understands and agrees that Seller's obligation to correct defects in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further obligations for the repair of such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition.

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit. If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees and contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns. Seller shall have no further obligation to complete punch list items if Seller has submitted three (3) written requests to Buyer for entry over a thirty (30) day period after closing, and access to the Unit has been denied for any reason.

Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workers at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing. **Buyer recognizes that Seller is not obligated to agree to provide extras or options.**

Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.     Closing Date. Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than six (6) months following the Outside Date.

Before Seller can require Buyer to close, however, two things must be done:

(a)     Seller must record the Declaration and related documents in the County public records; and

(b) ·     Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in), but, subject and subordinate to the provisions of paragraphs 8 and 34 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other

portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing, except in the event that Buyer's lender, if any, requires closing to be held on less than ten (10) days' notice, in which event, Buyer shall close upon demand of Buyer's lender. Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least 3 days' notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation. If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or phone, telecopy or telex number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the Purchase Price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. Buyer agrees that the late funding charge is appropriate in order to cover, among other things, Seller's administrative and other expenses resulting from a delay in closing. Except only as may result from delays desired, requested or caused by Seller, all prorations will be made as of the originally scheduled closing date. **Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.**

10.    <u>Closing</u>.  The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price, Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy, in accordance with the terms set forth in Section 11 below.

In the event that Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, (i) Buyer shall provide Seller with written notice of same ten (10) business days prior to the originally scheduled closing date, (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer and (iii) Buyer shall, no later than five (5) business days prior to closing (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Buyer will receive two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

(a)    <u>A written commitment</u>, whether provided by Seller's closing agent or otherwise, from a title insurance company licensed in Florida agreeing to issue a policy insuring title (American Land Title Association Owner's Policy, Standard Form B) or the policy itself. This commitment (or policy) shall list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

i    Liability for all taxes or assessments affecting the Unit starting the year Buyer receives title and continuing thereafter;

ii    All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

iii    The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

iv      The restrictions, covenants, terms and other provisions contained in the Declaration of Covenants, Restrictions and Easements for Brickell Key recorded in the Public Records of Miami-Dade County, Florida, as amended and supplemented from time to time.

v       Pending governmental liens or special assessment liens for public purposes as of closing (Seller will be responsible, however, for certified governmental liens or special assessment liens as of closing; provided, however, that to the extent that any such certified liens are then due or are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

vi      Standard exceptions for water-front property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar property

vii     All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Miami-Dade County, Florida (the "gap exceptions" and standard exceptions for parties in possession, and construction liens shall be deleted, however, at closing or otherwise insured over); and

viii    Any matters not listed above as long as affirmative title insurance is given for these matters and same do not render title unmarketable or uninsurable.

Buyer understands, however, that no limitation on Buyer's title prohibits construction of the Unit, nor the use of it as a residence, subject to the Condominium Documents.

(b)     A Special Warranty Deed.  At closing, Seller promises to give Buyer a special warranty deed to the Unit.  The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Buyer will also receive at closing a bill of sale for any appliances included in the Unit, Seller's form of owner's ("no lien") affidavit, closing agreement, FIRPTA (non-foreign) affidavit and an assignment of the exclusive use of a parking space as provided above.  When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate for transactions of this nature.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title.  If Seller cannot , after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

a.      Buyer can accept title in the condition Seller offers it (with defects) and pay the full purchase price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit.  Buyer will not make any claims against Seller because of the defects; or

b.      Buyer can cancel this Agreement and receive a full refund of Buyer's deposits.  Seller will be  relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the purchase price and any additional amounts owed under this Agreement.  Seller has no obligation to accept funds other than as set forth in Section 2 above.  Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County).  This Section shall survive closing.

11.     Costs and Fees.  Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing.  These include:

(a)     A "development fee" equal to one and one quarter percent (1.25%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price).  This fee will be used, in part, to pay for the following closing costs: (i) the costs of officially recording the deed in the Public Records of the County (presently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page), and (ii) documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (presently, documentary stamp taxes are $.60 for each $100.00 of consideration).  The balance of the "development fee" shall be retained by Seller as additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with development of the Condominium.  Accordingly, Buyer understands and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with development of the Condominium.  In the event of increases in either the recording fees imposed by the County or the documentary stamp tax rates subsequent to the date of this Agreement, or in the event of the imposition of any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee.

(b)     The premium for the owner's title insurance policy, whether obtained from Seller's closing agent or another source, which if issued by Seller's closing agent shall be issued at the minimum promulgated risk rate promulgated by the Florida Insurance Commissioner.

(c)     Loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $795.00 for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan" closing agent. In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender. Notwithstanding any references in this paragraph to coordinating closing with any lender that Buyer may elect to obtain, nothing herein shall be deemed to make the Agreement, or the Buyer's obligations under the Agreement, conditional or contingent in any manner on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all-cash". The amount of all lender's charges is now unknown.

(d)     A working capital contribution in an amount equal to: (i) twice the monthly maintenance charge owed to the Condominium Association and (ii) the quarterly maintenance charge owed to the Master Association, which charges are payable directly to the respective Associations to provide them with initial capital. These contributions will not be credited against regular assessments. Assuming no change in the current regular periodic assessments for the Unit, these charges will be in the amount shown in paragraph 2 of this Agreement. These charges may change, however, if the applicable monthly assessments change prior to closing (see paragraph 17).

(e)     A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit. The amount of this charge is now unknown.

(f)     The remaining balance, if any, of any charges for options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.

(g)     Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.

(h)     The late funding charges provided for elsewhere in this Agreement. The amount of any such charges is now unknown.

Current expenses of the Unit (for example, taxes and governmental assessments, levies and/or use fees and current monthly assessments of the Condominium Association and quarterly assessments of the Master Association) will be prorated between Buyer and Seller as of the date of closing. Additionally, at closing, Buyer shall be obligated to prepay the next periodic maintenance assessments to the Associations. These prepayments are in addition to Buyer's obligation to pay the working capital contribution, as described above. If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing. If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party, provided, however, that (i) the actual amount of taxes is at least 10% higher or lower than the estimate used for prorations, and (ii) any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year). No request for proration of amounts less than the threshold set forth above or made beyond the six (6) month period shall be valid or enforceable. In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and/or general service fees imposed by any governmental authority having jurisdiction over the Unit. This Subsection shall survive (continue to be effective after) closing.

12.     <u>Adjustments with the Associations</u>. Buyer understands that Seller may advance money to either or both of the Associations to permit it or them to pay for certain of its expenses (for example, but without limitation, insurance premiums, common element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the appropriate Association for all of these sums advanced by Seller. The applicable Association(s) will reimburse Seller out of initial contributions and regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the applicable Association(s). No initial contributions of purchasers to the Condominium Association may be used for such purposes, however, as long as any guaranty by Seller of such Association's assessments is in effect.

13.     <u>Default</u>. If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default". If Buyer is still in default ten (10) days after Buyer receives notice thereof, Seller shall be entitled to the remedies provided herein. **If, however, Buyer's default is in failing to close on the scheduled date, then Seller can cancel this Agreement without giving Buyer any prior (or subsequent) notification or opportunity to close at a later date.**

Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can resell the Unit without any accounting to Buyer. Buyer understands that because Seller has taken the Unit off the market for Buyer, has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement

because of Buyer's default, Buyer authorizes Seller to keep (or if not then paid by Buyer, Buyer will pay to Seller) all deposits and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages (and not as a penalty) and as Seller's sole and exclusive remedy. Buyer and Seller agree to this because there is no other precise method of determining Seller's damages. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages.

If Seller fails to perform any of Seller's obligations under this Agreement, Seller will be in "default". If Seller is still in default ten (10) days after Buyer sends Seller notice thereof (or such longer time as may reasonably be necessary to cure the default if same cannot be reasonably cured within ten (10) days), Buyer will have such rights as may be available in equity and/or under applicable law, provided however, that absent an intentional or willful default by Seller under this Agreement, Buyer shall not be permitted to seek specific performance of Seller's obligations under this Agreement.

The provisions of this Section 13 will survive (continue to be effective after) closing.

14.    Construction Specifications.  The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time. Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate in the field construction needs (as more fully discussed in this Section 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers. Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications". Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion. In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs. These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium. Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, Buyer and Seller both acknowledge and agree: The Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of Section 30, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications. Seller has not given and Buyer has not relied on or bargained for any such warranties. In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Buyer understands and agrees: The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the Condominium Documents or in any illustrations of the model and building); and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations). Buyer agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan. This paragraph does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property were intended solely for ingress and egress in the event of emergency and, as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly, the garage and utility pipes serving the Condominium are intended solely for functional purposes, and as such will be left unfinished without regard to the aesthetic appearance of same. The foregoing is not intended to prohibit the use of the stairwells, garage, and utility pipes for any other legal purpose. Further, Buyer hereby acknowledges and agrees that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises and/or odors from adjoining or nearby Units and/or mechanical equipment, and/or plumbing and/or piping installations can often be detected in other Units. Without limiting the generality of Section 30, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound and/or odor transmission. Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this Section, actual square footage of the Unit may also be affected. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed to Buyer at any time prior to closing, whether included as part of the Condominium Documents, Seller's promotional materials or otherwise. Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions or square footage of the Unit, and Buyer hereby waives and expressly releases any such warranty.

Buyer further agrees and understands that trees and landscaping which are located on portions of the Condominium Property may be removed to accommodate construction. Seller does not guaranty the survival of any trees and landscaping which are left or planted on any portion of the Condominium Property.

The agreements and waivers of Buyer contained in this Section 14 will survive (continue to be effective after) closing.

15.    Certain Items and Materials.  Buyer understands and agrees that the Unit is to be delivered at closing in "decorator-ready condition". "Decorator ready condition" generally means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Buyer after closing. The Unit will contain no floor, wall, window or ceiling coverings, other than flooring in the bathrooms. The Unit will not be painted and will not contain baseboards, moldings, closet rods or shelving, bathroom accessories or lighting fixtures. The Unit will contain, however, kitchen cabinets, a refrigerator, oven, range, microwave, dishwasher, and clothes washer and dryer. Buyer understands and agrees that certain items such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit: wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, brick, chattahoochee, scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only. Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller, or in any published list of standard Unit features distributed by Seller. Certain of these items may not even be available. In the event that Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay for such items. There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Buyer further understands and agrees that certain items, if included with the Unit, such as tile, marble, stone, granite, cabinets, wood, stain, grout, wall and ceiling textures, granite, marble, stone, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and agrees that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, stone, marble, granite, cabinetry, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

**If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within thirty (30) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood by Buyer that the choices will be made by Seller in Seller's sole discretion, and Buyer will be bound by Seller's choices.**

The agreements and waivers of Buyer contained in this Section 15 will survive (continue to be effective after) closing.

16.    Litigation.  In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys', paralegals and para-professionals fees and court costs at all trial and appellate levels. In addition, in the event of any litigation between the parties under this Purchase Agreement: (i) the parties shall and hereby submit to the jurisdiction of the state and federal courts of the State of Florida, and (ii) venue shall be laid exclusively in Miami-Dade County, Florida. This paragraph will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

17.    Maintenance Fee.  Buyer understands and agrees that the Estimated Operating Budgets for the Condominium Association and the Master Association expenses (the "Budgets") contained in the Condominium Documents provide only an estimate of what it will cost to run the Associations during the period of time stated in the Budgets. The Budgets are not guaranteed to accurately predict actual expenditures. Changes in the Budgets may be made at any time to cover increases or decreases in actual expenses or in estimates. It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will elect not to provide any reserves for the initial year of the Condominium Association. Thereafter, on an annual basis, a majority of the Condominium Association's members (which may include the Developer during the second fiscal year of the Association) may vote to continue not to provide any reserves. If an election is in fact made to waive reserves, the assessments per unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves". If no such election is made, the assessments per Unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves". The budget of the Master Association is not guaranteed.

18.    Condominium and Master Association.  This Agreement is also Buyer's application for membership in the Condominium and Master Associations, which memberships shall automatically take effect at closing. At that time, Buyer agrees to accept all of the liabilities and obligations of membership.

19.    Seller's Use of the Condominium Property.  As long as Seller owns a unit or units and is offering same for sale in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property and/or Association Property (excluding the Unit after closing) and/or The Properties, model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents contractors and prospective buyers are also hereby given, for construction and sales promotion

purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing) and/or The Properties, and the right to restrict and regulate access to the Common Elements and/or Association Property and/or The Properties , subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property, the Common Properties and/or other Units within the Condominium. Seller's salespeople can show units, the Association Property and/or the Common Elements and/or the Common Properties, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell, finance or lease Units or other portions of any improvements to be constructed upon the Condominium Property or develop and manage the Condominium Property and/or Association Property and/or The Properties or to provide management and administration and/or financial services, but Seller's use of the Condominium Property and/or Association Property and/or The Properties must be reasonable, in Seller's opinion, and cannot unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.

20.     Sales Commissions.  Seller will pay all sales commissions due its exclusive listing agent and/or its in-house sales personnel and **Swire Realty** (if this space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker. To properly register a prospective buyer, the broker must, among other things, be present with the prospective buyer the first time that the buyer visits the Condominium. No broker's registration of a prospective buyer after the prospective buyer has visited the Condominium will be accepted by Seller.  Seller has no responsibility to pay any sales commissions to any other broker or sales agent with whom Buyer has dealt (except as specifically named herein and then only as Seller has agreed in writing). Buyer will be solely responsible to pay any such brokers. Buyer represents and warrants to Seller that Buyer has not dealt with, nor has the sale been procured by, any real estate broker, salesperson or finder, other than Seller's in-house staff and the co-broker, if any, named in the first sentence of this subparagraph. Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise. Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses. This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

21.     Notices.  Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at 501 Brickell Key Drive, Suite 600, Miami, Florida 33131, Attn., Asia Sales Director, or such other address as Seller may otherwise direct.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice may be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., FedEx, Express Mail, Emory, Purolator, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of this Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly delivered or mailed, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22.     Transfer or Assignment.  Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a transfer of any stock, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed on the Multiple Listing Service or otherwise. Any violation of any of the foregoing provisions of this Section 22 shall be deemed an immediate  default by Buyer under this Agreement (which is not capable of cure and for which no notice must be given).

23.     Others Bound by this Agreement.  If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity resulting from operation of law. If more than one person signs this Agreement as Buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under this Agreement and Seller can enforce this Agreement against either as individuals or together.

24.     Public Records.  Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Miami-Dade County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded by the Buyer.

25.     Buyer's Right to Cancel.  THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS

AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

If Buyer does not cancel this Agreement during this 15-day period in the manner set forth above, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

26.   Florida Law; Severability.   Any disputes that develop under this Agreement will be settled according to Florida law. If any part of this Agreement violates a provision of applicable law, the applicable law will control. In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

27.   Changes.   Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any. Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest earned, if any. Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion, or to pursue any remedy other than the 15-day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Buyer).

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the 15-day period will mean that Buyer accepts the change and waives Buyer's right so to cancel. All rights of cancellation will terminate, then absolutely at closing, if not sooner. After closing, Buyer will have no remedy for any changes Seller may make or have made.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements into any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.

The provisions of this Section 27 will survive (continue to be effective after) closing.

28.   Time of Essence.   The performance of all obligations by Buyer on the precise times stated in this Agreement is of absolute importance and failure by Buyer to so perform on time is a default, time being of the essence as to Buyer's obligations hereunder.

29.    Nearby Activities and Views.  Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of nearby construction activity and Buyer may be impeded in using portions of the Condominium Property by that activity.  Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium. Therefore, the Buyer hereby agrees to release Seller, its partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction.  As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus.  Additionally, inasmuch as the Commercial Units may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Common Elements, and in or around the Condominium Property, shall not be deemed a nuisance.

30.    Disclaimer of Implied Warranties.  All manufacturers' warranties will be passed through to Buyer at closing. At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act.

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed.  Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203, Florida Statutes, to the extent applicable and to the extent that same have not expired by their terms.  Seller has not given and Buyer has not relied on or bargained for any such warranties.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or the Condominium Property. Buyer is hereby advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk.  By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller and Seller's Affiliates from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by any of Buyer's Guests as defined below and any other person or any pets).  Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores.  Buyer understands and agrees that Seller is not responsible for, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Buyer's Guests")as a result of mold, mildew, fungus or spores.  It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

This Section will survive (continue to be effective after) closing.

31.    Representations.  Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantage. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit.  Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit.  Further, Buyer understands and agrees that neither Seller, nor any brokerage company, in-house sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale, leasing or financing of the Unit.

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the media, in sales office and model suite are for promotional purposes only and may not be relied upon.  Buyer warrants that Buyer has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium, (d) disturbance from nearby properties, or (e) disturbance from air or vehicular traffic.  The provisions of this Section shall survive (continue to be effective after) the closing.

32.    Return of Condominium Documents.  If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him or her in the same condition received, reasonable wear and tear excepted.

If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

33.    Survival.  Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed.  All other provisions shall be deemed merged into the deed.

34.    Substantial Completion.  Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so complete or substantially complete in Seller's opinion.  Notwithstanding the foregoing, however, neither the Unit nor the building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased.  The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it.  Other units (and other portions of the building) may not necessarily be so complete and useable.

35.    Disclosures.  Under the laws of the State of Florida, Buyer is hereby advised as follows: DR JR 

(a)    RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.  The foregoing notice is provided in order to comply with state law and is for informational purposes only.  Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)    CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM.  SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS.  YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

(c)    BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE.    A  CHANGE  OF  OWNERSHIP  OR  PROPERTY  IMPROVEMENTS  TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.  IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(d)    Pursuant to the mandates of Miami-Dade County Ordinance 93-21 and the provisions of Chapter 11C of the Metropolitan Dade County Code, Buyer is hereby advised, and acknowledges and agrees, that the Unit is located in (i) a coastal high hazard area, and (ii) a special flood hazard area.  If the Unit is below the applicable flood elevation level and is substantially damaged or substantially improved, as defined in Chapter 11C of the Metropolitan Dade County Code, it may, among other things, be required to be raised to the applicable flood elevation level.

36.    Offer.  The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium.  This Agreement shall not become binding until executed and delivered by both Buyer and Seller.  Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer, otherwise the firm offer shall be considered rejected and all funds deposited by Buyer shall be promptly returned to Buyer.

37.    Liability.  The liability of Seller under this Agreement or any amendment or any instrument or document executed in connection with this Agreement shall be limited to and enforceable solely against the interest of Seller in the Condominium, and not against any other assets of Seller or any partner of Seller (or its or their officers, principals, directors, employees, managers, members or agents).

38.    Miscellaneous.  The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller.  Buyer acknowledges that the primary inducement for him or her to purchase under this Agreement is the Unit itself and not the recreational amenities and other Common Elements.  Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

39.    Entire Agreement.  This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can be amended only by a written instrument signed by both Buyer and Seller which specifically states that it is amending this Agreement.  Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement are void and have no effect.  Buyer has not relied on them.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

BUYER:

Name: _Josd Rodreiguez_

Date of Execution: _2/2/05_

Name: _Daymi Rodriguez_

Date of Execution: _2/2/05_

SELLER

Swire Pacific Holdings Inc., a Delaware corporation

By: _____

Name: _____

Title: _____

Date of Execution: _2/2/05_

ORIGINAL

## AMENDMENT TO PURCHASE AGREEMENT
### (Cabinets and Counter Selections)

THIS AGREEMENT is made as of the 2 day of February, 2005, by and between **Swire Pacific Holdings Inc.**, a Delaware corporation ("Seller") and **Double AA International Investment Group.** ("Buyer").

### R E C I T A L S

A.      Seller and Buyer have entered into that certain Purchase Agreement (the "Agreement") for the purchase and sale of Unit **3202** (the "Unit") in **ASIA, A CONDOMINIUM** (the "Condominium").

B.      The parties desire to amend the Agreement in certain respects as more particularly set forth below.

NOW, THEREFORE, in consideration of the execution and delivery of the Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      The foregoing recitals are true and correct and are incorporated herein as if repeated at length. Unless the context otherwise requires, all initial capitalized terms used but not defined in this Amendment, shall have the meaning or meanings given to such terms in the Agreement.  This Amendment shall be deemed a part of, but shall take precedence over and supersede any provisions to the contrary contained in, the Agreement.  All references in the Agreement or this Amendment to the "Agreement" or the "Purchase Agreement" shall be deemed to refer to the Agreement as modified by this Amendment, unless the context otherwise requires.

2.      At Buyer's request, the cabinets to be utilized in the kitchen shall be in the colors selected below:

Kitchen Cabinet:           Color:
(Select only one)

✓                    Sycamore

3.      At Buyer's request, the counters to be utilized in the kitchen shall be in the colors selected below:

Kitchen Counter:          Color:
(Select only one)

✓                    Cashmere white

Without limiting the generality of Section 8 of the Agreement, Buyer understands and agrees that the cabinet and counter colors selected above are subject to color, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations. Buyer also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in the cabinets and/or counters (if any).  Buyer recognizes that certain colors in wood stain, as shown in displays or in the models, will weather and fade and may not be duplicated precisely.

4.      The execution of this Amendment shall neither extend, toll, nor reinstate any rights of the Buyer to rescind the Agreement pursuant to the terms thereof, or of Section 718.503(1)(a), Florida Statutes.

5.      Except as amended herein, the Agreement shall remain in full force and effect.

EXECUTED as of the date and year first above written.

Buyer:

Name: _____

Name: _____

Seller:

Swire Pacific Holdings Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

# EXHIBIT C

## NOTICE OF ESCROW DEPOSIT <u>ASIA</u>, A CONDOMINIUM

Date: February 3, 2005

Attn: ADEL PAULISON
Lawyers Title Insurance Corp.
13800 NW 14th Street
Suite 190
Sunrise, FL 33323

Re:   *Purchase of Apartment No* <u>3202</u>
*in ASIA, A Condominium*

Dear Adel:

The purchaser(s) named below has/have entered into an Agreement to Purchase the above referenced Condominium Unit and we deliver herewith a deposit of $ _66,000_ in accordance with the Purchase Agreement. The total purchase price is $ _1,160,000_

This is a    ☑ Partial  or  ☐ Complete          ☑ Check # _5001_
             ☑ Initial  or  ☐ Second deposit.       ☐ Wire # _____

Name of Purchaser(s):        Double AA International Invest. Grp.

Mailing Address of          8045 NW 7th Street
     Purchaser(s):          Suite 407
                            Miami, FL 33126

Social Security Number(s)   _____
    of Purchaser(s):
                            _____

❖❖❖❖❖❖❖

## <u>RECEIPT</u>

*Receipt is acknowledged of the above deposit, subject to clearance of said funds if a check.*

**DATE OF RECEIPT:**                 Lawyers Title Insurance Corp.

_2-7-05_                         By: _____

# EXHIBIT D

## NOTICE OF ESCROW DEPOSIT ASIA, A CONDOMINIUM

Date: May 17, 2005

Attn:  ADEL PAULISON
Lawyers Title Insurance Corp.
13800 NW 14th Street
Suite 190
Sunrise, FL 33323

Re:   *Purchase of Apartment No 3202*
       *in ASIA, A Condominium*

Dear Adel:

The purchaser(s) named below has/have entered into an Agreement to Purchase the above referenced Condominium Unit and we deliver herewith a deposit of $ 116,000 = in accordance with the Purchase Agreement.  The total purchase price is $ 1,160,000 =

This is a      ☐ Partial  or  ☑ Complete          ☑ Check #  1018
              ☐ Initial  or  ☑ Second deposit.      ☐ Wire # _____

Name of Purchaser(s):        Double AA International Investment Group

Mailing Address of           c/o Jose  Rodriguez
                             8045 NW 7th Street
Purchaser(s):                Suite 407
                             Miami, FL 33126

Social Security Number(s)
   of Purchaser(s):          _____

                             _____

❖❖❖❖❖❖❖❖

### RECEIPT

*Receipt is acknowledged of the above deposit, subject to clearance of said funds if a check.*

DATE OF RECEIPT:             Lawyers Title Insurance Corp.

5/18/05                      By: *Jangela Reddick*


REC'D MAY 1 8 2005

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI-DIVISION

CASE NO. 08-23444-CIV-ALTONAGA/BROWN

DOUBLE AA INTERNATIONAL
INVESTMENT GROUP, INC., et al.

     Plaintiffs,

vs.

SWIRE PACIFIC
HOLDINGS, INC., et al.,

     Defendants.

_____/

### AFFIDAVIT OF DAMARIS RODRIGUEZ

STATE OF FLORIDA       )

                     )  ss

COUNTY OF BROWARD  )

     Before me, the undersigned authority, personally appeared **Damaris Rodriguez** who upon being fully sworn, deposes and says as follows:

     1.     I am over the age of eighteen and have personal knowledge of the facts that I am attesting to.

     2.     I am the Escrow Manager for Lawyers Title Insurance and Commonwealth Land Title Ins. ("Commonwealth"), escrow companies that provide escrow services for among others, developers of condominiums. I am located in its offices at 1560 Sawgrass Corporate Pkwy, Suite # 230, Sunrise, Florida.

     3.     With respect to the Asia Condominium, developed by Swire Properties, a first escrow account was established in order to hold the initial deposits received from

Case No. 08-23444-CIV-ALTONAGA/BROWN

purchasers until that purchaser signed the purchase contract for the unit. Thereafter, the purchaser provided additional deposit money. Once the purchase went to contract, the full deposit, which typically equaled twenty percent (20%) of the purchase price, was transferred to a "special account", that Lawyers Title calls the "Contract Account".

4.      My understanding is that the Florida Statute requires the establishment of a "special account" for the deposits by the purchaser of a condominium unit. Moreover, that "special account" must be controlled by the escrow agent/Lawyers Title and may not be used by the developer prior to closing the transaction, except as provided by the Statute, the Escrow Agreement and/or the Purchase and Sale Agreement.

5.      Lawyers Title operates its "Contract Account" in accordance with Florida law regarding the "special account".

6.      As far I am aware there is no provision in the Escrow Agreement and/or the Purchase and Sale Agreement that requires Lawyers Title to maintain a "separate account" for the deposits received that are in excess of ten percent (10%) of the purchase price of the unit.

7.      Pursuant to the Escrow Agreement and Purchase and Sale Agreement in this case, Lawyers Title is to disburse any funds deposited with our company in excess of ten percent (10%) of the purchase price for construction purposes upon receipt of a letter or statement from the developer that the construction of improvements has begun.

8.      In this case, Lawyers Title received correspondence from Swire Properties on April 5, 2006, stating: "We hereby certify that construction has begun on the condominium in which the unit is located and that all funds released to Developer will be

Case No. 08-23444-Clv-ALTONAGA/BROWN

sued solely for construction purposes and no part of these funds will be used for salaries or commissions, or for expenses of salesmen or for advertising purposes."

9.     On April 19, 2006, all funds in excess of ten percent (10%) of the purchase price or One Hundred and Sixteen Thousand Dollars ($116,000.00) for this particular purchaser were released to the developer for construction purposes.

10.     Lawyers Title will continue to hold the remaining balance deposited with it until closing or until it is properly directed as to how to disburse those funds.

**FURTHER AFFIANT SAYETH NAUGHT.**

**DAMARIS RODRIGUEZ**

The foregoing Affidavit was sworn to and subscribed before me this 29ᵗʰ day of April, 2009.  The Affiant is personally known to the undersigned or has produced a valid form of personal identification.

NOTARY PUBLIC

My Commission Expires

KARIN SLINKER
Notary Public - State of Florida
My Commission Expires Aug 16, 2009
Commission # DD462205
Bonded By National Notary Assn.

3

# EXHIBIT F

# ALEXANDER LIAN, P.A.
## Attorney at Law

ALEXANDER LIAN, ESQ.
EMAIL: alian@alexanderlian.com

777 Brickell Avenue ▪ Suite 1210
Miami ▪ Florida 33131

www.alexanderlian.com

TELEPHONE: 305.381.7910
FACSIMILE: 305.381.7135

February 24, 2009

**VIA FACSIMILE AND US MAIL**

Sandra J. Millor, Esq.
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131

RE:  *Double AA and Daymi Rodriguez v. Swire Pacific Holdings, Inc., et. al.*
Case No. 08-23444-CIV-Altonaga/Brown

Dear Sandra:

The purpose of this letter is to notify your client, Swire Pacific Holdings, Inc., that it violated the provisions of Fla. Stat. § 718.202 by failing to establish a "special escrow account" (as required under § 718.202(2)) for deposit payments in excess of 10% of the sale price.   The available records from Lawyers Title Insurance Corporation (see letter from Lawyers Title representative Hedda Desire, dated August 8, 2008) indicate that Swire established only one account to hold the full 20% deposit ($232,000.00), which is in direct violation of Fla. Stat. § 718.202.

Double AA International Investment Group, Inc. and Daymi Rodriguez hereby provide notice of voiding the Purchase Agreement with Swire under Fla. Stat. 718.202(5).   Ms. Rodriguez demands the return of the full deposit ($232,000.00) plus applicable interest as provided in Fla. Stat. § 718.202(5).

Sincerely yours,

*Alexander Lian*

Alexander Lian, Esq.

# ALEXANDER LIAN, P.A.
## — Attorney at Law —

ALEXANDER LIAN, ESQ.
EMAIL: alian@alexanderlian.com

777 Brickell Avenue ▪ Suite 1210
Miami ▪ Florida 33131

www.alexanderlian.com

TELEPHONE: 305.381.7910
FACSIMILE: 305.381.7135

May 7, 2009

**VIA FACSIMILE AND US MAIL**

Sandra J. Millor, Esq.
Greenberg Traurig, LLP
1221 Brickell Avenue
Miami, FL 33131

> RE:  **Double AA International v. Swire Realty and Lawyers Title
> Case No. 0823444CIV-ALTONAGA/BROWN**

Dear Sandra:

This letter is to follow up on our conversation concerning the Affidavit of Damaris Rodriguez, Escrow Manager for Lawyers Title. Ms. Rodriguez's Affidavit discusses Lawyers Title's manner of handling my client's escrow deposit.

According to Ms. Rodriguez's Affidavit, Lawyers Title did not create a special account for escrow payments in excess of 10% of the sale price as required by § 718.202(1) and (2). (*See* Affidavit, ¶ 3.)

The statute expressly provides that,

> [a]ll payments which are in excess of the 10 percent of the sale price described in subsection (1) and which have been received prior to completion of construction by the developer from the buyer on a contract for purchase of a condominium parcel shall be held in a special escrow account established as provided in subsection (1) . . . [.]

In addition subsection (5) expressly provides that,

> [t]he failure to comply with the provisions of this section renders the contract voidable by the buyer, and, if voided, all sums deposited or advanced under the contract shall be refunded with interest at the highest rate then being paid on savings accounts . . . [.]

Ms. Rodriguez's Affidavit flatly states that Lawyers Title did not create the special account which § 718.202(2) requires for escrow payments in excess of 10% of the sale price. Lawyers Title's failure, as escrow agent to comply with § 718.202(2), directly affects your client as it is the developer's ultimate responsibility to ensure that escrowed funds are handled properly under § 718.202.

There is no dispute that my clients tendered a deposit in escrow of 20% of the sale price. We have already provided notice of voiding the Purchase Agreement in our February 24, 2009 letter to you. Given the clear language of § 718.202 it would serve your client's best interest to resolve this matter sooner rather than later.

We again reaffirm our February 24, 2009 correspondence and demand return of the full $232,000.00 deposit (plus applicable interest) for failure to comply with § 718.202.


Sincerely,

Alexander Lian

# EXHIBIT G



Servicing Commonwealth Land Title Insurance Co. & Lawyers Title Insurance Corp.
1560 Sawgrass Corporate Parkway, Suite 230
Sunrise, FL 33323
Phone 954-377-2087 or 954-764-0800    FAX #954-838-8998

August 8, 2008

**To Whom It May Concern:**

**Ref: Asia/Unit #3202/**

This is to confirm that Lawyer's Title Insurance Corp., as escrow agent for Asia has received a total amount of **$232,000.00** in an Escrow Account at HSBC Bank, for the purchase of the above referenced unit.

**ALL FUNDS HAVE BEEN CLEARED**

Sincerely,

*Desire*

Hedda Desire
Escrow Coordinator

# EXHIBIT H

# ALEXANDER LIAN, P.A.
## — Attorney at Law —

777 Brickell Avenue ▪ Suite 1210
Miami ▪ Florida 33131
_____
www.alexanderlian.com

ALEXANDER LIAN, ESQ.
EMAIL: alian@alexanderlian.com

TELEPHONE: 305.381.7910
FACSIMILE: 305.381.7135

October 14, 2008

**VIA CERTIFIED MAIL**

Asia Sales Director
501 Brickell Key Drive
Suite 600
Miami, Florida 33131

RE:    **Asia Condominium Unit # 3202
NOTICE OF CANCELLATION AND
DEMAND FOR RETURN OF DEPOSIT**

Dear Sales Director:

This Notice of Cancellation is being provided pursuant to the Agreement between Swire Pacific Holdings, Inc., a Delaware Corporation ("Seller") and Double AA International Investment Group and its Assignee Daymi Rodriguez (collectively, "Buyer").

Buyer hereby cancels the Agreement between Seller and Buyer and demands the return of its deposit of $232,000.00 being held in Escrow with Lawyer's Title Insurance Corp., a LandAmerica subsidiary.

Seller materially breached the Agreement by refusing to permit Buyer to sell the property to a ready, willing, and able Purchaser.

Please immediately remit the deposit of $232,404.38 via certified check made payable to: Alexander Lian, P.A. Trust Account.

If there are any questions, please do not hesitate to contact the undersigned.

Sincerely yours,

Alexander Lian

cc:    Giovanna Coral (via email)
Swire Development Sales

# EXHIBIT I

# Greenberg
# Traurig

*Staci J. Rutman*
*(305) 579-0787*
*(305) 961-5787 (Direct Fax)*
*E-MAIL:RUTMANS@gtlaw.com*

October 14, 2008

**VIA ELECTRONIC MAIL**
alian@alexanderalian.com

**VIA OVERNIGHT DELIVERY**
Alexander Lian, Esq.
Alexander Lian, P.A.
777 Brickell Avenue
Suite 1210
Miami, Florida 33131

Re: Double AA International Group (the "Buyer") purchase of Unit 3202 (the "Unit") in Asia, a Condominium (the "Condominium") from Swire Pacific Holdings Inc., a Delaware corporation ("Seller") pursuant to Agreement between Buyer and Seller (the "Agreement")

Dear Mr. Lian:

This law firm represents the Seller and in that regard, we are in receipt of a copy of your letter to the Seller requesting cancellation of the Agreement.

As in initial matter, nothing contained in the Agreement precludes the Buyer from conveying the Unit once he has acquired title. However, as we are sure you are aware from your review of the Agreement, Section 22 states that the Buyer shall not be entitled to assign the Agreement or its rights thereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). It also states that, the Buyer shall not, prior to closing on title to the Unit, (unless first obtaining the prior written consent of Seller) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, or allowing the Unit to be listed on the Multiple Listing Service or otherwise. Should Seller determine that Buyer engaged in any of the aforementioned, then in accordance with paragraph 22 of the Agreement, Buyer will be in default of the Agreement and said default is incapable of cure.

Based upon the foregoing, and contrary to your allegations, Seller has not breached the Agreement. Additionally, should the Buyer fail to timely close and default on its obligations under the Agreement, please be advised that Seller intends to pursue all remedies available at law and in equity, including but not limited to retention of the deposits, and/or enforcement of the Agreement.

I am happy to discuss the matter with you at any time, please feel free to contact me.

Sincerely,

Staci J. Rutman

cc: Giavonna Coral
Lawyers Title Insurance Corporation