## UNITED STATES DISTRICT COURT
### Southern District of Florida

| | |
|---|---|
| Double AA International Investment Group, Inc. and Daymi Rodriguez, <br><br> Plaintiffs, <br><br> vs. <br><br><br> Swire Pacific Holdings, Inc., a Delaware Corporation, and Lawyers Title Insurance Corporation, <br><br> Defendants. <br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) / |

**Civil Action No. 08-23444**
**ALTONAGA/BROWN**

### PLAINTIFFS' MOTION FOR FURTHER RELIEF PURSUANT TO 28 U.S.C. § 2202 AND INCORPORTED MEMORANDUM OF LAW

Plaintiffs' Double AA International Investment Group, Inc. and Daymi Rodriguez ("Plaintiffs") request that this Court provide Plaintiffs with relief supplemental to this Court's December 15, 2009 Order [D.E. 124] which granted Plaintiffs' summary judgment on Count II of the Amended Complaint.

Plaintiffs' seek the following relief under 28 U.S.C. § 2202:

1. A Final Judgment against Defendant Swire Pacific Holdings, Inc. ("Swire") on Count II of the Amended Complaint that specifies (a) Swire must pay Plaintiffs the full amount of the deposit ($232,000.00 minus any disbursement from escrow), (b) Swire must pay Plaintiffs interest at the statutory rate on the entire $232,000.00 as provided in Fla. Stat. § 718.202(5), and (c) that the Court reserves jurisdiction to award Plaintiffs attorney's fees and costs.[1]

---

[1] Plaintiffs will, along with this Motion, be filing a Motion to Voluntarily Dismiss Count I of the Amended Complaint as this Court's summary judgment ruling on Count II renders Count I moot. (*See* Order, p. 12-13 [D.E.

2. An Order requiring Defendant Lawyers Title Insurance Corporation ("Lawyers Title") to immediately disburse the $116,404.38 it is holding in escrow to the Plaintiffs.

3. A Final Judgment against Defendant Lawyers Title on Count II of the Amended Complaint that specifies (a) Lawyers Title must pay Plaintiffs the full amount of the deposit ($232,000.00 minus any disbursement from escrow), (b) Lawyers Title must pay Plaintiffs interest at the statutory rate on the entire $232,000.00 as provided in Fla. Stat. § 718.202(5), and (c) that the Court retains jurisdiction to award Plaintiffs attorney's fees and costs.

4. A Final Judgment awarding damages against Lawyers Title for (a) breach of fiduciary duty, (b) breach of contract or breach of third party beneficiary contract, (c) negligence per se, and (d) reserving jurisdiction for this Court to award attorney's fees and costs.

## I. PROCEDURAL BACKGROUND

### A.     The Pleadings

Plaintiffs initiated this action on December 12, 2008 [D.E. 1]. Defendant Lawyers Title filed in response to Plaintiffs' Complaint an Answer, Affirmative Defenses and Counterclaim [D.E. 7]. Plaintiffs responded, on February 23, 2009, with their Reply to Lawyers Title's Affirmative Defenses and Answer, Defenses, and Affirmative Defenses to Lawyers Title's Counterclaim [D.E. 35]. Subsequently, Plaintiffs' filed an Amended Complaint [D.E. 47] to which Lawyers Title merely filed an Answer and Affirmative Defenses [D.E. 49].

---

124]). If this Court grants Plaintiffs' Motion to Voluntarily Dismiss Count I of the Amended Complaint, there will be no other claims against Defendant Swire for this Court to adjudicate.

Thus, by the time of this Court's December 15, 2009 Order, Lawyers Title's Interpleader Counterclaim [D.E. 35] still stood, as did Plaintiffs' Answer, Defenses, and Affirmative Defenses to Lawyers Title's Counterclaim ("Answer") [D.E. 49].[2]

Plaintiffs specifically enumerated the following allegations and claims against Lawyers Title:

1. Lawyers Title is not an innocent stakeholder.

2. Lawyers Title breached its fiduciary duty to Plaintiffs.

3. Plaintiffs' claim of breach of third party beneficiary contract against Lawyers Title.

4. Negligence.

(*See* Plaintiffs' Answer, p. 5, [D.E. 49].) Lawyers Title has not rebutted these claims.[3]

In addition, Plaintiffs expressly informed Lawyers Title, in their February 23, 2009 Answer, that the Purchase Agreement was "void" under § 718.202(5). (*See* Answer, p.5-6, [D.E. 49]) and that Plaintiffs properly terminated the Purchase Agreement under § 718.202(1)(a) (*See* Am. Compl., ¶¶ 72-74, [D.E. 47].)

**B.    Lawyers Title Is Fully Aware of Plaintiffs' Claims**

Despite the clear averments in Plaintiffs' Answer that they would be seeking claims against Lawyers Title in excess of the amount it held in escrow ($116,404.38) for breach of fiduciary duty, breach of third party beneficiary contract, and negligence, Lawyers Title remained curiously passive.

---

[2] Lawyers Title recently filed a Motion for Voluntary Dismissal Of Its Counterclaim [D.E. 130]. Plaintiffs oppose this motion to the extent that voluntary dismissal of the Counterclaim undercuts Plaintiffs' ability to obtain further relief in the form of damages against Lawyers Title under 28 U.S.C. § 2202.

[3] Lawyers Title solely argued, unaccompanied by any motion or brief, that Plaintiffs were not entitled to affirmative relief on these claims because they were styled as "defenses and affirmative defenses" to its Interpleader Counterclaim. (*See* Lawyers Title's Objections to Pretrial Stipulations, p. 3 [D.E. 123].)

For instance, Lawyers Title requested that this Court excuse it from mediation. (*See* Motion To Be Excused From Mediation, filed August 5, 2009, [D.E. 66].) Plaintiffs objected. However, before Plaintiffs' counsel had an opportunity to draft a memorandum in opposition, this Court granted Lawyers Title's Motion. (*See* Order Granting Motion To Be Excused From Mediation, dated August 6, 2009, [D.E. 67].)

Subsequently, Lawyers Title filed a Motion To Be Excused From Trial [D.E. 96]. Plaintiffs again objected. The Court conducted a hearing on that Motion and on November 6, 2009 denied the request [D.E. 111]. During the telephonic hearing, Plaintiffs' counsel made it clear that he objected because the dispute was not simply over the $116,404.38 held in escrow but also included causes of action against Lawyers Title based upon its failure to create and establish the §718.202 statutorily mandated escrow accounts, and for the $116,000.00 of Plaintiffs' money that Lawyers Title wrongfully disbursed.

## C.    Court's December 15, 2009 Summary Judgment Order

This Court's Order of December 15, 2009 granted Plaintiffs summary judgment on Count II of the Amended Complaint. Count II of the Amended Complaint requested the following:

> Plaintiffs request that this Court enter a declaratory judgment stating that, (1) Swire has no right, interest, or title to the $116,000.00 held in escrow; (2) that Lawyers Title must release the escrowed funds, plus any accumulated interest, to Ms. Rodriguez; (3) that Ms. Rodriguez has a right to recover the additional monies paid in deposit ($116,000.00) plus accumulated interest on the whole amount ($232,000.00) as provided in § 718.202(5); and, (4) awarding Plaintiffs' attorney's fees and costs and any other relief this Court deems just and proper. (*See* Amend. Compl., p.12 [D.E. 47].)

This Court determined in its Order that "Swire violated section 718.202, and Plaintiffs are therefore entitled to a refund of their deposit funds from Swire and Lawyers Title, plus interest, under Fla. Stat. § 718.202(5)." In addition, in footnote 4 to the Order, this Court made

clear that Lawyers Title as well as Swire violated section 718.202. (*See* Order, p. 11 [D.E. 124].) Though the Order does not specifically state that Lawyers Title violated § 718.202(1)(a) (as Plaintiffs alleged in the Am. Compl.,  ¶¶ 72-74 [D.E. 47]) and § 718.202(3) (as alleged in Plaintiffs' Answer at ¶¶ 25-27), such findings are logically and factually warranted.

## II. Post-Summary Judgment Proceedings

After this Court entered summary judgment on December 15, 2009 against Defendants Swire and Lawyers Title, Plaintiffs' counsel immediately contacted Lawyers Title's counsel and demanded the release to the Plaintiffs of the $116,404.38 held in escrow. Lawyers Title's counsel refused. Subsequently, on December 23, 2009, Swire's counsel directed Lawyers Title to *not* release the escrowed funds to the Plaintiffs as the ownership of the funds was purportedly still disputed (even though Swire knew that the funds had been interpleaded and were no longer under Lawyers Title's control but under the  jurisdiction of this Court). (*See* **Exhibit A**, Letter from Sandra J. Millor to Philip J. Kantor, dated December 23, 2009.)

Subsequently, on December 29, 2009, Swire filed a Motion for Reconsideration [D.E. 127], which this Court summarily denied on December 30, 2009 [D.E. 129].

Plaintiffs' counsel, again on December 30, 2009, demanded release of the $116,404.38 held in escrow. Lawyers Title again refused. Lawyers Title was unmoved by Plaintiffs' argument that since the escrowed funds had been interpleaded, the funds were no longer under the control of Lawyers Title but under the jurisdiction of this Court. As this Court had ruled that the funds belonged to the Plaintiffs, they should be released.

Lawyers Title remained adamant in its refusal. Instead of releasing the funds, Lawyers Title chose to file, on December 30, 2009, its Motion For Voluntary Dismissal of its Interpleader Counterclaim [D.E. 130].

Plaintiffs thus file this Motion seeking, among other things, an Order requiring Lawyers Title to immediately release to the Plaintiffs the $116,404.38 held in escrow.

### III. LEGAL ARGUMENT

**A.      Further Relief Based on Declaratory Judgment Warranted**

**1.      Lawyers Title's multiple violations of § 718.202.**

Based upon this Court's Summary Judgment Order [D.E. 124], which granted Plaintiffs summary judgment on Count II of the Amended Complaint, Plaintiffs anticipate this Court will enter a judgment rendering declaratory relief to the Plaintiffs in keeping with the Court's Summary Judgment Order.

Plaintiffs specifically alleged in Count II that Defendant Lawyers Title refused to release the $116,404.38 to Plaintiffs, despite Plaintiffs properly terminating the contract under § 718.202(5), and, consequently, Lawyers Title violated § 718.202(1)(a). (*See* Am. Compl. ¶¶ 72-74, [D.E. 47].)

Fla. Stat. § 718.202(1)(a) provides in relevant part:

> Default determinations and refund of deposits shall be governed by the escrow release provision of this subsection. Funds *shall* be released from escrow as follows:
>
> (a) If a buyer properly *terminates* the contract pursuant to its terms or *pursuant to this chapter*, the funds shall be paid to the buyer together with any interest earned. (Emphasis added.)

It is uncontroverted that Plaintiffs properly terminated the Purchase Agreement by providing notices voiding the Purchase Agreement both in February and May 2009. Plaintiffs further alerted Lawyers Title to this fact in their Answer. (*See* Answer, ¶ 29, [D.E. 49].) Lawyers Title violated § 718.202(1)(a) by refusing (many times) to refund the deposit or release the escrowed funds despite the Plaintiffs properly terminating the contract pursuant to § 718.202(5).

Plaintiffs also served notice on Lawyers Title that Plaintiffs would be seeking damages for an additional statutory violation — wrongfully disbursing $116,000.00 to Swire because the $116,000.00 was not disbursed from the proper escrow account pursuant to § 718.202(3). As Plaintiffs noted in their Reply to Lawyers Title's Affirmative Defenses:

> Lawyers Title alleges in its Eleventh Affirmative Defense that, "Plaintiffs agreed to allow Defendant Lawyers Title to hold and disburse the subject deposit in escrow in accordance with the Agreements and applicable law." Lawyers Title is correct when it admits it had a duty to Plaintiffs to *hold* and *disburse* the subject deposit in escrow according to the Agreements and *applicable* law.
>
> Lawyers Title breached this duty when it disbursed, on or around April 19, 2006, $116,000.00 to Defendant Swire. Lawyers Title breached its fiduciary duty to the Plaintiffs because, (a) the $116,000.00, which represents an escrow deposit in excess of 10% of the purchase price, was not held in a special account as required under Fla. Stat. § 718.202(2); and, (b) the $116,000.00 was disbursed to Swire pursuant to § 718.202(3) from the same escrow account which held Plaintiffs' initial 10% deposit and not from the special escrow account as the statute requires for escrow monies (in excess of 10% of the purchase price) disbursed to the developer (Swire) for use in actual construction and development of the condominium property in which the unit to be sold is located. (*See* Reply, ¶ 5, [D.E. 49].)[4]

This Court's Order upheld Plaintiffs' primary claim that Lawyers Title violated § 718.202(2) when it failed to create and establish the two statutorily mandated escrow accounts for the Plaintiffs' $232,000.00 deposit (representing 20% of the purchase price for Asia #3202). Based on this finding, Plaintiffs are entitled to the additional findings that:

   a. Lawyers Title violated § 718.202(1)(a) when it refused (and *still* refuses) to refund Plaintiffs deposit (plus interest) or release the $116,404.38 held in escrow to the Plaintiffs.

---

[4] Plaintiffs' counsel acknowledges that he mistakenly filed a Reply without first obtaining a Court Order. (*See* Rule 7(a), Fed. R. Civ. P.) However, for the purposes of this Motion, the content of Paragraph 5 of the Reply does not serve as a formal pleading in avoidance but simply as evidence that Lawyers Title has been on notice, from the early stages of this litigation, that Plaintiffs would be seeking damages against Lawyers Title for causes of action based upon Lawyers Title's multiple violations of the requirements in § 718.202. Additionally, Paragraph 25 of the Plaintiffs' Answer to Lawyers Title's Counterclaim makes the same points as Paragraph 5 of the Reply.

    b.   Lawyers Title violated § 718.202(3) when it disbursed $116,000.00 to Swire on April 19, 2006 from the § 718.202(1) account and not from the § 718.202(2) account as § 718.202(3) mandates.

**2.    28 U.S.C. § 2202 permits supplemental relief.**

In Count II of the Amended Complaint, Plaintiffs requested declaratory relief against Swire and Lawyers Title under both sections 2201 and 2202 of the Declaratory Judgment Act. (Am. Compl., ¶ 69, [D.E. 47].)

28 U.S.C. § 2202 provides:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

It has long been the rule in the Eleventh Circuit that a prevailing party in a declaratory judgment action may seek further relief in the form of damages. *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 537 (5th Cir. 1978); *see also Nat'l Fire Ins. Co. of Hartford v. Bd. of Pub. Instruction of Madison County, Fla.*, 239 F.2d 370, 376 (5th Cir. 1956) (citing § 2202 for the proposition that "[t]he Federal Declaratory Judgment Act contemplates that all necessary or proper relief based on the declaratory judgment should be granted);[5] *United Teacher Assoc. Insur. Co. v. Union Labor Life Insurance Co.*, 414 F.3d 558, 570 (5th Cir. 2005) ("§ 2202 permits the original judgment to be supplemented either by damages or by equitable relief even though coercive relief might have been available at the time of the declaratory action.") (internal citations omitted).

The only requirement under § 2202 for supplemental relief is that the adverse party receive reasonable notice. Lawyers Title has been on notice, at least since February 2009, that

---

[5] *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the Eleventh Circuit).

Plaintiffs would be seeking damages against Lawyers Title, especially when Count II of the Amended Complaint and Plaintiffs' Answer to Lawyers Title's Counterclaim are read together.

**B.    Summary Judgment on Count II Becomes Law of the Case**

The "law of the case" doctrine holds that when a court decides upon a rule of law, that decision should control the same issues in the same case. *See Arizona v. California*, 460 U.S. 605, 618 (1983) (As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case) (internal citations omitted); *see also Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1288-89 (11th Cir. 2009) (under the law of the case doctrine, "an issue decided at one stage of a case is binding at later stages of the same case.") (*citing United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997)).

This Court has already decided that Lawyers Title did not comply with the requirement of § 718.202 to create and establish two separate escrow accounts. This Court also found that Plaintiffs properly provided notice of voiding the Purchase Agreement under § 718.202(5) both in February 2009 and again in May 2009. (*See* Order, p. 9, [D.E. 124].)[6]

By implication, if Plaintiffs properly provided notice of terminating the contract then, under the requirement of § 718.202(1)(a), Lawyers Title was required to refund the deposit to the Plaintiffs, which includes the release of the $116,404.38 of the Plaintiffs' money which Lawyers Title holds in escrow. Lawyers Title has not released the funds or paid the deposit (despite Plaintiffs' repeated demands) which constitutes a clear violation of § 718.202(1)(a).

Also by direct implication of the Court's finding that Lawyers Title failed to create the two statutorily mandated escrow accounts, Lawyers Title violated § 718.202(3) by releasing

---

[6] Plaintiffs also provided notice of voiding the contract pursuant to § 718.202(5) in Paragraph 29 of the Answer to Lawyers Title's Counterclaim filed on February 23, 2009 [D.E. 49].

$116,000.00 to Swire from the wrong escrow account. It did not release the funds from the special account required under § 718.202(2) because it never created the § 718.202(2) special account.

## C.      Lawyers Title Breached Its Fiduciary Duty to Plaintiffs

### 1.      Escrow agent is a fiduciary under Florida law.

It is a well-settled rule in Florida that an escrow agent owes a fiduciary duty to the parties to the escrow.

> "[W]hen principal parties agree upon an escrow agent, . . . the escrow agent establishes a new legal relationship to the principal parties . . . . [T]he escrow agent [is] an agent of, and owes a fiduciary duty to, all of the principal parties."

*USA Flea Market, LLC, v. EVMC Real Estate Consultants, Inc.*, 2006 WL 2830881, *2 (M.D. Fla., Oct. 2, 2006) (*quoting United Am. Bank of Fla. v. Seligman*, 599 So.2d 1014, 1016 (Fla. 5th DCA 1992)). The *Seligman* court noted:

> In every escrow agreement there are two agreements involved, although both can be incorporated into one document. The primary agreement is between the principal parties who have or claim an interest to the escrowed funds. The second agreement is the agency agreement between the main parties as principals and the escrow agent.

Further, the law implies that,

> [T]he escrow agent has undertaken a legal obligation (1) to know the provisions and conditions of the principal agreement concerning the escrowed property, and (2) to exercise reasonable skill and ordinary diligence in holding and delivering possession of the escrowed property.

*United Am. Bank of Fla. v. Seligman*, 599 So.2d at 1016.

Under Florida law, the elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty, and (2) the breach of the duty such that it is the proximate cause of the plaintiff's damages. *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002).

This Court has already determined that Plaintiffs suffered actual damages: "[t]he additional $116,000.00 which was disbursed to Swire . . . is no longer held in the escrow account and constitutes actual damages to Plaintiffs." (Order, p. 11, n.3 [D.E. 124].)

As Florida law is clear, under the facts of this case, that Lawyers Title is an escrow agent who owes a fiduciary duty to the Plaintiffs, and that the Plaintiffs suffered actual damages for Lawyers Title's wrongful disbursement of the $116,000.00, the only issue left for this Court to decide is whether Lawyers Title breached its fiduciary duty to the Plaintiffs.

The answer to that question is yes.

2.    **§ 718.202 is incorporated into both the Purchase Agreement and the Escrow Agreement.**

The Purchase Agreement (*see* **Exhibit B**), at Paragraph 4, states the following:

> Deposits. Except as permitted below or by the provisions of the Florida Condominium Act,[7] all of Buyer's deposits will be held in escrow by LAWYERS TITLE INSURANCE CORPORATION ("Escrow Agent"), with offices at 200 South Biscayne Boulevard, Suite 2660, Miami, FL 33131, in accordance with the escrow agreement contained in the Condominium Documents. *The escrow agreement is incorporated into this Agreement as if repeated at length here*, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act[.] (Emphasis added.)

By its own terms, the Purchase Agreement expressly incorporates the Escrow Agreement.

The Escrow Agreement also provides, in Paragraph 10, that: "This Escrow Agreement shall be

---

[7] The Florida Condominium Act is the short title of Chapter 718 (*see* Fla. Stat. § 718.101 — "This Chapter shall be known and may be cited as the Condominium Act.") Clearly, the requirements of § 718.202 fall under the Condominium Act. In addition, § 718.102 provides: "Every condominium created and existing in this state shall be subject to the provisions of this chapter."

expressly incorporated by reference in all Contracts between Developer and purchasers." (*See* Escrow Agreement, **Exhibit C**.) The Escrow Agreements further states that the

> Developer intends to make arrangements to escrow deposits on each Contract in accordance herewith and with the provisions of Section 718.202, Florida Statutes. (*Id.*)

Finally, under Florida law, a contract, unless expressly stating otherwise, incorporates the law in force at the time and place of its making. *See Westside EKG Assoc. v. Foundation Health*, 932 So.2d 214, 216 (Fla. 4th DCA 2005) ("It is an accepted principle of law that when parties contract upon a matter which is the subject of statutory regulation, the parties are presumed to have entered into their agreement with reference to such statute, which becomes part of the contract, unless the contract discloses a contrary intention.") (*citing Grant v. State Farm Fire and Cas. Co.,* 638 So.2d 936 (Fla.1994); *P.C. Lissenden Co. v. Bd. of Cty. Comm'rs of Palm Beach,* 116 So.2d 632 (Fla.1960); *Citizens Ins. Co. v. Barnes,* 98 Fla. 933, 124 So. 722 (1929)); *see also Corporate Financial Inc. v. Principal Life Insur. Co.*, 461 F. Supp. 2d 1274, 1288 (S.D. Fla. 2006).[8]

There is no question that the escrowing of deposits for a pre-construction condominium unit falls under statutory regulation. There is no question that all the parties entered into a contractual agreement for the escrowing of Plaintiffs' pre-construction condominium deposits and that under the clear dictate of Florida law the requirements of § 718.202 are incorporated into the parties' Escrow Agreement. There is no question that Swire clearly made its intent known, both to Plaintiffs and Lawyers Title, that the requirements of § 718.202 controlled the

---

[8] The undersigned acknowledges that this Court, in its December 15, 2009 Order, denied Plaintiffs' Motion for Summary Judgment on the issue whether Swire breached the Purchase Agreement for failing to create and establish two escrow accounts under § 718.202. The Court held that compliance with § 718.202 was not a material term of the contract. The undersigned did not bring to the Court's attention the long held rule in this state that a contract incorporates a regulatory statute when the parties contract upon a matter within the regulatory statute's purview unless the contract expressly states otherwise. Be that as it may, the Court's Order did not address Lawyers Title's liability on this issue, only Swire's. (*See, infra,* Section III D.)

handling of the escrowed funds. There is also no question that by acting as the escrow agent Lawyers Title entered into a fiduciary relationship with the Plaintiffs. As a fiduciary, Lawyers Title had the legal obligation to inform itself of *all* the contractual requirements for escrowing the deposits, *including* the requirements under Fla. Stat. § 718.202 to create and establish two escrow accounts for deposits over 10% of the purchase price of the condominium unit. (*See Seligman* at 1016.)

Thus, the only issue left is whether Lawyers Title exercised reasonable diligence and ordinary skill in the manner in which it handled Plaintiffs' deposits. The answer, obviously, is no.

This Court noted in its Order that § 718.202 can only be reasonably interpreted in one way — that it requires the creation of two escrow accounts when a deposit exceeds 10% of the purchase price. This statute is not difficult to read and comprehend (despite Swire's willful misreading or Lawyers Title's ostrich-like behavior). *See Barrack v. State of Florida*, 462 So. 2d 1196, 1197 (Fla. 4th DCA 1985) ("The section [718.202] provides in precise and easily understood terms obligations with reference to receiving and handling condominium parcel purchase funds.")

Furthermore, Lawyers Title's own escrow manager, Damaris Rodriguez, acknowledged the statute's plain instructions:

> Q.   *Doesn't 718.202 require the escrow agent to create a separate account or a special account for deposits in excess of 10 percent? . . .*
>
> A.   *. . . Yes, it says that.*
>
> (See Dep. of Damaris Rodriguez, 25:18-26:9, [D.E. 92].)

Lawyers Title manifestly did not act with reasonable diligence (it failed to apprise itself of the requirements of a governing, regulatory statute (§ 718.202)). Nor did it act with ordinary

skill — it failed to create the two mandated escrow accounts, it wrongfully disbursed $116,000.00 to Swire in violation of § 718.202(3), and it failed, under § 718.202(1)(a), to refund the full deposit (plus interest) or to release to Plaintiffs the funds held in escrow ($116,404.38) despite Plaintiffs' repeated (and proper) termination of the Purchase Agreement pursuant to § 718.202(5).

For all the foregoing reasons, this Court should award damages to Plaintiffs for Lawyers Title's breach of fiduciary duty as supplemental relief under 28 U.S.C. § 2202.

**D.      Breach of Third Party Beneficiary Contract or Breach of Contract Against Lawyers Title**

Though Plaintiffs have, since the early stages of this lawsuit, notified Lawyers Title of its claim for third party beneficiary contract, the analysis developed in the prior section (III C) supports a revision of that cause of action to a straightforward breach of contract claim. If the Court finds that by the plain language of both the Purchase Agreement and the Escrow Agreement that the Escrow Agreement is incorporated into the Purchase Agreement, then, logically, Plaintiff Daymi Rodriguez, Swire, and Lawyers Title are all signatories to the same contract.

In Florida, the creation of escrow accounts and the handling of escrowed funds given for the purchase of a pre-construction condominium are regulated by statute (§ 718.202). The long-standing principle is that a contract, unless expressly stating otherwise, incorporates the law in force at the time and place of its making. *See Westside EKG Assoc. v. Foundation Health*, 932 So.2d 214, 216 (Fla. 4th DCA 2005). The incorporation of the requirements of § 718.202 into the Purchase Agreement (via the Escrow Agreement) turns Swire and Lawyers Title's failure to abide by those requirements into a material breach.

One court has stated that "[t]o constitute a vital or material breach, a party's nonperformance must go to the essence of the contract." *Covelli Family L.P. v. ABG5 L.L.C.*, 977 So.2d 749, 751 (Fla. 4th DCA 2008) (internal citations omitted.) The Purchase Agreement has three, and only three, parties: the buyer, the developer, and the escrow agent. Under the Purchase Agreement the developer would build and convey a condominium unit, the Plaintiffs' would pay an initial deposit and then pay the remaining funds at closing, and the escrow agent would handle the Plaintiffs' deposits as required under the Purchase Agreement and Florida law.

An intrinsic and key part of the transaction included the Plaintiffs' payment of a large deposit and the escrow agent's (and developer's) reciprocal obligation to properly escrow that deposit. That was not done. The escrow agent compounded its initial failure to create and establish the two statutorily required escrow accounts by, first, wrongfully disbursing $116,000.00 to the developer and, second, by then refusing to disburse the remaining funds to the Plaintiffs (or make them whole for the entire amount) despite the Plaintiffs' properly terminating the contract. In short, how the money is handled in a pre-construction contract is as vital as how the contracted-for unit is built and delivered. Both go to the essence of the contract. If this were not true, then the Florida Condominium Act would not require the intermediary services of an escrow agent.

Lastly, the only difference between a breach of contract claim and a breach of third party beneficiary claim is that in the latter the Court must find a "clear or manifest intent of the contracting parties that the contract primarily and directly benefits the third party." *Networkip, LLC v. Spread Enters., Inc.*, 922 So.2d 355, 358 (Fla. 3rd DCA 2006). If the Court finds that the Purchase Agreement and Escrow Agreement constitute one agreement, then the Plaintiffs seek relief on their breach of contract claim. If, on the other hand, the Court finds them to be distinct

and separate agreements, then the Plaintiffs seek relief against Lawyers Title for its failure to perform its obligations to the Plaintiffs (as third party beneficiaries) under the Escrow Agreement.

The Escrow Agreement clearly contemplates that it exists for the benefit of the contracting parties, both the developer and the buyer. For example, the Escrow Agreement expressly provides that:

> Escrow Agent shall disburse the purchaser's deposit(s), escrowed hereunder, and any interest earned thereon, in accordance with the following:
>
> (a) To the purchaser, within (5) days after the purchaser has properly terminated his or her contract.

(Escrow Agreement, Exhibit C, p.1.)

It is indisputable that Plaintiffs properly terminated the contract. They repeatedly notified Lawyers Title that they had terminated, and, regardless, they still have not received their deposit (despite many more than five days passing). Thus, Lawyers Title has clearly breached its contractual obligations to the Plaintiffs (whether directly as obligees or indirectly as beneficiaries) even if one does not take into account Lawyers Title's multiple violations under § 718.202 (the requirements of which are incorporated into the contracts under Florida law).

For the foregoing reasons, Plaintiffs seek supplemental relief under 28 U.S.C. § 2202, either as obligees or beneficiaries under the Purchase Agreement or the Escrow Agreement, against Lawyers Title for breach of contract damages.

**E.    Lawyers Title's Failures To Comply With § 718.202 Is Negligence Per Se**

Under Florida law, to maintain an action for negligence per se a plaintiff must establish, (1) that he or she is of the class of persons that the statute intended to protect; (2) that he or she suffered an injury of the type the statute was designed to prevent; and (3) that the violation of the

statute was the proximate cause of his or her injury. *DeJesus v. Seaboard Coast Line Railroad Co.*, 281 So.2d 198, 201 (Fla. 1973).

Plaintiffs easily meet these elements. By its own terms, § 718.202 governs the obligations of developers and escrow agents vis-à-vis pre-construction deposits. Plaintiffs are purchasers who deposits escrow funds with Lawyers Title for the purchase of a pre-construction condominium unit. Plaintiffs suffered the loss of $116,000.00 (which this Court has described as actual damages) when Lawyers Title, in violation of § 718.202(3) wrongfully disbursed these funds to Swire. Such an injury is manifestly one § 718.202 was designed to protect given its requirements regarding the creation, establishment, and disbursement (especially to a developer) of escrowed funds.

Lawyers Title's violations of § 718.202 have proximately caused Plaintiff's injury, including Lawyers Title ongoing refusal to disburse the $116,404.38 in escrow to Plaintiffs despite Plaintiffs properly terminating under § 718.202(5). Lawyers Title's ongoing refusal is a direct violation of § 718.202(1)(a).

For the above reasons, Plaintiffs request this Court award damages, as supplemental relief under 28 U.S.C. § 2202, against Lawyers Title under Plaintiff's claim of negligence per se.

## IV. CONCLUSION

For the reasons enumerated above, Plaintiffs respectfully request this Court for supplemental relief under 28 U.S.C. § 2202. Damages are warranted against Lawyers Title for breach of fiduciary duty, for either breach of contract or breach of third party beneficiary contract, and for negligence per se.

Respectfully Submitted,

/s/ Alexander Lian
Alexander Lian (Florida Bar Number:
571271)
Attorney e-mail address:
alian@alexanderlian.com
LIAN & ASSOCIATES
701 Brickell Avenue, Suite 1650
Miami, Florida 33131
Telephone: (305) 381-7910
Facsimile: (305) 381-7135
*Attorney for Plaintiffs Double AA and
Daymi Rodriguez*

## Certificate of Service

I hereby certify that on January 4, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Alexander Lian

<u>SERVICE LIST</u>

## U.S. District Court
## Southern District of Florida (Miami)
## CASE #: 1:08-cv-23444-CMA

### 08-22662-CIV- ALTONAGA/BROWN

**Stephen James Binhak**
**Greenberg Traurig**
**1221 Brickell Avenue**
**Miami , FL 33131**
**305-579-0862**
**Fax: 579-0717**
**Email: binhaks@gtlaw.com**
*Attorneys for Swire Pacific Holdings*

**Sandra Jessica Millor**
**Greenberg Traurig**
**1221 Brickell Avenue**
**Miami , FL 33131**
**305-579-0774**
**Fax: 305-579-0717**
**Email: millors@gtlaw.com**
*Attorneys for Swire Pacific Holdings*

**Philip J. Kantor**
**Quintairos, Prieto, Wood & Boyer, P.A.**
**One East Broward Boulevard, Suite 1400**
**Fort Lauderdale, Florida 33301**
**(954) 523-7008**
**Fax: (954) 523-7009**
**Email:  pkantor@qpwblaw.com**
*Attorneys for Lawyers Title Insurance Corporation*

**Asika Patel**
**Quintairos, Prieto, Wood & Boyer, P.A.**
**One East Broward Boulevard, Suite 1400**
**Fort Lauderdale, Florida 33301**
**(954) 523-7008**
**Fax: (954) 523-7009**
**Email:  apatel@qpwblaw.com**
*Attorneys for Lawyers Title Insurance Corporation*

# EXHIBIT A



GreenbergTraurig

Sandra J. Millor
Tel. (305) 579-0774
Fax (305) 961-5774
MillorS@gtlaw.com

December 23, 2009

**VIA E-MAIL, FACSIMILE, & FIRST-CLASS MAIL**

Philip J. Kantor, Esq.
Quintairos, Prieto, Wood & Boyer, P.A.
One East Broward Blvd.
Suite 1400
Fort Lauderdale, Florida 33301

Re:     *Double AA, et al. v. Swire Pacific Holdings, Inc., et al.*
        *Case No. 08-23444-CIV-Altonaga/Brown*

Dear Phil,

On December 15, 2009, the Court granted summary judgment to Double AA and Daymi Rodriguez in Case No. 08-23444. As I understand it, shortly after the ruling, the plaintiffs' attorney demanded that Lawyers Title Insurance Corporation immediately release the deposit for Asia apartment 3202.

There is no final judgment in the case which would justify releasing the funds.

Accordingly, Swire is notifying Lawyers Title that there is still a pending dispute regarding the escrowed funds, and that Swire objects to the release of any of these funds at this time.

Thank you for your cooperation in this matter.

Sincerely,

Sandra J. Millor

Cc:   Alexander Lian, Esq.

# EXHIBIT B

Form 99

## ASIA, A CONDOMINIUM
## AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

In this Agreement ("Agreement"), the term "Buyer" or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" or "Developer" means or refers to Swire Pacific Holdings Inc., a Delaware corporation, and its successors and/or assigns.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition of such word is given in this Agreement, then in the Declaration (as defined in Section 1 of this Agreement).

| Buyer(s): | Double AA International Investment Group | | |
|---|---|---|---|
| Address: | 8045 NW 7th Street, Suite 407 | | |
| City: | Miami | State: | FL |
| Country: | USA | Zip Code: | 33126 |
| Home Phone: | 305-227-9986 | Office Phone: | |
| Tax I.D. No.: | | Fax. No. | 305-227-9987 |
| Email: | | Cellular No. | 305-812-8228 |
| Soc. Sec. No.: | | Other: | |

1.      **Purchase and Sale.** Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **3202**, (the "Unit") in the proposed ASIA, A CONDOMINIUM (the "Condominium"), located at approximately 900 Brickell Key Boulevard, Miami, Florida 33131. The Unit and the Condominium are described in greater detail in this Agreement and in the proposed Declaration of Condominium (the "Declaration") included in the Prospectus and attached exhibits (the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement. The foregoing statement shall not be in lieu of the execution of a Receipt for Condominium Documents.

The total purchase price for the Unit is **$ 1,160,000.00** (the "Purchase Price").

The Purchase Price also includes the exclusive use of one parking space to be located within the Common Elements of the Condominium Property. At closing, Buyer will receive an assignment of the exclusive right to use such parking space, which, once assigned, shall be a Limited Common Element appurtenant to the Unit. The designated parking space shall be selected by Seller or its designee, in its sole discretion.

2.      **Payment of the Purchase Price.** Buyer agrees to make the following payments against the Purchase Price:

| Payment | Due Date | Amount | |
|---|---|---|---|
| Initial 10% deposit | Upon execution of this Agreement | $ | |
| Application of Reservation Deposit (if applicable) | Upon execution of this Agreement | $ | 50,000.00 Received |
| Balance of Initial 10% Deposit | Upon execution of this Agreement | $ | 66,000.00 |
| Additional 10% deposit | 120 days following the date of this Agreement | $ | 116,000.00 |
| Balance | Due at closing | $ | 928,000.00 |
| TOTAL PURCHASE PRICE | | $ | 1,160,000.00 |

Deposits may be made by personal check (subject to clearance), cashier's check or wire transfer of federal funds. All payments must be made in United States funds and all checks must be payable on a bank located in the Continental United States. The balance due at closing must be paid by wire transfer of good funds or by cashier's check, payable directly to Seller or its designee, or as otherwise directed by Seller, drawn on a Florida bank doing business in Miami-Dade, Broward or Palm Beach County. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer by credit card and/or drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing. If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received and cleared by Seller.

Plaintiff's 0046

Buyer also agrees to pay all costs and other sums required to be paid by Buyer in this Agreement. At the present time, the costs for which dollar amounts can be computed are:

(a)     $_____14,500.00_____     -     1.25% Development Fee

(b)     $_____1,834.41_____     -     Initial Contribution to the Condominium Association and Master Association

These charges are subject to change as provided in Section 11 of this Agreement and are explained in more detail in that paragraph, as are other costs which cannot be computed at this time.

3.     How Buyer Pays. Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing. This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender. Buyer will be solely responsible for making Buyer's own financial arrangements. Seller agrees, however, to cooperate with any lender Buyer chooses and to coordinate closing with such lender, if, but only if, such lender meets the Seller's closing schedule and pays Seller the proceeds of its mortgage at closing. In the event that lender does not pay Seller these proceeds at closing in immediately cleared funds, and if Seller allows same (which it is not obligated to do), Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared. Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Buyer's obligation to close "all cash" on the purchase of the Unit.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance). This late funding charge may be estimated and charged by Seller at closing. Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request. The foregoing Section will survive (continue to be effective after) closing.

4.     Deposits. Except as permitted below or by the provisions of the Florida Condominium Act, all of Buyer's deposits will be held in escrow by LAWYERS TITLE INSURANCE CORPORATION ("Escrow Agent"), with offices at 200 South Biscayne Boulevard, Suite 2660, Miami, FL 33131, in accordance with the escrow agreement contained in the Condominium Documents. The escrow agreement is incorporated into this Agreement as if repeated at length here, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law. In addition to the foregoing, if Seller has obtained or obtains the approval of the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the Escrow Agent to disburse such deposits to it for all uses permitted by law. If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer. Likewise, if such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.

If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.

At closing, all deposits not previously disbursed to Seller will be released to Seller. Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller, and as such, shall not be credited against the Purchase Price of the Unit. Buyer further understands and agrees that to the extent that deposit monies are used for construction purposes, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest.

5.     Seller's Financing. Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium. Buyer agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing. At closing, Seller shall cause the then applicable mortgages to be released and may use Buyer's closing proceeds for such purpose. Neither this Agreement, nor Buyer's payment of deposits, will give Buyer any lien or claim against the Unit, the Condominium or the real property upon which the Condominium is being developed. Without limiting the generality of the foregoing, Buyer's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit or the Condominium (or the real property upon which the Condominium is being developed) even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6.     Insulation; Energy Efficiency. Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation: (a) 3/4" sprayed insulation on the exterior walls, having an R-Value of R-3; and (b) rigid insulation of varying widths on the roof, having an average R-Value of

Plaintiff's 0047

R-11. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors.

To the extent required by applicable law, each buyer may have the Condominium building's energy efficiency rating determined. In accordance with the provisions of applicable law, upon the completion and certification of an energy performance level display card for the Condominium building, such card shall be forwarded to the Buyer and deemed incorporated in this Agreement. Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's general right, under Sections 14, 27 and 30, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.     Completion Date, Presale Contingency. Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than June 30, 2009, subject, however, only to delays resulting from "Force Majeure" (the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control. Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least fifty percent (50%) of the Units in the Condominium. Seller must, however, notify Buyer of such a termination no later than one (1) year following the date of this Agreement, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to proceed with the construction of the Condominium and to remain bound by the terms of this Agreement, whether or not the stated presales threshold has been met. In the event of Seller's termination of this Agreement pursuant to this Section, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to meet the foregoing pre-sale requirement.

8.     Inspection Prior to Closing. Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit, itself) which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Miami-Dade County, Florida for properties, of similar, type, style and age), Seller will be obligated to correct those defects at its cost within a reasonable period of time after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted. Buyer understands and agrees that Seller's obligation to correct defects in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further obligations for the repair of such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition.

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit. If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees and contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time Seller performs any such work, Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns. Seller shall have no further obligation to complete punch list items if Seller has submitted three (3) written requests to Buyer for entry over a thirty (30) day period after closing, and access to the Unit has been denied for any reason.

Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workers at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing. Buyer recognizes that Seller is not obligated to agree to provide extras or options.

Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.     Closing Date. Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than six (6) months following the Outside Date.

Before Seller can require Buyer to close, however, two things must be done:

(a)     Seller must record the Declaration and related documents in the County public records; and

(b)     Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in), but, subject and subordinate to the provisions of paragraphs 8 and 34 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other

Plaintiff's 0048

portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing, except in the event that Buyer's lender, if any, requires closing to be held on less than ten (10) days' notice, in which event, Buyer shall close upon demand of Buyer's lender. Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least 3 days' notice of the new date, time and place is given). A change of time or place of closing (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of other information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation. If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or phone, telecopy or telex number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the Purchase Price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. Buyer agrees that the late funding charge is appropriate in order to cover, among other things, Seller's administrative and other expenses resulting from a delay in closing. Except only as may result from delays desired, requested or caused by Seller, all prorations will be made as of the originally scheduled closing date. Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.

10.   Closing.   The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price, Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy, in accordance with the terms set forth in Section 11 below.

In the event that Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, (i) Buyer shall provide Seller with written notice of same ten (10) business days prior to the originally scheduled closing date, (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer and (iii) Buyer shall, no later than five (5) business days prior to closing (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Buyer will receive two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

(a)   A written commitment, whether provided by Seller's closing agent or otherwise, from a title insurance company licensed in Florida agreeing to issue a policy insuring title (American Land Title Association Owner's Policy, Standard Form B) or the policy itself. This commitment (or policy) shall list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

i   Liability for all taxes or assessments affecting the Unit starting the year Buyer receives title and continuing thereafter;

ii   All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

iii   The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

Plaintiff's 0049

iv    The restrictions, covenants, terms and other provisions contained in the Declaration of Covenants, Restrictions and Easements for Brickell Key recorded in the Public Records of Miami-Dade County, Florida, as amended and supplemented from time to time.

v    Pending governmental liens or special assessment liens for public purposes as of closing (Seller will be responsible, however, for certified governmental liens or special assessment liens as of closing; provided, however, that to the extent that any such certified liens are then due or are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

vi    Standard exceptions for water-front property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar property

vii    All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Miami-Dade County, Florida (the "gap exceptions" and standard exceptions for parties in possession, and construction liens shall be deleted, however, at closing or otherwise insured over); and

viii    Any matters not listed above as long as affirmative title insurance is given for these matters and same do not render title unmarketable or uninsurable.

Buyer understands, however, that no limitation on Buyer's title prohibits construction of the Unit, nor the use of it as a residence, subject to the Condominium Documents.

(b)    <u>A Special Warranty Deed</u>. At closing, Seller promises to give Buyer a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Buyer will also receive at closing a bill of sale for any appliances included in the Unit, Seller's form of owner's ("no lien") affidavit, closing agreement, FIRPTA (non-foreign) affidavit and an assignment of the exclusive use of a parking space as provided above. When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate for transactions of this nature.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title. If Seller cannot , after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

a.    Buyer can accept title in the condition Seller offers it (with defects) and pay the full purchase price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit. Buyer will not make any claims against Seller because of the defects; or

b.    Buyer can cancel this Agreement and receive a full refund of Buyer's deposits. Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the purchase price and any additional amounts owed under this Agreement. Seller has no obligation to accept funds other than as set forth in Section 2 above. Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County). This Section shall survive closing.

11.    <u>Costs and Fees</u>. Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing. These include:



(a)    A "development fee" equal to one and one quarter percent (1.25%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price). This fee will be used, in part, to pay for the following closing costs: (i) the costs of officially recording the deed in the Public Records of the County (presently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page), and (ii) for documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (presently, documentary stamp taxes are $.60 for each $100.00 of consideration). The balance of the "development fee" shall be retained by Seller as additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with development of the Condominium. Accordingly, Buyer understands and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with development of the Condominium. In the event of increases in either the recording fees imposed by the County or the documentary stamp tax rates subsequent to the date of this Agreement, or in the event of the imposition of any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee.

(b)    The premium for the owner's title insurance policy, whether obtained from Seller's closing agent or another source, which if issued by Seller's closing agent shall be issued at the minimum promulgated risk rate promulgated by the Florida Insurance Commissioner.

Plaintiff's 0050

(c)     Loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable.  Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $795.00 for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan" closing agent.  In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender.  Notwithstanding any references in this paragraph to coordinating closing with any lender that Buyer may elect to obtain, nothing herein shall be deemed to make the Agreement, or the Buyer's obligations under the Agreement, conditional or contingent in any manner on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all-cash".  The amount of all lender's charges is now unknown.

(d)     A working capital contribution in an amount equal to: (i) twice the monthly maintenance charge owed to the Condominium Association and (ii) the quarterly maintenance charge owed to the Master Association, which charges are payable directly to the respective Associations to provide them with initial capital.  These contributions will not be credited against regular assessments.  Assuming no change in the current regular periodic assessments for the Unit, these charges will be in the amount shown in paragraph 2 of this Agreement.  These charges may change, however, if the applicable monthly assessments change prior to closing (see paragraph 17).

(e)     A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit.  The amount of this charge is now unknown.

(f)     The remaining balance, if any, of any charges for options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.

(g)     Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.

(h)     The late funding charges provided for elsewhere in this Agreement.  The amount of any such charges is now unknown.

Current expenses of the Unit (for example, taxes and governmental assessments, levies and/or use fees and current monthly assessments of the Condominium Association and quarterly assessments of the Master Association) will be prorated between Buyer and Seller as of the date of closing.  Additionally, at closing, Buyer shall be obligated to prepay the next periodic maintenance assessments to the Associations.  These prepayments are in addition to Buyer's obligation to pay the working capital contributions, as described above.  If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing.  If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes.  Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party, provided, however, that (i) the actual amount of taxes is at least 10% higher or lower than the estimate used for prorations, and (ii) any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year).  No request for proration of amounts less than the threshold set forth above or made beyond the six (6) month period shall be valid or enforceable.  In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and/or general service fees imposed by any governmental authority having jurisdiction over the Unit.  This Subsection shall survive (continue to be effective after) closing.

12.     <u>Adjustments with the Associations.</u>  Buyer understands that Seller may advance money to either or both of the Associations to permit it or them to pay for certain of its expenses (for example, but without limitation, insurance premiums, common element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses).  Seller is entitled to be reimbursed by the appropriate Association for all of these sums advanced by Seller.  The applicable Association(s) will reimburse Seller out of initial contributions and regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller.  Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the applicable Association(s).  No initial contributions of purchasers to the Condominium Association may be used for such purposes, however, as long as any guaranty by Seller of such Association's assessments is in effect.

13.     <u>Default.</u>  If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default".  If Buyer is still in default ten (10) days after Buyer receives notice thereof, Seller shall be entitled to the remedies provided herein.  If, however, Buyer's default is in failing to close on the scheduled date, then Seller can cancel this Agreement without giving Buyer any prior (or subsequent) notification or opportunity to close at a later date.

Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can resell the Unit without any accounting to Buyer.  Buyer understands that because Seller has taken the Unit off the market for Buyer, has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller.  As compensation for this damage, in the event Seller cancels this Agreement

Plaintiff's 0051

because of Buyer's default, Buyer authorizes Seller to keep (or if not then paid by Buyer, Buyer will pay to Seller) all deposits and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like). Buyer has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages (and not as a penalty) and as Seller's sole and exclusive remedy. Buyer and Seller agree to this because there is no other precise method of determining Seller's damages. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages.

If Seller fails to perform any of Seller's obligations under this Agreement, Seller will be in "default". If Seller is still in default ten (10) days after Buyer sends Seller notice thereof (or such longer time as may reasonably be necessary to cure the default if same cannot be reasonably cured within ten (10) days), Buyer will have such rights as may be available in equity and/or under applicable law, provided however, that absent an intentional or willful default by Seller under this Agreement, Buyer shall not be permitted to seek specific performance of Seller's obligations under this Agreement.

The provisions of this Section 13 will survive (continue to be effective after) closing.

14.     Construction Specifications.  The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time.  Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this Section 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers.  Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications".  Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion.  In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium. Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities).  As a result of the foregoing, Buyer and Seller both acknowledge and agree: The Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of Section 30, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications.  Seller has not given and Buyer has not relied on or bargained for any such warranties.  In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Buyer understands and agrees: The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the Condominium Documents or in any illustrations of the model and building); and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations).  Buyer agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan. This paragraph will not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property were intended solely for ingress and egress in the event of emergency and, as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells.  Similarly, the garage and utility pipes serving the Condominium are intended solely for functional purposes, and as such will be left unfinished without regard to the aesthetic appearance of same. The foregoing is not intended to prohibit the use of the stairwells, garage, and utility pipes for any other legal purpose. Further, Buyer hereby acknowledges and agrees that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises and/or odors from adjoining or nearby Units and/or mechanical equipment, and/or plumbing and/or piping installations can often be detected in other Units. Without limiting the generality of Section 30, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound and/or odor transmission.  Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount.  Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this Section, actual square footage of the Unit may also be affected.  Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit.  By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed to Buyer at any time prior to closing, whether included as part of the Condominium Documents, Seller's promotional materials or otherwise.  Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions or square footage of the Unit, and Buyer hereby waives and expressly releases any such warranty.

Plaintiff's 0052

Buyer further agrees and understands that trees and landscaping which are located on portions of the Condominium Property may be removed to accommodate construction. Seller does not guaranty the survival of any trees and landscaping which are left or planted on any portion of the Condominium Property.

The agreements and waivers of Buyer contained in this Section 14 will survive (continue to be effective after) closing.

15.   **Certain Items and Materials.** Buyer understands and agrees that the Unit is to be delivered at closing in "decorator-ready condition". "Decorator ready condition" generally means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Buyer after closing. The Unit will contain no floor, wall, window or ceiling coverings, other than flooring in the bathrooms. The Unit will not be painted and will not contain baseboards, moldings, closet rods or shelving, bathroom accessories or lighting fixtures. The Unit will contain, however, kitchen cabinets, a refrigerator, oven, range, microwave, dishwasher, and clothes washer and dryer. Buyer understands and agrees that certain items such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit: wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, brick, chattahoochee, scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only. Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller, or in any published list of standard Unit features distributed by Seller. Certain of these items may not even be available. In the event that Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay for such items. There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Buyer further understands and agrees that certain items, if included with the Unit, such as tile, marble, stone, granite, cabinets, wood, stain, grout, wall and ceiling textures, granite, marble, stone, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and agrees that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, stone, marble, granite, cabinetry, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within thirty (30) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood by Buyer that the choices will be made by Seller in Seller's sole discretion, and Buyer will be bound by Seller's choices.

The agreements and waivers of Buyer contained in this Section 15 will survive (continue to be effective after) closing.

16.   **Litigation.** In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys', paralegals and para-professionals fees and court costs at all trial and appellate levels. In addition, in the event of any litigation between the parties under this Purchase Agreement: (i) the parties shall and hereby submit to the jurisdiction of the state and federal courts of the State of Florida, and (ii) venue shall be laid exclusively in Miami-Dade County, Florida. This paragraph will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

17.   **Maintenance Fee.** Buyer understands and agrees that the Estimated Operating Budgets for the Condominium Association and the Master Association expenses (the "Budgets") contained in the Condominium Documents provide only an estimate of what it will cost to run the Associations during the period of time stated in the Budgets. The Budgets are not guaranteed to accurately predict actual expenditures. Changes in the Budgets may be made at any time to cover increases or decreases in actual expenses or in estimates. It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will elect not to provide any reserves for the initial year of the Condominium Association. Thereafter, on an annual basis, a majority of the Condominium Association's members (which may include the Developer during the second fiscal year of the Association) may vote to continue not to provide any reserves. If an election is in fact made to waive reserves, the assessments per unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves". If no such election is made, the assessments per Unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves". The budget of the Master Association is not guaranteed.

18.   **Condominium and Master Association.** This Agreement is also Buyer's application for membership in the Condominium and Master Associations, which memberships shall automatically take effect at closing. At that time, Buyer agrees to accept all of the liabilities and obligations of membership.

19.   **Seller's Use of the Condominium Property.** As long as Seller owns a unit or units and is offering same for sale in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property and/or Association Property (excluding the Unit after closing) and/or The Properties, model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents contractors and prospective buyers are also hereby given, for construction and sales promotion

Plaintiff's 0053

purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing) and/or The Properties, and the right to restrict and regulate access to the Common Elements and/or Association Property and/or The Properties , subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property, the Common Properties and/or other Units within the Condominium. Seller's salespeople can show units, the Association Property and/or the Common Elements and/or the Common Properties, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell, finance or lease Units or other portions of any improvements to be constructed upon the Condominium Property or develop and manage the Condominium Property and/or Association Property and/or The Properties or to provide management and administration and/or financial services, but Seller's use of the Condominium Property and/or Association Property and/or The Properties must be reasonable, in Seller's opinion, and cannot unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.



20.    Sales Commissions. Seller will pay all sales commissions due its exclusive listing agent and/or its in-house sales personnel and Swire Realty (if this space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker. To properly register a prospective buyer, the broker must, among other things, be present with the prospective buyer the first time that the buyer visits the Condominium. No broker's registration of a prospective buyer after the prospective buyer has visited the Condominium will be accepted by Seller. Seller has no responsibility to pay any sales commissions to any other broker or sales agent with whom Buyer has dealt (except as specifically named herein and then only as Seller has agreed in writing). Buyer will be solely responsible to pay any such brokers. Buyer represents and warrants to Seller that Buyer has not dealt with, nor has the sale been procured by, any real estate broker, salesperson or finder, other than Seller's in-house staff and the co-broker, if any, named in the first sentence of this subparagraph. Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise. Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Buyer (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses. This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

This Section 20 will survive (continue to be effective after) closing and any termination of this Agreement.

21.    Notices. Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at 501 Brickell Key Drive, Suite 600, Miami, Florida 33131, Attn., Asia Sales Director, or such other address as Seller may otherwise direct.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., FedEx, Express Mail, Emory, Purolator, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of this Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly delivered or mailed, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22.    Transfer or Assignment. Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a transfer of any stock, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed on the Multiple Listing Service or otherwise. Any violation of any of the foregoing provisions of this Section 22 shall be deemed an immediate default by Buyer under this Agreement (which is not capable of cure and for which no notice must be given).

23.    Others Bound by this Agreement. If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity resulting from operation of law. If more than one person signs this Agreement as Buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under this Agreement and Seller can enforce this Agreement against either as individuals or together.

24.    Public Records. Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Miami-Dade County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded by the Buyer.

25.    Buyer's Right to Cancel. THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS

Plaintiff's 0054

AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

If Buyer does not cancel this Agreement during this 15-day period in the manner set forth above, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

26.   Florida Law; Severability.  Any disputes that develop under this Agreement will be settled according to Florida law.  If any part of this Agreement violates a provision of applicable law, the applicable law will control.  In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

27.   Changes.  Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any.  Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest earned, if any.  Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion, or to pursue any remedy other than the 15-day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Buyer).

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the 15-day period will mean that Buyer accepts the change and waives Buyer's right so to cancel.  All rights of cancellation will terminate, then absolutely at closing, if not sooner.  After closing, Buyer will have no remedy for any changes Seller may make or have made.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements into any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.

The provisions of this Section 27 will survive (continue to be effective after) closing.

28.   Time of Essence.  The performance of all obligations by Buyer on the precise times stated in this Agreement is of absolute importance and failure by Buyer to so perform on time is a default, time being of the essence as to Buyer's obligations hereunder.

Plaintiff's 0055

29.     Nearby Activities and Views.  Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of nearby construction activity and Buyer may be impeded in using portions of the Condominium Property by that activity.  Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium.  Therefore, the Buyer hereby agrees to release Seller, its partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction.  As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus.  Additionally, inasmuch as the Commercial Units may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Common Elements, and in or around the Condominium Property, shall not be deemed a nuisance.

30.     Disclaimer of Implied Warranties.  All manufacturers' warranties will be passed through to Buyer at closing.  At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act.

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed.  Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203, Florida Statutes, to the extent applicable and to the extent that same have not expired by their terms.  Seller has not given and Buyer has not relied on or bargained for any such warranties.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or the Condominium Property.  Buyer is hereby advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk.  By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller and Seller's Affiliates from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by any of Buyer's Guests as defined below and any other person or any pets).  Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores.  Buyer understands and agrees that Seller is not responsible for, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Buyer's Guests")as a result of mold, mildew, fungus or spores.  It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

This Section will survive (continue to be effective after) closing.

31.     Representations.  Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantage.  Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives.  Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit.  Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit.  Further, Buyer understands and agrees that neither Seller, nor any brokerage company, in-house sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale, leasing or financing of the Unit.

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the media, in sales office and model suite are for promotional purposes only and may not be relied upon.  Buyer warrants that Buyer has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium, (d) disturbance from nearby properties, or (e) disturbance from air or vehicular traffic.  The provisions of this Section shall survive (continue to be effective after) the closing.

32.     Return of Condominium Documents.  If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him or her in the same condition received, reasonable wear and tear excepted.

Plaintiff's 0056

If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

33.　　Survival. Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

34.　　Substantial Completion. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so complete or substantially complete in Seller's opinion. Notwithstanding the foregoing, however, neither the Unit nor the building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased. The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it. Other units (and other portions of the building) may not necessarily be so complete and useable.

35.　　Disclosures. Under the laws of the State of Florida, Buyer is hereby advised as follows:　ᴅʀ ᴊʀ

(a)　RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)　CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

(c)　BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(d)　Pursuant to the mandates of Miami-Dade County Ordinance 93-21 and the provisions of Chapter 11C of the Metropolitan Dade County Code, Buyer is hereby advised, and acknowledges and agrees, that the Unit is located in (i) a coastal high hazard area, and (ii) a special flood hazard area. If the Unit is below the applicable flood elevation level and is substantially damaged or substantially improved, as defined in Chapter 11C of the Metropolitan Dade County Code, it may, among other things, be required to be raised to the applicable flood elevation level.

36.　　Offer. The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium. This Agreement shall not become binding until executed and delivered by both Buyer and Seller. Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer, otherwise the firm offer shall be considered rejected and all funds deposited by Buyer shall be promptly returned to Buyer.

37.　　Liability. The liability of Seller under this Agreement or any amendment or any instrument or document executed in connection with this Agreement shall be limited to and enforceable solely against the interest of Seller in the Condominium, and not against any other assets of Seller or any partner of Seller (or its or their officers, principals, directors, employees, managers, members or agents).

38.　　Miscellaneous. The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller. Buyer acknowledges that the primary inducement for him or her to purchase under this Agreement is the Unit itself and not the recreational amenities and other Common Elements. Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

39.　　Entire Agreement. This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can be amended only by a written instrument signed by both Buyer and Seller which specifically states that it is amending this Agreement. Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement are void and have no effect. Buyer has not relied on them.

Plaintiff's 0057

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

BUYER:

Name: _Jose Rodriguez_

Date of Execution: _2/2/05_

Name: _Dayeri Rodriguez_

Date of Execution: _2/2/05_

SELLER

Swire Pacific Holdings Inc., a Delaware corporation

By: _____
Name:
Title:

Date of Execution: _2/2/05_

Agreement
- 13 -

**Plaintiff's 0058**

**AMENDMENT TO PURCHASE AGREEMENT**
(Cabinets and Counter Selections)

THIS AGREEMENT is made as of the 2 day of February 2005, by and between Swire Pacific Holdings Inc., a Delaware corporation ("Seller") and Double AA International Investment Group. ("Buyer").

### RECITALS

A.      Seller and Buyer have entered into that certain Purchase Agreement (the "Agreement") for the purchase and sale of Unit 3202 (the "Unit") in ASIA, A CONDOMINIUM (the "Condominium").

B.      The parties desire to amend the Agreement in certain respects as more particularly set forth below.

NOW, THEREFORE, in consideration of the execution and delivery of the Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      The foregoing recitals are true and correct and are incorporated herein as if repeated at length. Unless the context otherwise requires, all initial capitalized terms used but not defined in this Amendment, shall have the meaning or meanings given to such terms in the Agreement. This Amendment shall be deemed a part of, but shall take precedence over and supersede any provisions to the contrary contained in, the Agreement.   All references in the Agreement or this Amendment to the "Agreement" or the "Purchase Agreement" shall be deemed to refer to the Agreement as modified by this Amendment, unless the context otherwise requires.

2.      At Buyer's request, the cabinets to be utilized in the kitchen shall be in the colors selected below:

Kitchen Cabinet:                Color:
(Select only one)

   ✓                    Sugadore

3.      At Buyer's request, the counters to be utilized in the kitchen shall be in the colors selected below:

Kitchen Counter:                Color:
(Select only one)

   ✓                    Cashmere white

Plaintiff's 0059

Without limiting the generality of Section 8 of the Agreement, Buyer understands and agrees that the cabinet and counter colors selected above are subject to color, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations. Buyer also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in the cabinets and/or counters (if any). Buyer recognizes that certain colors in wood stain, as shown in displays or in the models, will weather and fade and may not be duplicated precisely.

4.    The execution of this Amendment shall neither extend, toll, nor reinstate any rights of the Buyer to rescind the Agreement pursuant to the terms thereof, or of Section 718.503(1)(a), Florida Statutes.

5.    Except as amended herein, the Agreement shall remain in full force and effect.

EXECUTED as of the date and year first above written.

Buyer:

Name: _____

Name: _____

Seller:

Swire Pacific Holdings Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

**Plaintiff's 0060**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS AGREEMENT is made as of the 21 day of August, 2008 by and between Double AA International Investment Group ("Assignor") and Baysal Badelgoon ("Assignee").

1. **Assignment.** In consideration of the agreements of Assignee hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to that certain Purchase Agreement dated February 2, 2008 and all amendments and additions thereto, by and between SWIRE PACIFIC HOLDINGS Inc., a Delaware corporation, as Seller, and Assignor, as Purchaser, for the sale and purchase of Condominium Unit 2802 in ASIA, A CONDOMINIUM, according to the unrecorded Declaration of Condominium thereof, to be recorded in the Public Records of Miami-Dade County, Florida.

2. **Assumption.** Assignee hereby accepts the assignment described in Paragraph 1 above and assumes and undertakes to pay, perform and discharge each and every one of the obligations of the Assignor under the Purchase Agreement, as if Assignee had executed the Purchase Agreement ab initio.

3. **Assignment of Escrowed Funds.** Assignor does herewith assign, transfer and set over to Assignee any and all interest of Assignor in any funds previously paid to Developer now being held by Escrow Agent designated in said Purchase Agreement, and Escrow Agent and Developer be and are herewith instructed to deal with Assignee as if the original pay or of such funds.

4. **Assignor's Continuing Liability.** Notwithstanding the Assignment by Assignor to Assignee, Assignor shall remain liable to Developer under the terms and conditions of the Purchase Agreement to and including the closing of the transaction contemplated by the Purchase Agreement.

5. **Jurisdiction and Venue.** This Agreement shall be enforced in Miami-Dade County, Florida pursuant to the laws of the State of Florida, and all parties agree to submit to said jurisdiction and agree that venue is appropriate only in said jurisdiction.

6. **Miscellaneous.** This Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, successors and assigns and shall be governed by the laws of the State of Florida. The parties hereto agree to execute and deliver, or cause to be executed and delivered, such further instruments or documents and take such other actions as may be required to carry out effectively the transactions contemplated herein. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

THIS ASSIGNMENT is made as of the date set forth above, but, Assignor and Assignee understand and agree that same shall only be deemed effective upon the approval of same in writing by Seller.

"ASSIGNOR"

_____
Double AA International Investment Group

"ASSIGNEE"

_____
Baysal Badelgoon

APPROVED:
SWIRE PACIFIC HOLDINGS Inc.,
A Delaware corporation

By: _____
Date: _____

**Plaintiff's 0061**

## ASSIGNMENT AND ASSUMPTION
## AGREEMENT

THIS AGREEMENT is made as of the _____ day of August, 2008 by and between **Double AA International Investment Group** ("Assignor") and **Daymi Rodriguez** ("Assignee").

1.      **Assignment.**  In consideration of the agreements of Assignee hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to that certain Purchase Agreement dated **February 2, 2005** and all amendments and additions thereto, by and between **SWIRE PACIFIC HOLDINGS Inc. a Delaware corporation**, as Seller, and Assignor, as Purchaser, for the sale and purchase of Condominium Unit **3202** in **ASIA, A CONDOMINIUM**, according to the unrecorded Declaration of Condominium thereof, to be recorded in the Public Records of Miami-Dade County, Florida.

2.      **Assumption.**  Assignee hereby accepts the assignment described in Paragraph 1 above and assumes and undertakes to pay, perform and discharge each and every one of the obligations of the Assignor under the Purchase Agreement, as if Assignee had executed the Purchase Agreement *ab initio.*

3.      **Assignment of Escrowed Funds.**  Assignor does herewith assign, transfer and set over to Assignee any and all interest of Assignor in any funds previously paid to Developer now being held by Escrow Agent designated in said Purchase Agreement, and Escrow Agent and Developer be and are herewith instructed to deal with Assignee as if the original pay or of such funds.

4.      **Assignors' Continuing Liability.**       Notwithstanding the Assignment by Assignor to Assignee, Assignor shall remain liable to Developer under the terms and conditions of the Purchase Agreement to and including the closing of the transaction contemplated by the Purchase Agreement.

5.      **Jurisdiction and Venue.**  This Agreement shall be enforced in Miami-Dade County, Florida pursuant to the laws of the State of Florida, and all parties agree to submit to said jurisdiction and agree that venue is appropriate only in said jurisdiction.

6.      **Miscellaneous.**  This Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, successors and assigns and shall be governed by the laws of the State of Florida.  The parties hereto agree to execute and deliver, or cause to be executed and delivered, such further instruments or documents and take such other actions as may be required to carry out effectively the transactions contemplated herein. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

THIS ASSIGNMENT is made as of the date set forth above, but, Assignor and Assignee understand and agree that same shall only be deemed effective upon the approval of same in writing by Seller.

"ASSIGNOR(S)"                                       "ASSIGNEE(S)"


_____          _____
Double AA International Investment Group          Daymi Rodriguez




APPROVED:
SWIRE PACIFIC HOLDINGS Inc.,
A Delaware corporation


By:      _____
Date:    _____

Plaintiff's 0062

# EXHIBIT C

## ESCROW AGREEMENT

THIS AGREEMENT is made as of the 26th day of January, 2005, by and between LAWYERS TITLE INSURANCE CORPORATION ("Escrow Agent"), having an office at 200 South Biscayne Boulevard, Suite 2660, Miami, FL 33131 and Swire Pacific Holdings, Inc., a Delaware corporation ("Developer"), having an office at 501 Brickell Key Drive, Suite 600, Miami, FL 33131.

### W I T N E S S E T H

A.      Developer proposes to construct and develop a condominium in Miami-Dade County, Florida, to be located at approximately 900 Brickell Key Boulevard, Miami, Florida  33131, tentatively named ASIA, A CONDOMINIUM (as may hereafter be renamed, the "Condominium").

B.      Developer intends to enter into contracts for the sale and purchase of units in the Condominium (each of which is hereinafter called a "Contract").

C.      Developer desires to make arrangements to escrow deposits on each Contract in accordance herewith and with the provisions of Section 718.202, Florida Statutes.

D.      Escrow Agent has consented to hold all deposits it receives pursuant to the terms and provisions hereof.

NOW, THEREFORE, Escrow Agent and Developer hereby agree as follows:

1.      From time to time, Developer will deliver checks payable to or endorsed to Escrow Agent which will represent deposits on Contracts, together with a copy of each executed Contract (if not previously delivered with prior deposits) and a "Notice of Escrow Deposit" in the form attached hereto. Escrow Agent shall acknowledge receipt of the deposit upon the form attached and deliver an executed copy of same to Developer, and to the individual unit purchaser upon request.

2.      Escrow Agent shall disburse the purchaser's deposit(s), escrowed hereunder, and any interest earned thereon, in accordance with the following:

(a)     To the purchaser, within five (5) days after the purchaser has properly terminated his or her contract.

(b)     To Developer, within five (5) days after the receipt of Developer's written certification that the purchaser's contract has been terminated by reason of said purchaser's failure to cure a default in performance of purchaser's obligations thereunder.

(c)     To Developer (as to that portion of the deposits equal to no more than 10% of the applicable purchase price) within five (5) days after receipt of the Developer's written certification, together with documented evidence, that the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes has accepted "other assurances" in accordance with Section 718.202 (1) of the Florida Condominium Act in lieu of requiring that such portion of the deposits be held in escrow pursuant to this Agreement. As of this date, the Director has not been requested to accept "alternative assurance", and, accordingly has not accepted any such "alternative assurances".

(d)     To Developer (as to that portion of the deposits in excess of 10% of the applicable purchase price) within five (5) days after receipt of the Developer's written certification that construction of the improvements of the Condominium has begun, that the Developer will use such funds in the actual construction and development of the Condominium Property and that no part of these funds will be used for salaries or commissions, or for expenses of salesmen or for advertising purposes. Escrow Agent shall not, however, be responsible to assure that such funds are so employed and shall be entitled to rely solely on such certification.

(e)     If the deposit of a purchaser has not been previously disbursed in accordance with the provisions of subparagraphs 2(a), 2(b), 2(c) or 2(d) above, the same shall be disbursed immediately to Developer or its designees upon receipt from Developer of a closing statement or other verification signed by the purchaser, or his attorney or authorized agent, reflecting that the transaction for sale and purchase of the subject condominium unit has been closed and consummated; provided, however, that no disbursement shall be made if prior to the disbursement, Escrow Agent receives from purchaser written notice of a dispute between the purchaser and Developer until such dispute is settled as evidenced by written notice from both purchaser and Developer or by an order of a court of competent jurisdiction.

(f)     Escrow Agent shall at any time make distribution of the purchaser's deposit and interest earned thereon upon written direction duly executed by Developer and purchaser.

No disbursement need be made by Escrow Agent until sums necessary to make such disbursement have actually and finally cleared Escrow Agent's account.

3.      Escrow Agent shall, at Developer's discretion, invest the deposits received hereunder in savings or time deposits in institutions insured by any agency of the United States or in securities of the United States and/or any agency thereof, and/or in such other lawful manner as the Developer shall direct, provided title thereto shall always evidence the escrow relationship. Escrow Agent assumes no liability or responsibility for any loss of funds which may result from the failure of any institution in which Developer directs that such savings or time deposits be invested nor any loss or impairment of funds deposited in escrow in the course of collection or while on deposit with a trust company, bank, or savings association resulting

**Plaintiff's 0259**

from failure, insolvency or suspension of such institution, or the fact that such funds exceed the maximum amount insured by the FDIC.

4.      Escrow Agent may act in reliance upon any writing, instrument or signature which it, in good faith, believes to be genuine, may assume the validity and accuracy of any statements or assertions contained in such writing or instrument and may assume that any person purporting to give any writing, notice, advice or instruction in connection with the provisions hereof has been duly authorized to do so. Escrow Agent shall not be liable in any manner for the sufficiency or correctness as to form, manner of execution, or validity of any written instructions delivered to it, nor as to the identity, authority, or rights of any person executing the same. The duties of Escrow Agent shall be limited to the safekeeping of the deposits and the disbursement of same in accordance with the written instructions described above. Escrow Agent undertakes to perform only such duties as are expressly set forth herein, and no implied duties or obligations shall be read into this Agreement against Escrow Agent. Upon Escrow Agent disbursing the deposit of a purchaser in accordance with the provisions hereof, the escrow shall terminate with respect to said purchaser's deposit, and Escrow Agent shall thereupon be released of all liability hereunder in connection therewith.

5.      Escrow Agent may consult with counsel of its own choice and shall have full and complete authority and protection for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel. Escrow Agent shall not be liable for any mistakes of fact or errors of judgment, or for any acts or omissions of any kind unless caused by its misconduct or gross negligence, and Developer agrees to indemnify and hold Escrow Agent harmless from and against any claims, demands, causes of action, liabilities, damages, judgments, including the cost of defending any action against it together with any reasonable attorneys' fees incurred therewith, in connection with Escrow Agent's undertaking pursuant to the terms and conditions of this Escrow Agreement, unless such action or omission is a result of the misconduct or gross negligence of Escrow Agent.

6.      In the event of a good faith disagreement about the interpretation of this Agreement, or about the rights and obligations, or the propriety, of any action contemplated by Escrow Agent hereunder, Escrow Agent may, at its sole discretion, file an action in interpleader to resolve said disagreement. Escrow Agent shall be indemnified by Developer for all costs, including reasonable attorneys' fees, in connection with the aforesaid interpleader action. No such action shall be filed where the Escrow Agent's required course of action is clearly dictated herein.

7.      Escrow Agent may resign at any time upon the giving of thirty (30) days' written notice to Developer. If a successor to Escrow Agent is not appointed within thirty (30) days after notice of resignation, Escrow Agent may petition any court of competent jurisdiction to name a successor escrow agent and Escrow Agent shall be fully released from all liability under this Agreement to any and all parties, upon the transfer of the escrow deposit to the successor escrow agent either designated by Developer or appointed by the Court. The successor escrow agent must be authorized to act as such by the Florida Condominium Act.

8.      Developer shall have the right to replace Escrow Agent upon thirty (30) days' written notice with a successor escrow agent named by Developer. In such event, Escrow Agent shall turn over to the successor escrow agent all funds, documents, records and properties deposited with Escrow Agent in connection herewith and thereafter shall have no further liability hereunder. The successor or other escrow agent must be authorized to act as such by the Florida Condominium Act.

9.      This Agreement shall be construed and enforced according to the laws of the State of Florida and this Agreement may be made a part, in its entirety, of any prospectus, offering circular or binder of documents distributed to purchasers or prospective purchasers of condominium units in the Condominium.

10.     This Escrow Agreement shall be expressly incorporated by reference in all Contracts between Developer and purchasers.

11.     As used in this Escrow Agreement, interest will be deemed earned on a specific deposit at the rate which is the average for all deposits held hereunder over the period the specific deposit is held.

12.     This Agreement represents the entire agreement between the parties with respect to the subject matter hereof and shall be binding upon the parties, their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

LAWYERS TITLE INSURANCE CORPORATION

By: _____

Name: _____

Title: _____

(Corporate Seal)

Swire Pacific Holdings, Inc., a Delaware corporation

By: _____

Name: STEPHEN L. OWENS

Title: VICE PRESIDENT

Plaintiff's 0260