UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-23444-CIV-ALTONAGA/Brown

DOUBLE AA INTERNATIONAL
INVESTMENT GROUP, INC.;
and **DAYMI RODRIGUEZ**,

      Plaintiffs,

vs.

SWIRE PACIFIC HOLDINGS, INC.,
a Delaware corporation; and **LAWYERS
TITLE INSURANCE CORPORATION**,

      Defendants.

_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the Court on January 20 and February 11, 2010. The Court has carefully considered the arguments and written submissions of the parties, and applicable law. The following findings of fact and conclusions of law are now made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

### I. Procedural History

This case arises from the preconstruction sale of a luxury residential condominium in Miami, Florida, and the manner in which the purchasers' $232,000.00 deposit was handled by the developer and its escrow agent. Central to this dispute are the requirements imposed on condominium developers by Section 718.202 of the Florida Statutes, and the remedy afforded purchasers when the developer and its escrow agent fail to follow the law.

Purchasers, Double AA International Investment Group ("Double AA") and Daymi Rodriguez ("Rodriguez") (collectively, "Plaintiffs"), filed suit against the developer, Swire Pacific

Case No. 08-23444-CIV-ALTONAGA/Brown

Holdings, Inc. ("Swire"), and its escrow agent, Lawyers Title Insurance Corporation ("Lawyers Title") (collectively, "Defendants"), on December 12, 2008.  (*See* Complaint ("Compl.") [D.E. 1]). Plaintiffs subsequently filed an Amended Complaint ("Am. Compl.") [D.E. 47] on June 11, 2009. In the Amended Complaint, Plaintiffs (1) seek a declaratory judgment against Swire as to the disposition of $116,000.00 held in escrow by Lawyers Title on the grounds that a Purchase and Sale Agreement ("Purchase Agreement") between Plaintiffs and Swire is invalid based on lack of mutuality of remedies, and because a liquidated damages clause in the contract is a penalty (Count I); (2) seek a declaratory judgment against Swire and Lawyers Title as to the disposition of the $116,000.00 held in escrow, as well as the additional $116,000.00 deposited by Plaintiffs, on the basis that Defendants violated section 718.202 (Count II); (3) allege violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-213, against Swire (Count III); (4) allege breach of contract against Swire (Count IV); and (5) allege a breach of the covenant of good faith and fair dealing against Swire (Count V).  Swire and Lawyers Title each filed an Answer and Affirmative Defenses.  (*See* Def. Swire's Answer, Defenses & Affirmative Defenses ("Swire's Answer") [D.E. 48]; Def. Lawyers Title's Answer, and Affirmative Defenses ("Lawyers Title's Answer") [D.E. 49]).

With its Answer to the initial Complaint, Lawyers Title also filed an Interpleader as a Counterclaim against Plaintiffs and Swire, alleging Lawyers Title had no interest in the $116,404.38 deposit it held in escrow, asking to be discharged from all liability except as to the party to whom the escrow monies should rightfully be distributed, and seeking to recover its costs and attorney's fees.  (*See* Def. Lawyers Title's Countercl. ("Countercl.") [D.E. 7] ¶¶ 19-23).  Swire and Plaintiffs

Case No. 08-23444-CIV-ALTONAGA/Brown

filed their respective Answers to Lawyers Title's Counterclaim.  (*See* Swire's Answer to Def. Lawyers Title's Countercl. [D.E. 23]; Pls.' Reply to Lawyers Title's Countercl. [D.E. 35]).

Thereafter, Swire and Plaintiffs filed Cross Motions for Summary Judgment.  (*See* Swire's Mot. for Summ. J. [D.E. 89]; Pls.' Mot. for Summ. J. [D.E. 93]).  The Court granted Plaintiffs' Motion as to Swire on Count II (declaratory judgment) and denied their Motion as to Count IV (breach of contract).  (*See* Order (*"Summ. J. Order"*) [D.E. 124], entered on December 14, 2009). The Court granted Swire's Motion as to Count III (violation of the FDUTPA), Count IV (breach of contract), and Count V (breach of the covenant of good faith and fair dealing), but denied Swire's Motion as to Count I (declaratory judgment).  (*See id.*).  Swire filed a Motion for Reconsideration [D.E. 127], asserting Plaintiffs were too late in filing their claims under *Zambrano v. Indian Creek Holding, LLC*, Case No. 09-20453-Civ-Huck, 2009 WL 1585980 (S.D. Fla. June 4, 2009), which motion was denied (*see* [D.E. 129]).  Subsequently, the Court granted Plaintiffs' Motion for Voluntary Dismissal of Count I of the Amended Complaint.  (*See* Order [D.E. 137]).

Two matters were left for trial: (1) Count II of the Amended Complaint against Lawyers Title, in which Plaintiffs allege Lawyers Title failed to release the escrowed funds despite their proper termination of the Purchase Agreement under section 718.202 (*see* Am. Compl. ¶¶ 68-76); and (2) Lawyers Title's Interpleader Counterclaim seeking the disposition of the monies it holds in escrow, its own discharge from all liability except as to the party to whom the escrow monies should be distributed, and recovery of costs and attorney's fees (*see* Countercl. ¶¶ 19-23)  Swire also used the opportunity of trial to re-argue the issues decided at summary judgment and urged the Court to

3

Case No. 08-23444-CIV-ALTONAGA/Brown

vacate the Summary Judgment Order against Swire on Count II.  (*See* Swire's Prop. Concl. of Law [D.E. 145] at 2, 18).

At trial, the parties presented no witnesses or evidence, insisting the remaining issues could be decided on the basis of documentation already provided.  At the Court's direction, then, the parties submitted 24 statements of stipulated facts including a statement agreeing to designated evidence for the Court's consideration.  (*See* Findings of Facts ("Findings") [D.E. 140]).  The Court heard only legal arguments, and the parties subsequently submitted their respective Proposed Conclusions of Law.  (*See* Def. Lawyers Title's Prop. Concl. of Law [D.E. 144]; Swire's Prop. Concl. of Law; and Pls.' Prop. Concl. of Law [D.E. 146]).

## II.  <u>Findings of Fact</u>

Swire is the developer of "Asia, A Condominium" ("Asia"), a residential construction project and a condominium as defined by Section 718.103(11) of the Florida Statutes.  The project is subject to the Florida Condominium Act, as codified in Chapter 718 (2004) of the Florida Statutes.  On September 20, 2004, Jose Rodriguez and Daymi Rodriguez signed a Reservation Agreement for the purchase of Unit 3202 in Asia and gave Swire a $50,000.00 reservation deposit check made out to Lawyers Title.  Lawyers Title issued a receipt for the funds to Jose and Daymi Rodriguez on September 21, 2004.  The receipt states that the "deposit will be held in accordance with your Reservation Agreement, the Escrow Agreement referred to therein and Florida Statutes, Section 718.202(6)."[1]  (Am. Compl., Ex. A).  Swire delivered the $50,000.00 reservation deposit to Lawyers Title to hold in escrow, and on September 29, 2004, Lawyers Title deposited the $50,000.00

---

[1] Neither the Reservation Agreement between Swire and Jose and Daymi Rodriguez, nor an Escrow Agreement in effect prior to January 25, 2005 between Swire and Lawyers Title was entered into evidence.

4

Case No. 08-23444-CIV-ALTONAGA/Brown

reservation deposit into Wachovia Bank, Account Number 2000026521273 ("the Reservation Account").

Two months later, on January 25, 2005, Swire and Lawyers Title entered into an Escrow Agreement whereby Lawyers Title agreed to serve as an escrow agent for Swire, holding all deposits Swire received from buyers of the Asia condominium units.  The Escrow Agreement includes the following recital: " Developer desires to make arrangements to escrow deposits on each Contract in accordance herewith and with the provisions of Section 718.202, Florida Statutes."  (Findings, Ex. 2 ¶ C).  Paragraph 9 of the Escrow Agreement states, "This Agreement shall be construed and enforced according to the laws of the State of Florida and this Agreement may be made a part, in its entirety, of any prospectus, offering circular or binder of documents distributed to purchasers or prospective purchasers of condominium units in the Condominium."  (*Id.* ¶ 9).  The Escrow Agreement also contains a provision expressly incorporating it "by reference in all Contracts between Developer and purchasers."  (*Id.* ¶ 10).

Double AA entered into an agreement with Swire to purchase Unit 3202 at Asia on February 2, 2005.  (*See* Findings, Ex. 1).  Paragraph 4 of the Purchase Agreement, titled "Deposits," states: "Except as permitted below or by the provisions of the Florida Condominium Act, all of the Buyer's deposits will be held in escrow by Lawyers Title . . . in accordance with the escrow agreement contained in the Condominium Documents."  (*Id.* ¶ 4).  That same paragraph includes language that incorporates the Escrow Agreement between Swire and Lawyers Title into the Purchase Agreement. With respect to the buyers' deposits, the Purchase Agreement includes a provision whereby the

Case No. 08-23444-CIV-ALTONAGA/Brown

"Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law." (*Id.*).

The purchase price of Unit 3202 was $1,160,000.00. The Purchase Agreement required an initial ten percent (10%) deposit of $116,000.00 on execution of the agreement with credit for the Reservation Deposit of $50,000.00. An additional ten percent (10%) deposit of $116,000.00 was due 120 days after the Purchase Agreement. Thus, the total deposit required for Unit 3202 was twenty percent (20%) of the purchase price, or $232,000.00.

Upon signing the Purchase Agreement on February 2, 2005, Double AA gave Swire $66,000.00, the balance of the initial ten percent deposit. Swire then transmitted the Double AA check to Lawyers Title, which deposited the funds into the Wachovia Reservation Account on February 7, 2005. On February 24, 2005, Lawyers Title transferred $66,000.00 of the total $116,000.00 on deposit from the Reservation Account to Wachovia Bank into Account Number 2000026526647 ("the Contracts Account").

On May 17, 2005, Double AA delivered to Swire the additional ten percent deposit of $116,000.00. Lawyers Title received the check and deposited it into the Contracts Account on May 18, 2005. The Contracts Account then held $182,000.00 of the $232,000.00 total deposit made by Double AA. On May 25, 2005, Lawyers Title transferred Double AA's initial reservation deposit with accrued interest, $50,404.38, from the Reservation Account to the Contracts Account. The Contracts Account then held $232,404.38, or the entirety of Double AA's deposits and interest earned on the initial reservation deposit.

6

Case No. 08-23444-CIV-ALTONAGA/Brown

Nearly a year later, on April 5, 2006, Swire provided written notice to Lawyers Title requesting the construction funds and certifying Swire would use the funds in the actual construction and development of Asia, and that no part of the funds would be used for salaries, commissions, expenses of salesmen or for advertising purposes.  On April 19, 2006, Lawyers Title released $116,000.00 to Swire from the Contracts Account as a construction draw.  Remaining in the Contracts Account was $116,404.38 of Double AA's deposits, or ten percent of the purchase price plus the interest earned on the reservation deposit.  This money was subsequently transferred by Lawyers Title from Wachovia Bank to HSBC Bank in February 2007.

Lawyers Title maintains a "Buyers Transaction Log" for each condominium unit sold.  The log documents the escrow transactions, "deposits received and the funds disbursed," and includes the initials of the person who worked on each transaction.  (Findings, Ex. 3 at 43).  The Buyers Transaction Log for Unit 3202 shows three deposits: $66,0000.00 on February 7, 2005; $116,000.00 on May 18, 2005; and $50,404.38 on May 25, 2005.  The log reflects the construction draw of $116,000.00 on April 19, 2006.  Two other entries appear on the log: (1) a withdrawal of $116,404.38 on July 17, 2008, with a handwritten notation "closed GT" followed by two sets of initials, and (2) a deposit of $116,404.38 on October 3, 2008, with a handwritten notation, "wire funds ret'd by GT" followed by one set of initials.  (*Id.*).  Apparently, in anticipation of closing, Lawyers Title transferred $116,404.38 to Swire's closing agent on July 17, 2009.[2]

---

[2]  The funds remained out of the control of Lawyers Title until October 3, 2009.  The funds were returned to Lawyers Title only after Plaintiffs noticed Lawyers Title of their dispute with Swire, apparently prompting Lawyers Title to recover the deposits from the developer's closing agent.

Case No. 08-23444-CIV-ALTONAGA/Brown

On August 8, 2008, Lawyers Title's parent company, LandAmerica, issued the following signed statement regarding Asia Unit 3202: "This is to confirm that Lawyer's Title Insurance Corp., as escrow agent for Asia has received a total amount of $232,000.00 in an Escrow Account at HSBC Bank, for the purchase of the above referenced unit.  <u>ALL FUNDS HAVE BEEN CLEARED</u>." (Am. Compl., Ex. G) (emphasis in original).  The parties concede that the statement suffers from grammatical imprecision, and that while it is true Lawyers Title had received a total of $232,000.00 in deposits for the purchase of Unit 3202 at the time the statement was made, only $116,000.00 of Double AA's deposits remained in escrow at HSBC Bank.  The Court notes the further inconsistency between this "corrected" version of the funds' status on August 8, 2008, and the Buyers Transaction Log maintained by Lawyers Title, which indicates that on August 8, 2008, none of Double AA's deposit funds remained in Lawyers Title's escrow account because all of the funds had been transferred to Swire's closing agent.

Double AA subsequently assigned the Purchase Agreement to Rodriguez on August 21, 2008, while retaining liability under the contract until Rodriguez closed on the condominium. Rodriguez accepted Double AA's rights and obligations under the Purchase Agreement.  On October 1, 2008, Plaintiffs' counsel notified Lawyers Title's agent, LandAmerica, of Plaintiffs' intent to cancel their Purchase Agreement with Swire and directed that their deposits not be released to Swire. Two days later, which was more than ten weeks after the anticipated closing date of July 23, 2008, Swire's closing agent wired $116,404.38, the balance of Plaintiffs' deposits, to HSBC Bank and back under the control of Lawyers Title.

Case No. 08-23444-CIV-ALTONAGA/Brown

Email communications between Plaintiffs' counsel and Lawyers Title on October 15, 2008 further indicate Plaintiffs' intention to cancel the Agreement and Lawyers Title's acknowledgment of that intent.  Plaintiffs also sent a cancellation letter to Swire's Sales Director, claiming that Swire materially breached the Purchase Agreement on October 14, 2008; Swire responded in writing the same day, rebutting the alleged breach.

When Plaintiffs filed their initial Complaint against Swire and Lawyers Title on December 12, 2008, they did not allege a violation of section 718.202.  However, on February 24, 2009, Plaintiffs sent Swire a letter indicating that Plaintiffs were exercising their option to void the Purchase Agreement under section 718.202(5) and demanding Swire return Plaintiffs' full deposit with interest.  Plaintiffs sent Swire a second demand letter on May 7, 2009, citing facts revealed during discovery to substantiate the violation and reaffirming their intention to void the Purchase Agreement.  Plaintiffs subsequently filed their Amended Complaint to include the section 718.202 violations on June 11, 2009.

### III.  Conclusions of Law

Two issues are before the Court.  First, Plaintiffs allege in Count II of their Amended Complaint that Lawyers Title has refused to release the $116,000.00 in escrow despite Plaintiffs' proper termination of the Purchase Agreement under section 718.202, and they seek a declaratory judgment as to the disposition of the deposit held by Lawyers Title, as well as attorney's fees and costs.  The second issue concerns Lawyers Title's Interpleader Counterclaim against Swire and Plaintiffs, in which Lawyers Title seeks (1) a determination as to the rightful disposition of the funds

Case No. 08-23444-CIV-ALTONAGA/Brown

in escrow; (2) the discharge of Lawyers Title from all liability except as to the party to whom the escrow monies should be distributed; and (3) its recovery of attorney's fees and costs.

In response to the Counterclaim, Plaintiffs maintain the escrow funds should be returned to them as they properly voided the Purchase Agreement under section 718.202. Lawyers Title, in response to Count II, and Swire, in response to the Interpleader, aver there was no violation of section 718.202 because Florida law does not require Plaintiffs' deposits be kept in two separate accounts. Furthermore, as affirmative defenses, Lawyers Title and Swire assert: (1) the contract is voidable, not void; (2) the violation was technical and does not render the contract voidable because the purpose of the statute was fulfilled; (3) the claim is time barred under section 718.503, Florida Statutes; and (4) the claim is barred by waiver, laches and estoppel.

The Summary Judgment Order found for Plaintiffs and against Swire on Count II, the same Count of the Amended Complaint at issue here against Lawyers Title. The Court ruled Swire had violated section 718.202 by failing to maintain Plaintiffs' initial ten percent deposit in an account separate from other deposit funds. Because Lawyers Title did not seek a summary judgment or participate in any way in the briefing of the issues raised in the Cross Motions, the Summary Judgment Order was silent as to Lawyers Title. Thus, Lawyers Title maintains it is entitled to a separate adjudication of Count II. Swire, before the Court to answer Lawyers Title's Counterclaim, uses its appearance, the opportunity of trial and the fortuitous coincidence of the partially-unresolved Count II to again ask the Court to reconsider and vacate the Summary Judgment Order against it as to Count II. Swire is, in effect, seeking a third bite at the proverbial apple of litigation and, given the procedural posture of the case, the Court must necessarily consider it.

10

Case No. 08-23444-CIV-ALTONAGA/Brown

Therefore the Court once again addresses (1) whether Swire and Lawyers Title violated Florida law by failing to maintain separate escrow deposit accounts; (2) if there was a violation, have Swire and Lawyers Title presented meritorious affirmative defenses; and (3) the remedy available in the event of a violation.[3]  Because this case appears to be one of first impression and because the parties disagree over what Florida law requires, the starting point for this analysis is the text of section 718.202 and a review of its legislative history.

**A.      Section 718.202: The Requirement of Separate Escrow Accounts**

An aerial view of Florida's coastline and major cities bears witness to the importance and popularity of the condominium as a form of property ownership in the State.  Not surprisingly, Florida has been a national leader in the development of condominium law.  *See*, *e.g.,* John R. Stokes, Note, *Commercial Condominiums: Statutory Roadblocks to Development*, 34 U. FLA. L. REV. 432, 433 (1981-82); Barry Kutun, Robert Krantz & Richard Blinderman, *Governmental Considerations: Condominiums and Recent Legislative Action in Florida*, 2 FLA. B. J.148 (1981). "In Florida, condominiums are creatures of statute and as such are subject to the control and regulation of the Legislature." *Century Village, Inc. v. Wellington, E, F, K ,L, H, J, M, & G, Condo. Ass'n*, 361 So. 2d 128, 133 (Fla. 1978).

The Florida Condominium Act ("the Act") was first adopted in 1963 to appease builders and bankers anxious to capitalize on what was then a novel form of property ownership.  *See* 1963 Fla. Laws c. 63-35, §§ 1 to 23; Michael Anderson, *Legal Protection for Florida Condominium and*

---

[3]  The Court is aware the Summary Judgment Order has prompted additional litigation across the State by purchasers seeking to void their preconstruction condominium purchase agreements, alleging violations of section 718.202.  (*See* Lawyers Title's Resp. to Pls.' Mot. for Vol. Dismissal of Count II of the Am. Compl. [D.E. 143] at 3-4).

11

Case No. 08-23444-CIV-ALTONAGA/Brown

*Cooperative Buyers and Owners*, 27 U. MIAMI L. REV. 451, n.3 (1973). The rapid growth in condominium construction and ownership between the mid-1960s and early 1980s along with the concomitant "abuses of unscrupulous developers and brokers" prompted regular updating by the state legislature as well as major revisions to the Act. Stokes, 34 U. FLA. L. REV. at 440; *see also* Guy Batsel, *Florida Condominiums – Developer Abuses and Securities Law Implications Create a Need for a State Regulatory Agency*, 25 U. FLA. L. REV. 350, 351 (1973) ("Florida has experienced the most phenomenal condominium growth . . . ."); Kutun, et. al, 2 FLA. B. J. at 148-49 (documenting condominium growth and legislative revisions). In its lawmaking, "[t]he objective of the Florida Legislature has been to strike a balance between the interests of individual unit buyers and owners, and those of the condominium developers and builders who represent a vital industry in Florida." Kutun, et al., 2 FLA. B. J. at 148.

### 1. The plain meaning of section 718.202

This dispute is between two buyers and a developer, and it first turns on whether Florida law required Swire to keep the Plaintiffs' deposits in two separate accounts. The undersigned has not been able to locate a published decision addressing whether a developer's failure to establish up to three separate escrow accounts under section 718.202 renders the contract voidable.[4] One Florida court has held that section 718.202 is not ambiguous or arbitrary, and that it "provides in precise and easily understood terms a condominium developer's obligations with reference to receiving and handling condominium parcel purchase funds. The wisdom of the legislature in its effort to protect

---

[4] One might surmise that the relative paucity of case law on this issue is due to the clarity of the statute.

12

Case No. 08-23444-CIV-ALTONAGA/Brown

an unsuspecting segment of society can be seen from the facts of this case." *Barrack v. State*, 462 So. 2d 1196, 1197 (Fla. 4th DCA 1985). The court there went on to observe

> It might have been simpler and more to the point for the legislature to merely restrict use by a developer of any such purchase funds, as opposed to specifying the type of escrow accounts that should be utilized; however, we can understand that the enacting body foresaw payment into the specified escrow accounts as a key to all else that is required by the section.

*Id.*

Courts "begin by examining the text of the statute to determine whether its meaning is clear." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). The "starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "The primary principle of statutory construction requires courts to give effect to the plain meaning of the words used 'in their ordinary and usual sense.'" *Brh. of Locomotive Eng'rs & Trainmen v. CSX Transp., Inc.*, 522 F.3d 1190, 1194-95 (11th Cir. 2008) (quoting *Caminetti v. United States*, 242 U.S. 470, 485-86 (1917)). "To the extent possible, the rules of statutory construction require courts to give meaning to every word and clause in a statute." *Id.* at 1195 (citations omitted). "[O]ne must assume that the legislature knew the plain and ordinary meaning of words when it chose to include them in a statute." *Sheffield v. Davis*, 562 So. 2d 384, 386 (Fla. 2d DCA 1990).

The text is the starting point of this analysis. A condominium developer's duty to maintain escrow accounts is clearly required by law:

> (1)  If a developer contracts to sell a condominium parcel and the construction . . . has not been substantially completed . . . , the developer shall pay into an escrow

13

account all payments up to 10 percent of the sale price received by the developer from the buyer towards the sale price. . . .

(2)  All payments which are in excess of the 10 percent of the sale price described in subsection (1) and which have been received prior to completion of construction by the developer from the buyer on a contract for purchase of a condominium parcel shall be held in a special escrow account established as provided in subsection (1) and controlled by an escrow agent and may not be used by the developer prior to closing the transaction, except as provided in subsection (3) or except for refund to the buyer. . . .

(3)  If the contract for sale of the condominium unit so provides, the developer may withdraw escrow funds in excess of 10 percent of the purchase price from the special account required by subsection (2) when the construction of improvements has begun. . . .

. . .

(5) The failure to comply with the provisions of this section renders the contract voidable by the buyer, and, if voided, all sums deposited or advanced under the contract shall be refunded with interest . . . .

(6)  If a developer enters a reservation agreement, the developer shall pay into an escrow account all reservation deposit payments.  Reservation deposits shall be payable to the escrow agent, who shall give to the prospective buyer a receipt for the deposit, acknowledging that the deposit is being held pursuant to the requirements of this subsection. . . .  Upon the execution of a purchase agreement for a unit, any funds paid by the purchaser as a deposit to reserve the unit pursuant to a reservation agreement, and any interest thereon, shall cease to be subject to the provisions of this subsection and shall instead be subject to the provisions of subsections (1)-(5).

(7)  Any developer who willfully fails to comply with the provisions of this section concerning establishment of an escrow account, deposits of funds into escrow, and withdrawal of funds from escrow is guilty of a felony of the third degree . . . .  The failure to establish an escrow account or to place funds in an escrow account is prima facie evidence of an intentional and purposeful violation of this section.

(8) Every escrow account required by this section shall be established with . . . a title insurer authorized to do business in this state, acting through either its employees or a title insurance agent licensed under chapter 626 . . . .

14

Case No. 08-23444-CIV-ALTONAGA/Brown

Fla. Stat. § 718.202 (2008).

"The obvious purpose of section 718.202 is to protect purchasers under preconstruction condominium contracts from loss of their deposits should the developer fail to perform its contractual obligations." *First Sarasota Serv. Corp. v. Miller*, 450 So. 2d 875, 878 (Fla. 2d DCA 1984). The plain meaning of section 718.202 requires a developer to establish as many as three escrow accounts when offering preconstruction condominiums for sale. Subsection (1) requires "an escrow account" for a buyer's deposits up to ten percent of the purchase price (the "protected deposit"). Subsection (2) requires that all payments in excess of ten percent of the purchase price be deposited in "a special escrow account" established in the same manner as the escrow account in subsection (1). The modifier "special" indicates the escrow account for deposits in excess of ten percent of the purchase price is different from the protected deposit account required in subsection (1). This understanding is reaffirmed by the text of subsection (3), which refers to "the special account" in subsection (2) as the source of funds available to developers for construction purposes under certain conditions. Finally, subsection (6) designates a third possible escrow account for reservation deposits. Upon execution of the purchase agreement, the reservation deposit becomes part of the protected deposit escrow account required in subsection (1) or the construction deposit special escrow account under subsection (2), depending upon the amount of money the buyer has deposited for the preconstruction condominium.

## 2. The legislative history of section 718.202

Notwithstanding the clarity of the statute, Defendants maintain they did not violate the statute because it does not require a separate special escrow account. They point the Court to the legislative

Case No. 08-23444-CIV-ALTONAGA/Brown

history of section 718.202 and focus on how the words "an," "the," "every," "account," "accounts," "special," and "escrow" are used throughout the statute.  But an understanding of the history of section 718.202 reinforces the plain meaning of the text and the intent of the Florida Legislature in drafting and amending this legislation.  What is clear from the following analysis is that Florida has repeatedly tried to protect the good faith deposits of condominium buyers from unscrupulous developers by requiring that a buyer's deposits be treated with special care.

In 1970, the Florida Legislature first addressed the issue at the heart of this case when it adopted a provision to protect buyers "who placed deposits with developers" for preconstruction condominiums.  Anderson, 27 U. MIAMI L. REV. at 459; *see* 1970 Fla. Laws ch. 70-274 § 3, codified as Fla. Stat. § 711.25.  Simply titled "Deposits," section 711.25 of the Florida Statutes contained three subsections.  The first required that deposits "shall be held in a special account by the seller or his duly authorized agent and shall not be commingled with the funds of the seller or his agent prior to the filing of a notice of commencement," and provided for the allocation of interest if the deposit is earned and the deposit is retained in the "special account for more than three months." Fla. Stat. § 711.25(1) (1971).

The second subsection allowed developers to "withdraw such advance deposits from the special account" for construction purposes on notice of commencement, if the contract provided for the withdrawal and included a legislatively-mandated consumer warning in boldface capital type no less than 20 point-type.  *Id.* § 711.25(2) (1971).  Immediately following the recitation of the characteristics of the required contract legend, the legislation provided:

> Failure to comply with the provisions of this subsection shall render the contract voidable at the option of the buyer, and all sums deposited or advanced under the

Case No. 08-23444-CIV-ALTONAGA/Brown

> contract shall be refunded with interest thereon at the highest rate then being paid on
> savings accounts . . . in the area in which the condominium property is located.

*Id.* In other words, a buyer had the option of voiding the contract if the developer used the buyer's

deposits without having provided notice in the contract, failed to include the required legend in the

contract, used the deposits in advance of a notice of commencement, or used the monies for other

than direct construction costs.  Important to note is that the buyer's option to void did not apply to

the developer's failure to establish a special account or violation of the bar on commingling of funds

in subsection (1).

The final subsection put some teeth into the consumer protection measure by placing

developers at risk of an embezzlement conviction "[i]f any portion of the funds so withdrawn is used

by the developer for any purpose other than as provided herein with intent to defraud the prospective

buyer . . . ."  *Id.* § 711.25(3) (1971).

In 1974, the Legislature transferred section 711.25 to section 711.67, changed the title to

"Sales; use of proceeds prior to closing," and extensively amended the provision to be more specific

regarding the control and disbursement of a buyer's deposit funds on a condominium that has not

been substantially completed when there was no performance bond to cover the construction

contract.  *See* 1974 Fla. Laws ch. 74-104 § 13, codified as Fla. Stat. § 711.67 (1974 Supp.).  A

wholly new subsection required the developer to

> establish an escrow with a bank or trust company having trust powers, an attorney
> who is a member of The Florida Bar, or a title company authorized to do business in
> the State of Florida, with whom shall be deposited all payments received by the
> developer from the buyer of such parcel upon the sale price of the parcel until the
> amount deposited shall equal 5 percent of the sale price.  The escrowed funds may
> be deposited in separate accounts or in common escrow or trust accounts or

Case No. 08-23444-CIV-ALTONAGA/Brown

> commingled with other escrow or trust moneys handled by or received by the escrow
> agent.

*Id.* § 711.67(1) (1974 Supp.).

Two important changes are especially relevant here: the requirement that an escrow agent be used and the bifurcated treatment of the buyer's deposit funds.  The apparent intent was to take the initial five percent of a buyer's deposits completely out of the hands of the developer and to protect it by placing the funds with an independent escrow agent.  In doing so, the Legislature also granted the escrow agent a great deal of latitude in how the agent managed the buyer's funds.

The new legislation distinguished between two types of buyer's deposits: the first five percent, which was to be set aside and protected for the buyer until closing (the "protected deposit"), and everything deposited beyond the first five percent, which could be used by the developer for construction costs (the "construction deposit").  With respect to the protected deposit, the legislation specified how and to whom funds could be released from escrow.  The first condition for release required, "[f]unds deposited from payments made by a buyer who properly voids his contract shall be paid to the buyer free of all costs of the escrow."  *Id.* § 711.67(1)(a) (1974 Supp.).  The escrow agent could release monies to the developer at or after closing "in accordance with written instructions from the buyer," *id.* § 711.67(1)(c) (1974 Supp.), or six months after closing unless the agent "has received from the buyer written notice of a dispute between the buyer and developer," *id.* § 711.67(1)(d) (1974 Supp.).  The developer could not receive the funds prior to closing unless the buyer defaulted.  *See id.* § 711.67(1)(b) (1974 Supp.).  A provision for the disbursement of interest on the protected deposit was also included.  *See id.* § 711.67(1)(e) (1974 Supp.).

Case No. 08-23444-CIV-ALTONAGA/Brown

The construction deposit and any interest accrued on it were addressed separately in the 1974 legislation.

> [S]uch money in excess of 5 percent of the sale price of the parcel shall be held in a special account by the developer or his duly authorized agent and shall not be used by the developer prior to closing of the transaction, except as provided in subsection (3) or for refund to the buyer.

*Id.* § 711.67(2) (1974 Supp.).  Interest earned on these funds went to the party "entitled to receive the principal upon closing or upon breach of the contract." *Id.*  Importantly, the construction deposit could be retained either by the developer or by its duly authorized agent in a special account.  The language of the 1971 legislation specifically barring the commingling of deposit funds with that of the seller or its agent seems to have been transposed into the earlier section governing the protected deposit and was not included in the provision where it probably was most needed – the developer's retention of the construction deposit.

Subsection (3) of the new legislation retained nearly verbatim the strictures of the 1971 legislation on using the special account funds (the construction deposit) only for construction purposes.  The buyer's option to void was also retained in the same form; a buyer could void only if the developer used the construction deposit for something other than construction, or used it for construction without notice to the buyer.  Thus, a buyer could not void the contract if a developer failed to escrow the protected deposit as required by subsection (1).  The criminal penalty provision, however, was revised to apply to a developer's failure to establish an escrow account "or if any portion of the funds withdrawn from the special account required by subsection (2) is used by the developer for any purpose other than as provided herein, with intent to defraud . . . ." *Id.* § 711.67(4) (1974 Supp.).

19

Case No. 08-23444-CIV-ALTONAGA/Brown

Two years later, the Florida Legislature engaged in a major revision of the Florida Condominium Act.  Structurally, the Act became chapter 718 and was divided into distinct parts. *See* 1976 Florida Laws ch. 76-222 § 1, codified as Fla. Stat. § 718.202 (1976 Supp.).  The deposit section was renamed "Sales deposits prior to closing," placed in Part II under "Rights and Obligations of Developers," and underwent its own substantive and structural changes.  First, the new legislation increased the amount of the buyer's protected deposit to ten percent.[5]  Second, while the discretion afforded to escrow agents on how they maintained the protected deposits was retained, the new law required them to provide the buyer with a receipt, if requested, and limited how agents might invest the protected deposits.  *See id.* § 718.202(1) (1976 Supp.).  The provision for releasing protected deposits was also reworded to address the distribution of interest under each of four scenarios.[6]

_____

[5] It also allowed certain real estate brokers to handle the escrow in addition to the previously-named agents.

[6]  The four conditions are:

    (a)  If a buyer properly terminates the contract pursuant to its terms or pursuant to this chapter, the funds shall be paid to the buyer together with any interest earned.

    (b)  If the buyer defaults in the performance of his obligations under the contract of purchase and sale, the funds shall be paid to the developer together with any interest earned.

    (c)  If the contract does not provide for the payment of any interest earned on the escrowed funds, interest shall be paid to the developer at the closing of the transaction.

    (d)  If the funds of a buyer have not been previously disbursed in accordance with the provisions of this subsection, they may be disbursed to the developer by the escrow agent at the closing of the transaction, unless prior to the disbursement the escrow agent receives from the buyer written notice of a dispute between the buyer and developer.

Fla. Stat. § 718.202(1) (1974 Supp.).

20

Case No. 08-23444-CIV-ALTONAGA/Brown

Important changes were also made to the legislative text on construction deposits. The word "escrow" was inserted in subsection (2): "All payments in excess of the 10 percent of the sale price . . . shall be held in a special escrow account by the developer or his agent and may not be used by the developer prior to closing the transaction, except as provided by subsection (3) or except for refund to the buyer." *Id.* § 718.202(2) (1976 Supp.). Subsection (3), which set out the conditions for using the construction deposits, was revised to include a direct reference to subsection (2). "(3) If the contract for sale of the condominium unit so provides, the developer may withdraw escrow funds in excess of 10 percent of the purchase price from the special account required by subsection (2) when the construction of improvements has begun." *Id.* § 718.202(3) (1976 Supp.).

Finally, the language regarding a buyer's option to void was removed from subsection (3) where it had previously been limited only to violations of that subsection, and was set out as a wholly new subsection applicable to the entire section.

> (5) Failure to comply with the provisions of this section renders the contract voidable by the buyer, and if voided, all sums deposited or advanced under the contract shall be refunded with interest at the highest rate then being paid on savings accounts, excluding certificates of deposit, by savings and loan associations in the area in which the condominium property is located.

*Id.* § 718.202(5) (1976 Supp.). Effectively, the Legislature imposed strict liability on the developer in favor of the buyer. Subsection (6), providing for criminal penalties, was also revised and referred to the multiple escrow accounts required by the section. "Any developer who willfully fails to pay all required funds into the escrow accounts required by this section is guilty of a felony . . . ." *Id.* § 718.202(6) (1976 Supp.).

Case No. 08-23444-CIV-ALTONAGA/Brown

In 1979, the Legislature added a new subsection to address a growing trend in condominium sales: the reservation agreement.[7]  *See* 1979 Florida Laws ch. 79-314 § 7, codified as Fla. Stat. § 718.202(6) (1980).  The section was re-titled: "Sales or reservation deposits prior to closing."  Fla. Stat. § 718.202 (1980).  To protect buyers, the Legislature required the developer to put a prospective buyer's reservation deposit into an escrow account established under the same strictures as the protected deposit escrow account and allowed buyers to receive a receipt for their money upon request.  *See id.* § 718.202(6) (1980).  Upon written request, the buyer could withdraw the funds at any time.  As with protected deposits, the escrow agent was granted similar latitude in how it maintained the funds with respect to the use of separate or common escrow accounts.  The legislation also provided for the further disposition of the funds by the agent when the buyer went forward with the purchase.

> Upon the execution of a purchase agreement for a unit, any funds paid by the purchaser as a deposit to reserve the unit pursuant to a reservation agreement, and any interest thereon, shall cease to be subject to the provisions of this subsection and shall instead be subject to the provisions of subsections (1)-(5).

*Id.* § 718.202(6) (1981).

In 1981, the Florida Legislature provided developers with an alternative to the protected deposit by allowing the developer to post a surety bond with the State.[8]  *See* 1981 Florida Laws ch. 81-185 § 3, codified as Fla. Stat. § 718.202(1).  The language was inserted in subsection (1), midway

---

[7] The subsection on reservation deposits was inserted between the buyer's option to void (subsection 5) and the subsection on criminal penalties (subsection 6, which became subsection 7). *See id.* § 718.202(6) (1980).

[8] A 1980 amendment added financial institutions with a threshold of assets to the list of approved escrow agents. *See* 1980 Florida Laws, c. 80-323, § 3, codified as Fla. Stat. § 718.202(1).

22

Case No. 08-23444-CIV-ALTONAGA/Brown

through the text on the escrow agent's obligations.  *See id.* § 718.202(1) (1982).  In other words, developers could potentially access all of a buyer's deposits for construction and avoid establishing the protected deposit account.

The reservation deposit subsection was also revised to benefit the buyer.  For example, reservation deposits had to be made payable to the escrow agent, a receipt was required with specific language referencing the statute, and the developer had to maintain separate records for each condominium for which deposits were accepted.  *See id.* § 718.202(6) (1982).  Language barred the escrow agent's release of reservation deposits to the developer "except as a down payment on the purchase price simultaneously with or subsequent to the execution of a contract."  *Id.*

Section 718.202 was once again revised by the Florida Legislature in 1984.[9]  *See* Florida Laws c. 84-368 § 9, codified as Fla. Stat. § 718.202 (1986).  The Legislature added subsection (8), which is devoted solely to the subject of escrow agents and escrow accounts.[10]  *See* Fla. Stat. §

---

[9]  Despite substantial revisions, no changes were made to subsections (3) (limiting use of construction deposits and requiring the contract legend), (4) (defining completion of construction), or (5) (the buyer's option to void).

[10]  Subsection (8) states:

(8)  All escrow accounts required by this section shall be established with a bank, a savings and loan association, an attorney who is a member of The Florida Bar, a real estate broker registered under chapter 475, or any financial lending institution having a net worth in excess of $5 million.  The escrow agent shall not be located outside the state unless, pursuant to the escrow agreement, the escrow agent submits to the jurisdiction of the division and the courts of this state for any cause of action arising from the escrow.  All escrow agents shall be independent of the developer, and no developer nor any officer, director, affiliate, subsidiary or employee thereof may serve as escrow agent.  Escrow funds may be invested only in securities of the United States or any agency thereof, or in accounts in institutions, the deposits of which are insured by an agency of the United States.

Fla. Laws c. 84-368, codified as Fla. Stat. § 718.202(8) (1986).

23

Case No. 08-23444-CIV-ALTONAGA/Brown

718.202(8) (1986).  It is clear from the revisions that the Legislature's intent was threefold: (a) to insure that all of a buyer's deposits – whether reservation, protected or construction – be placed into escrow accounts independent of the developer; (b) to identify those institutions eligible to maintain escrow accounts; and (c) to clarify how escrow accounts should be maintained and invested.  The text designating the institutions eligible to serve as escrow agents in subsections (1) and (6), which address the protected and reservation deposits, was moved to the new subsection (8).  *See id.*

The Legislature also eliminated the developer's control over a buyer's construction deposits held in the special escrow account by deleting the words "by the developer or his agent."  *Id.* § 718.202(2) (1986).  Retaining the language requiring construction deposits "be held in a special escrow account," the Legislature added, immediately thereafter, "established as provided in subsection (1) and controlled by an escrow agent . . . ."[11]  *Id.*  The intent of the Legislature here is clear: the special escrow account holding a buyer's construction deposit would no longer be held by the developer but by an escrow agent, and the special escrow account must be established in the same manner as the escrow account holding the buyer's protected deposit.

Also important for this case is the omission of two sentences – which previously appeared consecutively – from subsection (1), and the fact that only one of these sentences was moved to the

---

[11]  Changes to subsection (2), with insertions underlined and deletions stricken, are as follows:

(2)  All payments in excess of the 10 percent of the sale price described in subsection (1) received prior to completion of construction by the developer from the buyer on a contract for purchase of a condominium parcel shall be held in a special escrow account established as provided in subsection (1) and controlled by an escrow agent ~~by the developer or his agent~~ and may not be used by the developer prior to closing the transaction, except as provided in subsection (3) or except for refund to the buyer.

Fla. Laws c. 84-368, codified as Fla. Stat. § 718.202(2) (1986).

Case No. 08-23444-CIV-ALTONAGA/Brown

new subsection on escrow.  The first, which afforded escrow agents flexibility concerning how to maintain the protected deposit escrow account, was completely omitted from the statute: "The escrowed funds may be deposited in separate accounts or in common escrow or trust accounts or commingled with other escrow or trust accounts handled by or received by the escrow agent." *Id.* § 718.202(1) (1986).  The very next sentence was modified slightly and moved to subsection (8).[12] The relevance here is the Legislature's affirmative omission of the singular provision that allowed escrow agents to determine how they would maintain the buyer's protected deposit and, following the revision, the construction deposit.  It is also instructive to note the new subsection (8) refers to "[a]ll escrow accounts required by this section . . . ." *Id.* § 718.202(8) (1986).  In short, the Legislature's reference to multiple accounts reflects its intention that the three accounts – one for the

---

[12]  Relevant changes to subsection (1), with insertions underlined and deletions stricken, are as follows:

> (1)  If a developer contracts to sell a condominium parcel . . . , the developer shall pay into an escrow account ~~established with a bank or trust company having trust powers, an attorney who is a member of The Florida Bar, a real estate broker registered under chapter 475, any financial lending institution having a net worth in excess of $5 million, or a title insurance company authorized to insure title to real property in the State of Florida,~~ all payments up to 10 percent of the sale price received by the developer from the buyer towards the sale price. . . .  Default determinations and refund of deposits shall be governed by the escrow release provision of this subsection.  ~~The escrowed funds may be deposited in separate accounts or in common escrow or trust accounts or commingled with other escrow or trust accounts handled by or received by the escrow agent.  The escrow agent may invest the escrow funds in securities of the United States or any agency thereof or in savings or time deposits in institutions insured by an agency of the United States.~~  Funds shall be released from escrow as follows . . .

Fla. Laws c. 84-368, codified as Fla. Stat. § 718.202(2) (1986).

25

Case No. 08-23444-CIV-ALTONAGA/Brown

protected deposit, one for the construction deposit, and one for the reservation deposit – continue to be treated separately.

The Florida Legislature also revised subsection (7), the provision dealing with criminal charges for developers who fail to follow the law.  Here, the Legislature changed the phrase, "Any developer who willfully fails to pay all required funds into the escrow accounts required by this section is . . . ," *id.* § 718.202(7) (1984), by substituting more comprehensive language regarding a developer's handling of the buyer's deposits.  The new language provides,

> Any developer who willfully fails to comply with the provisions of this section concerning establishment of an escrow account, deposits of funds into escrow, and withdrawal therefrom shall be guilty of a felony of the third degree . . . .  The failure to establish an escrow account or to place funds therein shall be prima facie evidence of an intentional and purposeful violation of this section.

*Id.* § 718.202(7) (1986).  In other words, a developer who fails to establish any one – or all three – of the required escrow accounts violates the section.

A final, relatively minor amendment to subsection (8) was made in 1987, when the Legislature included title insurers in the litany of eligible escrow agents.  In addition to making that substantive addition, the introductory language to the subsection was also changed from "(8) All escrow accounts required by this section . . . " to "(8) Every escrow account required by this section . . . ." Fla. Laws. c. 87-117 § 5, codified as Fla. Stat. § 718.202(8) (1988).  This editorial change has no effect because ultimately the escrow account for the protected deposit, the escrow account for the construction deposit, and the escrow account for the reservation deposit must each meet the requirements of subsection (8).

26

Case No. 08-23444-CIV-ALTONAGA/Brown

This historical analysis leads to the same conclusion the Court arrived at in the Summary Judgment Order under a plain reading of the law: the Florida Legislature requires developers and their escrow agents to maintain separate accounts for the protected deposit, the construction deposit, and for the reservation deposit until the purchase agreement is executed, when it becomes subject to the protected and construction deposit provisions. The progression of the statute has been one of increasing protections for the condominium buyer while decreasing the control by both the developer and the escrow agent over the buyer's funds. More importantly, where there was once flexibility afforded to the escrow agent in permitting it to commingle funds, the Legislature eliminated it. Thus, despite Swire and Lawyers Title's arguments to the contrary, the Florida Legislature did not change the requirements that separate accounts be maintained when it demanded that developers use independent escrow agents to secure a buyer's deposits. If anything, the Legislature made the statute even more specific in this regard.

### 3.  Other relevant Florida law and agency opinions

While no court has directly addressed the buyer's option to void a contract due to the developer's failure to maintain separate escrow accounts under section 718.202, Florida courts have discussed the requirements of section 718.202 more generally, recognizing the buyer's right to void under subsection (6).[13] *See, e.g., Barrack*, 462 So. 2d at 1196 (finding section 718.202 to be "in precise and easily understood terms" sufficient to withstand a due process challenge); *Finst Dev.,*

---

[13] Section 711.25, the precursor to section 718.202, was discussed, but was not at issue in *Armetta v. Clevetrust Realty Investors*, 359 So. 2d 540, 541 (Fla. 4th DCA 1978) (denying purchasers recovery of their deposits against lender to condominium project).

Case No. 08-23444-CIV-ALTONAGA/Brown

*Inc. v. Bemaor*, 449 So. 2d 292 (Fla. 3d DCA 1984) (upholding buyers' rescission under section 718.202 and other provisions of chapter 718).

A case especially relevant to the instant matter involved an escrow agent's disbursement of deposits to a developer when purchasers failed to close despite the purchasers' written notice of a dispute between the developer and purchasers.[14]  In *First Sarasota Serv. Corp. v. Miller*, 450 So. 2d 875 (Fla. 2d DCA 1984), the court vacated summary judgment granted in favor of the purchasers who had demanded the return of their deposits under subsection (5) (buyer's option to void) on grounds they provided proper notice to the escrow agent, the escrow agent violated subsection (1) in disbursing the deposits to the developer, and "the developer's acceptance of those funds were improper . . . ."  *Id.* at 876-77.  The trial court had failed to determine if the purchasers were in default under the contract prior to granting summary judgment.  *See id.* at 878.  What is important for purposes of this Order is the appellate court's recognition that the escrow agent's improper actions put the contract at peril.  "[I]f the purchasers were not in default, then the escrow agent's failure to retain the deposits would be a violation of subsection (1)(d) and would bring into play the purchasers' right to void the contracts under section 718.202(5)."  *Id.*

A bankruptcy court has also read section 718.202 to require separate escrow accounts.  *See In re Viking I, Inc.*, 95 B.R. 225 (Bankr. M.D. Fla. 1989).  Despite establishing an agreement with an eligible escrow agent under Florida law, a developer personally retained the deposits tendered by purchasers of preconstruction condominiums.  In considering whether those deposits belonged to the purchasers or to the developer/debtor's bankruptcy estate, the court observed:

---

[14]  Although litigated prior to the 1984 amendments, the issues involve aspects of the law that remain unchanged.

Case No. 08-23444-CIV-ALTONAGA/Brown

> The Statute requires the developer to establish one escrow account controlled by an escrow agent for down payments of up to 10% of the sale price received by the developer from the time-share purchaser and one escrow account likewise controlled by an escrow agent for payments in excess of 10% of the sale price received by the developer from the purchaser prior to closing.

*Id.* at 226-27.

Two statements addressing section 718.202 have been issued by agencies of the State of Florida. The first is a memorandum from the State of Florida Department of Business and Professional Regulation, Office of the General Counsel, addressed to Julie Baker, Chief of the Bureau of Condominium, dated February 12, 1999.[15]   (*See* Notice, Ex. A ("Mem.")).   The memorandum is an informal legal opinion ("ILO") interpreting the term "special escrow account" as it is used in subsection (2), regarding the construction deposit.[16]   (Mem. at 1).   An internal interagency memorandum, it was issued in response to a query by the Director of Condominiums seeking advice on an enforcement action under its rule-making authority.[17]   *See* Fla. Admin. Code Rule 61B.20.006.   It does not address, directly or indirectly, the buyer's option to void for a violation of the statute or the criminal penalties available under the section.

---

[15]   On March 16, 2010, after trial proceedings had closed, Lawyers Title filed a Notice [D.E. 153] submitting the authenticated memorandum. Lawyers Title indicates it received the memorandum from the Department of Business and Professional Regulation on March 8, 2010. Lawyers Title has made no further statement regarding how the Court should consider the document.

[16]   The memorandum bears the following prefatory statement: "The contents of this informal legal opinion may be Attorney-Client work product and may not be subject to the Public Records Act. Please check with OGC-A prior to release." (Mem. at 1).

[17]   This is evident by the opening ("in response to your request") and conclusion ("an enforcement action . . . would not lie . . . .). (Mem. at 1, 4).

Case No. 08-23444-CIV-ALTONAGA/Brown

The ILO reviews the pertinent text of the statute, cites *Barrack*, 462 So. 2d at 1196, and relies on BLACK'S LAW DICTIONARY for definitions of "escrow account," "account," and "special." (*See* Mem. at 2-3). The heart of the analysis is as follows:

> An interpretation of the statute would seem to define a special escrow account as a separate and distinct account established for payments in excess of 10 percent of the sales price. This account is in addition to the escrow account that is established for the 10 percent deposits. It is my understanding from Jon Peet, Financial Administrator for the Division, that in accordance with good accounting principles, the separate accounting of the special escrow funds would comply with the mandates of the statute even if the funds are held by the escrow agent in the same bank account.

(*Id.* at 3). Recognizing that requiring separate bank accounts for the escrow funds "may not be current practice" (*id.*), the ILO concludes that "the requirement of separate escrow accounts may be complied with by separate accounting of the funds placed in escrow for each unit that exceed ten percent of the purchase price from the funds which comprise ten percent of the purchase price," (*id.* at 4).[18]

The Court must first determine what weight the ILO should be afforded in its deliberations. Agency statements may be treated by courts as law and authoritative, given great deference or given no weight at all. *See McKenzie Check Advance of Florida, LLC v. Betts*, 928 So.2d 1204, 1215-16 (2006) (Cantero, J., concurring in part and dissenting in part). The ILO is clearly not the product of formal rule-making, which would require the Court to treat it as law, but Florida does not require that all agency rules be created through the formal rule-making process of the Florida Administrative

---

[18] The evidence presented at trial shows that Lawyers Title's accounting practices pertaining to the Plaintiffs' deposits did not even meet this standard. While Lawyers Title maintained separate accounting records according to client, it did not maintain its records according to purpose. The spreadsheet ledgers and Buyers Transaction Log do not show the purchase price of the unit (an essential factor in determining the appropriate amount of funds assigned to each purpose) nor do they distinguish funds to the reservation deposit, protected deposit or construction deposit.

Case No. 08-23444-CIV-ALTONAGA/Brown

Procedure Act. *See Volusia County Sch. Bd. v. Volusia Homes Builders Ass'n, Inc.*, 946 So. 2d

1084, 1089 (Fla. 5th DCA 2006); Fla. Stat. § 120.52(16). Instead, Florida law defines a rule as an

> agency statement of general applicability that implements, interprets, or prescribes
> law or policy or describes the procedure or practice requirements of an agency and
> includes any form which imposes any requirement or solicits any information not
> specifically required by statute or by an existing rule. . . . The term does not include:
> . . .
>
> (b) Legal memoranda or opinions issued to an agency by the Attorney General
> or agency legal opinions prior to their use in connection with an agency action.

Fla. Stat. § 120.52(16). Additionally, agency rules and regulations must be consistent with statutory

provisions and not amend them by adding words not placed there by the Legislature. *See*

*Commercial Coating Corp. v. State, Dep't of Env. Regulation*, 548 So. 2d 677, 678-79 (Fla. 3d DCA

1989).

      The ILO falls squarely within the exception for agency legal memoranda as it was issued as

advice to the Bureau of Condominiums in crafting enforcement regulations. Even if its purpose was

not in connection with an agency action, the ILO would not meet Florida's standard for non-

promulgated rules. "A court deciding whether a challenged action constitutes a rule analyzes the

action's general applicability, requirement of compliance, or direct and consistent effect of law."

*Volusia*, 946 So. 2d at 1089. This memorandum carries none of the hallmarks of a rule. *See Fla.*

*Dep't of Fin. Servs. v. Capital Collateral Reg'l Counsel-Middle Region*, 969 So. 2d 527, 530-31

(Fla. 1st DCA 2007) (finding legal opinion was not an unpromulgated rule).

      Florida courts generally grant "[a]n agency's interpretation of the statute that it is charged

with enforcing . . . great deference." *Level 3 Commc'ns, LLC v. Jacobs*, 841 So. 2d 447, 450 (Fla.

2003). Deference is afforded only "as long as that interpretation is consistent with legislative intent

Case No. 08-23444-CIV-ALTONAGA/Brown

and is supported by substantial, competent evidence." *Pub. Employees Relations Comm'n v. Dade County Police Benevolent Ass'n*, 467 So. 2d 987, 989 (Fla. 1985); *see also Rizov v. State of Florida, Bd. of Prof'l Eng'rs*, 979 So. 2d 979, 980 (Fla. 3d DCA 2008). The ILO is not consistent with legislative intent nor is it supported by substantial, competent evidence. The ILO fails to consider the plain meaning of the words used by the Legislature, and it adopts the general definition of "account" over the very specific words used by the Legislature in the statute – "special escrow account." While it recognizes the intent of the Legislature "to require separate bank accounts for the escrow funds is an attempt to place specific controls over the bank, real estate broker, attorney or title insurer who is charged with holding the funds," it then dismisses that intent with an observation that it "may not be current practice." (Mem. at 3). For these reasons, the ILO is not entitled to deference by the Court.

A second agency statement, issued more recently than the ILO, also addresses section 718.202. The Division of Florida Land Sales, Condominiums, and Mobile Homes, Department of Business and Professional Regulation rendered a Declaratory Statement ("Statement") under the Florida Administrative Procedure Act, Fla. Stat. § 120.565, interpreting the ownership of interest accruals in the special escrow account. *See In re: Petition for Declaratory Statement, Castillo Grand Residences*, BPR-2003-00874, Docket No. CD2002.064, March 26, 2003. In restating the requirements of section 718.202, the agency repeatedly observes that the statute requires interest be held "in escrow *accounts*" and refers to the "special escrow *account*." *Id.* at ¶¶ 3, 7-8 (emphasis added). Relying on *Barrack*, 462 So. 2d at 1196, the agency states, "Florida courts have found section 718.202, Florida Statutes to be clear on its face." *Id.* at ¶ 9. The Statement concludes by

32

Case No. 08-23444-CIV-ALTONAGA/Brown

quoting *First Sarasota*, where "the court followed what it termed the 'plain meaning' of the statute and the express legislative intent and found that the purpose of section 718.202, Florida Statutes, was to 'protect purchasers under preconstruction condominium contracts from loss of their deposits should the developers fail to perform its contractual obligations.'" *Id.* (quoting 450 So. 2d at 878).

While declaratory statements are generally "accorded great deference, unless there is clear error or conflict with the intent of a statute," *Sans Souci v. Div. of Fla. Land Sales & Condo., Dep't of Bus. Reg.*, 421 So. 2d 623, 626 (Fla. 1st DCA 1982), that deference may not extend to dicta. Nonetheless, the dicta in the Statement suggest that the agency understands the statute to require separate accounts and to be unambiguous.

### 4. Summary

This review of the text of section 718.202, its legislative history, relevant case law and agency statements reaffirms the conclusion reached in the Summary Judgment Order: Florida law requires developers of preconstruction condominiums to maintain separate escrow accounts for the deposits of buyers. The Court recognizes, as did the court in *Barrack*, that this legislative scheme may not be the simplest, the best, or even the most efficient method of protecting buyers' deposits, but under Florida law, "the judiciary has an obligation . . . to construe statutory pronouncements in strict accord with the legislative will, so long as the statute does not violate organic principles of constitutional law." *Sebring Airport Auth. v. McIntyre*, 783 So. 2d 238, 244 (Fla. 2001) (footnote call numbers omitted); *Price v. Time, Inc.*, 416 F.3d 1327, 1334 (11th Cir. 2005) ("The goal of a federal court deciding a state law issue is to resolve it the same way the state's highest court would."). "The courts have no veto power, and do not assume to regulate state policy; but they

33

Case No. 08-23444-CIV-ALTONAGA/Brown

recognize and enforce the policy of the law as expressed in valid enactments . . . ." *Sebring Airport Auth.,* 783 So. 2d at 245 (quoting *City of Jacksonville v. Bowden*, 64 So. 769, 772 (Fla. 1914)).  The policy espoused in section 718.202 is that developers must establish separate escrow accounts for the protected and construction deposits of condominium buyers.  Until the Florida Legislature changes the law or an agency with an appropriate delegation of authority establishes a rule that does not contravene the plain language of the statute, Florida law requires developers to keep a buyer's protected deposits in a separate account from the construction deposits.

**B.      Swire's and Lawyers Title's Affirmative Defenses**

Swire and Lawyers Title raise several affirmative defenses.  They maintain Plaintiffs did not properly terminate the Purchase Agreement because: (1) a violation of section 718.202 only renders the contract voidable – not void; (2) the Defendants' violation of section 718.202 was technical and did not violate the purpose of the statute; and (3) Plaintiffs' termination was improper as it was untimely and barred by waiver, laches and estoppel.  The issues underlying the affirmative defenses relate directly to the remedy sought by Plaintiffs against Lawyers Title: a judgment "that Lawyers Title must release the escrowed funds, plus any accumulated interest, to Ms. Rodriguez." (Am. Compl. ¶ 76).

Of the four conditions for the release of escrow funds outlined in section 718.202(1), two are relevant here:

Funds shall be released from escrow as follows:

(a) If a buyer properly terminates the contract pursuant to its terms or pursuant to this chapter, the funds shall be paid to the buyer together with any interest earned.

34

Case No. 08-23444-CIV-ALTONAGA/Brown

. . .

> (d) If the funds of a buyer have not been previously disbursed in accordance with this subsection, they may be disbursed to the developer by the escrow agent at the closing of the transaction, *unless* prior to the disbursement the escrow agent receives from the buyer *written notice of a dispute* between the buyer and developer.

Fla. Stat. § 718.202(1) (emphasis added).

Plaintiffs initially notified Lawyers Title of their dispute with Swire on October 1, 2008 by written correspondence when they advised Lawyers Title of their intent to cancel the Purchase Agreement and directed that their deposits not be released to Swire.  Plaintiffs' action triggered subsection (1)(d), effectively barring Lawyers Title from disbursing the funds.  However, in order to have the escrowed funds distributed to Plaintiffs under subsection (1), Plaintiffs must have properly terminated the contract "pursuant to its terms or pursuant to this chapter . . . ."  Because Plaintiffs have since exercised their option to void under subsection (5), they seek the release of their escrow deposits under subsection (1)(a).

### 1.  The contract is voidable by the buyer

Swire and Lawyers Title argue section 718.202(5) renders the Purchase Agreement voidable – not void, and because it is a voidable contract, they must be permitted an opportunity to cure.[19]

Section 718.202(5) states:

> The failure to comply with the provisions of this section renders the contract voidable by the buyer, and if voided, all sums deposited or advanced under the contract shall be refunded with interest at the highest rate then being paid on savings accounts, excluding certificates of deposit, by savings and loan associations in the area in which the condominium property is located.

---

[19] Defendants acknowledge, however, they cannot cure because the funds for construction have already been disbursed.

Case No. 08-23444-CIV-ALTONAGA/Brown

The statute clearly places the power to avoid the contract in the hands of the buyer and sets only one specific condition: "[t]he failure to comply with the provisions of this section . . . ." *Id.*

"A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract . . . ." RESTATEMENT (SECOND) OF CONTRACTS, § 7. "The propriety of calling a transaction a voidable contract rests primarily on the traditional view that the transaction is valid and has its usual legal consequences until the power of avoidance is exercised." *Id.* at Comment e. Defendants cite *Pitts v. Pastore*, 561 So. 2d 297 (Fla. 2d DCA 1990), for the proposition that the language of subsection (5) renders the contract voidable – not void. As the *Pitts* court noted:

> The term 'void,' . . . has not at all times been used with technical precision, nor restricted to its peculiar and limited sense, as contradistinguished from 'voidable'; it being frequently introduced, even by legal writers and jurists, when the purpose is nothing further than to indicate that a contract was invalid, and not binding in law.

*Id.* at 300. The court then went on to recognize the several literal variations of "void" used by other Florida courts to address the issue in that case. *Id.*

The Purchase Agreement is not void *ab initio*, or void on its face. Rather, it is a voidable contract, and in the instant case, voiding the contract is an option to be exercised by the buyers granted by Florida law in section 718.202(5). The Florida Condominium Act uses the same words, "voidable by buyer" to permit buyers to terminate their purchase agreements for a number of other reasons (i.e., no-fault cancellations, developer's failure to disclose, material alteration or modification). *See* Fla. Stat. § 718.503(1). Florida courts have read these words to mean the buyer has a "statutory right to rescind a contract" and have allowed buyers to unilaterally avoid the purchase agreements. *McGuinness v. Prospect Aragon, LLC*, 981 So. 2d 496, 498 (Fla. 3d DCA

Case No. 08-23444-CIV-ALTONAGA/Brown

2008); *see also*, *Mastaler v. Hollywood Ocean Group, L.L.C.*, 10 So. 3d 1114 (Fla. 4th DCA 2009); *Finst Dev., Inc.*, 449 So. 2d at 292.

Defendants nevertheless assert that the law allows them an opportunity to cure. To suggest as much turns the plain meaning of the law on its head and ignores the deterrent and remedial purposes of the statute. Defendants rely on *District Bd. of Trustees v. Morgan*, 890 So. 2d 1155 (Fla. 5th DCA 2005), a dispute between a college and two architects, where the college sought to avoid the contract for the architects' non-compliance with Florida law. The court found the contract to be voidable and not void, and allowed the architects an opportunity to cure. *Id.* at 1159. *Morgan* is distinguishable from the present case because in *Morgan* the statute that permitted voidability for non-compliance "was not intended by the legislature to assure that all architects working in Florida are licensed." *Id.* "Rather, a plain reading of [the non-compliance statute] indicates that its intention is to avoid a misrepresentation regarding the composition of architectural business entities that enter contracts for work on Florida projects." *Id.* In the instant case, Plaintiffs sue under a statute where the clear intention of the Legislature was to dissuade developers from mismanaging a buyer's deposits by giving the buyer the option to avoid the contract if the developer violated the statute.

The historical development of section 718.202 confirms subsection (5) was meant to serve as a private enforcement mechanism against developers. As designed, developers risk losing a contract on which they may have acted in reliance (and at potentially great cost) by failing to protect a buyer's deposits in the manner the Legislature demanded. While a willful violation would place a developer at risk of criminal prosecution under subsection (7), any violation means a buyer may avoid the contract, imposing an economic loss on the developer. The Legislature "has broad

37

Case No. 08-23444-CIV-ALTONAGA/Brown

discretion to fashion such remedies as it deems necessary to protect the interests of the parties involved." *Century Village*, 361 So. 2d at 133. And "remedial statutes should be liberally construed in favor of granting access to the remedy provided by the Legislature," *Golf Channel v. Jenkins*, 752 So. 2d 561, 565-66 (Fla. 2000), with "statutory limitations on remedial statutes . . . narrowly construed," *id.* at 566. Section 718.202(5) affords Plaintiffs the right to avoid the contract because their deposit funds were not maintained in accord with Florida law, and Defendants are not provided an opportunity to cure.

### 2. The violation was a technical one

Swire and Lawyers Title raise the defense that the violation was a technical one that should excuse them from liability. They rely on *Gates v. Chrysler Corp.*, where the court found that a car dealer's omission of one sentence required by the Magnuson-Moss Warranty Act ("Warranty Act"), 15 U.S.C. § 2301, "was at most a technical one and contributed not at all to appellant's damages." 397 So. 2d 1187, 1189 (Fla. 4th DCA 1981). The Warranty Act is quite different, however, from section 718.202 in that the Warranty Act requires a showing of damages. *See* 15 U.S.C. § 2310(d)(3)(A) (consumer suits limited to cases where damages exceed $25.00). Section 718.202(5) does not require the buyer show damages because it is designed to deter developers from doing just that – damaging a buyer by misusing, mishandling or even stealing the buyer's deposits. Here, the Defendants' "technical" violations go to the heart of a detailed legislative scheme designed to protect the assets of consumers.

The Defendants also point to *First Sarasota*, an appeal by a developer and escrow agent of a summary judgment order in favor of the purchasers where the court, in addressing section 718.202,

Case No. 08-23444-CIV-ALTONAGA/Brown

stated, "we must apply the statute in a realistic, common sense manner that will preserve the basic contract rights of the parties while affording the purchasers the protection the legislature intended."[20] 450 So. 2d at 877.  The issue on appeal involved a key factual issue left unresolved by the trial court on summary judgment, namely, "whether there was a default by the purchasers."  *Id.* at 878.  *First Sarasota* was not a case where the appellate court ignored the "plain meaning of the statute in light of express legislative intent" in favor of common sense; the court simply remanded the case for a factual determination central to the case.  *Id.* at 877.

Swire and Lawyers Title suggest their technical violations of section 718.202 should be ignored by the Court on a theory of "no harm, no foul."  Because the buyers suffered no damage and their deposits were not lost, the Defendants maintain they fulfilled the intent of the statute.  This circular reasoning would have a buyer wait until her assets are lost before she can act under section 718.202.  To accept this theory would produce an absurd result and ignore the very design of the statute – to forestall losses by purchasers.  *See Palm Beach County Canvassing Bd. v. Harris*, 772 So. 2d 1273, 1287 (Fla. 2000) ("A statutory provision will not be construed in such a way that it renders meaningless or absurd any other statutory provision.").

### 3.  Timeliness, waiver, laches and estoppel

Swire and Lawyers Title also argue Plaintiffs are barred by Plaintiffs' lack of timeliness, waiver, laches and estoppel.  Section 718.202 operates from the time a prospective purchaser makes a reservation deposit with a developer until either a proper termination by the buyer, a default by the purchaser, or a closing on the unit.  *See* Fla. Stat. § 718.202(1).  To suggest otherwise would

---

[20] Defendants' knowledge and awareness of this case is particularly relevant given the discussion *infra* at note 22.

Case No. 08-23444-CIV-ALTONAGA/Brown

undermine the intent and purpose of the statute which is to protect the buyer's deposits.[21]

On February 24, 2009, Plaintiffs sent Swire a letter exercising their right to void under section 718.202(5).   As of that date, Plaintiffs had neither defaulted nor closed on the condominium.[22]   Therefore, Plaintiffs exercised their option to void the Purchase Agreement in a timely manner.

_____

[21]   Defendants cite section 718.503 as limiting a buyer's option to void to a 15-day window, known as the "cooling-off period," following acceptance of the purchase agreement.   *See* Fla. Stat. § 718.503(1)(a)(1).  Titled, "Contents of contracts," section 718.503 – like section 718.202 – mandates specific contractual language and allows buyers the right to void in the event of a material change.  While limiting a buyer's right to void to 15 days may make sense when mandatory language is incorrectly located in, but not omitted from a contract, *see Zambrano*, 2009 WL 1585980, at *1-2, it does not apply here because to do so would make subsection (5) superfluous and frustrate the clear intent of the Legislature.  *See Fleischman v. Dep't of Prof'l Reg.*, 441 So. 2d 1121, 1123 (Fla. 3d DCA 1983) ("Every statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts.") (citation omitted).   Moreover, section 718.503(a)(1) also requires the following contractual statement in conspicuous type: "BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING." Fla. Stat. 718.503(a)(1).

[22]   This case might have looked more like *First Sarasota* had Swire or Lawyers Title established either at summary judgment or at trial that Plaintiffs defaulted by failing to close.  *See* 450 So. 2d at 875 (vacating summary judgment and remanding to determine whether plaintiffs had defaulted).  While Swire alleged Plaintiffs' default as an affirmative defense in its Answer to the Amended Complaint, it did not pursue this defense or present any evidence at summary judgment.

Lawyers Title generally alleged Plaintiffs' default in its Counterclaim (*see* Countercl. ¶ 16), which Swire admitted and Plaintiffs denied.  (*See* Swire's Answer to Def. Lawyers Title's Countercl. ¶ 16; Pls.' Reply to Lawyers Title's Affirm. Defenses & Answer, Defenses, & Affirm. Defenses to Lawyers Title's Countercl. at 4).  But no evidence was introduced to show that Plaintiffs defaulted (i.e., notice of closing date and receipt thereof by Plaintiffs and their failure to close; actions by Swire conforming with paragraphs 8-9 of the Purchase Agreement; a demand by Swire on Lawyers Title for the deposits under section 718.202(1)(b); or an affirmative act showing Swire cancelled under paragraph 13 of the Agreement).  The only fact in evidence – specifically, the retention of Plaintiffs' deposit by Swire's closing agent – suggests that negotiations between the parties were ongoing until Plaintiffs notified Lawyers Title of the dispute.

Whether Plaintiffs were in default was not a fact in dispute at summary judgment, nor was it an issue addressed or proved at trial.  Clearly, Plaintiffs would not have been able to exercise their right to void in February 2009 had they defaulted prior to that date because Plaintiffs would have been the parties in breach.

Case No. 08-23444-CIV-ALTONAGA/Brown

The defenses of waiver, laches and estoppel are also ineffective here. Plaintiffs have enjoyed no benefit of the contract nor have they taken any action that would constitute waiver. Lawyers Title points to the lapse of time between May 2005, when Plaintiffs completed the tender of their deposits, and February 24, 2009, when Plaintiffs formally notified Swire that they were voiding the contract as grounds for laches and waiver. However, Plaintiffs did not fully discover the violation of section 718.202 until after they commenced litigation, after which they filed an amended complaint to include Count II. Finally, to allow estoppel because Lawyers Title disbursed part of the funds to Swire, which Swire then used for construction, would be to undermine the enforcement mechanism intended by the Legislature. In short, Swire's and Lawyers Title's affirmative defenses fail.

**C.     Remedies under Section 718.202**

Plaintiffs seek the return of their deposits with interest under section 718.202(5) and an award of attorney's fees and costs. In the event the statute is violated, "all sums deposited or advanced under the contract shall be refunded with interest at the highest rate then being paid on savings accounts, excluding certificates of deposit, by savings and loan associations in the area in which the condominium property is located." Fla. Stat. § 718.202(5). If a buyer properly terminates as Plaintiffs have done, section 718.202(1)(a) further directs that the funds in escrow "be paid to the buyer together with any interest earned." Plaintiffs are entitled to the full return of their deposits.

Plaintiffs tendered deposits in the amount of $232,000.00 and are entitled to the return of those funds with interest. Of that amount, $116,000.00 currently remains in escrow with Lawyers Title where it has accrued $404.38 in interest. Lawyers Title shall release the entire amount it

Case No. 08-23444-CIV-ALTONAGA/Brown

currently holds in escrow, $116,404.38, and any additional interest that may have accrued during this litigation to Plaintiffs.

Plaintiffs are also entitled to (a) the balance of $116,000.00, which was previously disbursed by Lawyers Title to Swire for construction purposes; (b) interest on the entire amount," *see id.* § 718.202(5); and (c) attorney's fees and costs under the Purchase Agreement.  The Purchase Agreement provides that "[i]n the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys', paralegals [sic] and para-professionals [sic] fees and court costs at all trial and appellate levels."  (Findings, Ex. 1, ¶ 16).

Lawyers Title also seeks attorney's fees and costs.  Two sections of the Escrow Agreement between Swire and Lawyers Title are particularly relevant here:

> 5.     Escrow Agent may consult with counsel of its own choice and shall have full and complete authority and protection for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel.  Escrow Agent shall not be liable for any mistakes of fact or errors of judgment, or for any acts or omissions of any kind unless caused by its misconduct or gross negligence, and Developer agrees to indemnify and hold Escrow Agent harmless from and against any claims, demands, causes of action, liabilities, damages, judgments, including the cost of defending any action against it together with any reasonable attorneys' fees incurred therewith, in connection with Escrow Agent's undertaking pursuant to the terms and conditions of this Escrow Agreement, unless such action or omission is a result of the misconduct or gross negligence of Escrow Agent.

> 6.     In the event of a good faith disagreement about the interpretation of this Agreement, or about the rights and obligations, or the propriety, of any action contemplated by Escrow Agent hereunder, Escrow Agent may, at its sole discretion file an action in interpleader to resolve said disagreement.  Escrow Agent shall be indemnified by Developer for all costs, including reasonable attorneys' fees, in connection with the aforesaid interpleader action.  No such action shall be filed where the Escrow Agent's required course of action is clearly dictated herein.

42

Case No. 08-23444-CIV-ALTONAGA/Brown

(Findings, Ex. 2).  The Escrow Agreement provides broad protection to Lawyers Title.  Swire has agreed to indemnify Lawyers Title except for "misconduct or gross negligence" or "where the Escrow Agent's required course of action is clearly dictated herein."  *Id.*  Swire introduced no evidence to show Lawyers Title engaged in misconduct or gross negligence, nor did it present any other ground suggesting Lawyers Title's required course of action was clearly outlined in the Escrow Agreement.

Because Swire has agreed to indemnify Lawyers Title, Swire must bear the costs due Plaintiffs.  This includes (a) returning the balance of Plaintiffs' deposits, $116,000.00; (b) paying the interest on Plaintiffs' deposits afforded by section 718.202(5), which shall be calculated from each individual date of deposit; and (c) Plaintiffs' attorney's fees and costs.  Lawyers Title, in its interpleader action, also seeks attorney's fees and costs, and under the Escrow Agreement it is entitled to be indemnified by Swire for its reasonable fees and costs.

Plaintiffs' deposits for a preconstruction condominium were not maintained according to Florida law, and Defendants have failed to prove their affirmative defenses.  For the reasons explained, it is

**ORDERED AND ADJUDGED** that

1. Final Judgment will be entered by separate order in favor of Plaintiffs, Double AA International Investment Group, Inc. and Daymi Rodriguez, and against Defendants, Swire Pacific Holdings, Inc. and Lawyers Title Insurance Corporation, on Count II of the Amended Complaint.

Case No. 08-23444-CIV-ALTONAGA/Brown

2.  Defendant, Swire Pacific Holdings, Inc., shall pay $116,000.00 to Plaintiffs within thirty (30) days of the date of this Order.

3.  On its Counterclaim for Interpleader, Lawyers Title Insurance Corporation shall return all of the Plaintiffs' deposits currently held in escrow with accumulated interest to Plaintiffs within thirty (30) days of the date of this Order.

4.  Plaintiffs, Double AA International Investment Group, Inc. and Daymi Rodriguez, and Defendant, Lawyers Title Insurance Corporation, are awarded reasonable attorney's fees and costs to be borne by Defendant, Swire Pacific Holdings, Inc..

5.  Plaintiffs' Motion for Voluntary Dismissal of Count II of the Amended Complaint Against Lawyers Title with Prejudice and Motion for Leave to Amend Answer, Defenses, and Affirmative Defenses **[D.E. 142]**, filed after the trial commenced, is **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of March, 2010.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

44